Hon. Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SCOTT MILLER, an individual, MICHAEL SPAULDING, an individual,<br><br>                                   Plaintiffs,<br><br>     v.<br><br>KSHAMA SAWANT, an individual, CITY OF SEATTLE, a municipal corporation,<br><br>                                   Defendants. | Case No. 2:18-cv-00506-MJP<br><br>**DEFENDANT KSHAMA SAWANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Noted for Consideration: February 3, 2023** |

MOTION FOR SUMMARY JUDGMENT
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400 **BARNARD**

SEATTLE, WASHINGTON 98119 **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132 **LAVITT LLP**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 1

   I.   Seattle Police officers Scott Miller and Michael Spaulding shot and killed Che Andre Taylor on February 21, 2016. ......................................................................................... 1

   II.  Seattle City Councilmember Kshama Sawant commented publicly on the death of Che Taylor on February 25, 2016. ................................................................................ 5

   III.  SPD investigated the Taylor killing. ......................................................................... 6

   IV.  A King County coroner's inquest was held into the cause of death of Che Taylor. ........... 7

   V.  The King County Prosecutor declined to charge Miller or Spaulding. .............................. 8

   VI.  Councilmember Sawant briefly mentioned the killing of Che Taylor in a second speech on June 20, 2017. ..................................................................................... 9

   VII.  The Taylor family sued Miller, Spaulding, and the City of Seattle for Che Taylor's wrongful death. ..................................................................................... 11

EVIDENCE RELIED UPON ............................................................................................. 12

LEGAL STANDARD ........................................................................................................ 12

ARGUMENT ..................................................................................................................... 12

   I.   Plaintiffs have failed to establish a prima facie case of defamation under state law. ........ 12

      A.   Plaintiffs cannot prove that Councilmember Sawant's speeches contained any false statements of fact. .......................................................................... 13

         1.   Sawant's statements were protected expressions of opinion. ............................... 13

         2.   Plaintiffs cannot prove that what Sawant said was false, because what she said was substantially true. ................................................................................ 18

      B.   Plaintiffs cannot establish that Sawant's statements were "unprivileged." ............... 20

         1.   The Court should find Sawant's statements were protected by an absolute legislative privilege. ................................................................................ 20

         2.   The Court should find that Sawant's statements were protected by an absolute privilege to criticize police officers' use of force. ................................................. 22

      C.   Plaintiffs cannot show that Sawant acted with "actual malice." ................................. 23

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

D.    Plaintiffs cannot prove that Sawant's statements caused them any harm...................24

E.    Plaintiffs cannot establish that Sawant's statements were made "of and concerning" them..........................................................................................................................26

II.   Sawant's statements are protected by the Washington State Constitution. .....................27

A.    The Washington Constitution protects Sawant's right to call a police killing a "murder," because she did not "abuse" the right "to freely speak." .............................................28

B.    Imposing civil liability for defamation for calling a police killing a "murder" would lead to self-censorship and function as a prior restraint on speech............................28

III.  Summary judgment is warranted on Plaintiffs' state-law outrage claim. .........................29

CONCLUSION...................................................................................................................29

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

**TEL** 800.238.4231 | **FAX** 206.378.4132   **LAVITT LLP**

1

**INTRODUCTION**

Seattle Police officers Scott Miller and Michael Spaulding shot and killed Che Andre Taylor, an unarmed Black man, in February 2016. Whether their killing of Taylor was justified was widely disputed. Some, including Seattle City Councilmember Kshama Sawant, called Taylor's death a "murder." Miller and Spaulding sued Sawant in 2018 for state-law defamation and outrage, and "federal defamation." Their federal defamation claim was dismissed, and Sawant now moves for summary judgment on the remaining state-law claims. Summary judgment should be granted because Plaintiffs have failed to establish the essential elements of defamation under Washington law, and because Sawant's speech was protected by the Washington Constitution.

**STATEMENT OF FACTS**

**I.      Seattle Police officers Scott Miller and Michael Spaulding shot and killed Che Andre Taylor on February 21, 2016.**

On the afternoon of Sunday, February 21, 2016, Seattle Police officers Scott Miller and Michael Spaulding were conducting surveillance of an apartment building at the intersection of NE 85th Street and 21st Avenue NE in Northeast Seattle. Iglitzin Decl. Ex. 1 at 18, 27 (Force Investigation Report). Miller and Spaulding were sitting in an unmarked, undercover police vehicle, a silver Chevrolet Trailblazer, parked on the west side of 21st Avenue, facing north toward the apartment building. Iglitzin Decl. Ex. 2 at 3 (CSI Scene Report). Miller was in the driver's seat; Spaulding was in the front passenger seat. Iglitzin Decl. Ex. 3 at 997:2–4 (Inquest Transcript). They were dressed in plainclothes, not police uniforms. Iglitzin Decl. Ex. 2 at 3.

At about 3:38 PM, a black Dodge Magnum drove past Miller and Spaulding from the south and parked on the opposite (east) side of 21st Avenue, just south of the intersection with 85th Street. Iglitzin Decl. Ex. 1 at 18. When the driver of the black Dodge exited the vehicle, both Miller and Spaulding recognized him as Che Andre Taylor, whom they knew as "Che T." *Id.* Taylor, a forty-six year-old Black man, stood at 6'2" tall and 232 pounds. *Id.* at 8. He was wearing black pants, a belt, a long-sleeve shirt, and a black vest. *Id.* at 18; Iglitzin Decl. Ex. 2 at 15.

MOTION FOR SUMMARY JUDGMENT - 1
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

As Taylor got out of the black Dodge, he stood beside the car for a moment, facing east. Iglitzin Decl. Ex. 3 at 1238:20–25. His black vest rode up, out of place, before he pulled it back down. *Id.* at 1239:2–14. From his position in the driver's seat of the unmarked Trailblazer, Miller claimed that, in that moment, he saw a small black handgun in a holster on Taylor's right hip, before Taylor covered it with his vest. *Id.* at 1239:15–17; Iglitzin Decl. Ex. 1 at 18. Taylor then walked up 21st Avenue and entered the apartment Miller and Spaulding were surveilling. *Id.* at 19. Spaulding did not see the gun, but Miller told him what he saw. Iglitzin Decl. Ex. 3 at 1006:13–1007:12. Miller and Spaulding decided to arrest Taylor for being a felon allegedly in possession of a handgun. Iglitzin Decl. Ex. 1 at 18.

At 3:44 PM, Miller and Spaulding requested additional officers' assistance to arrest Taylor. *Id.* at 7. Officers Timothy Barnes and Audi Acuesta responded and agreed to assist. *Id.* at 19. Both were in uniform, and were in a marked SPD patrol vehicle. Iglitzin Decl. Ex. 4 at 1 (Barnes Use of Force Report), Ex. 5 at 1 (Acuesta Use of Force Report). Another officer, Chuck Miller, also responded. Iglitzin Decl. Ex. 1 at 19. Chuck Miller was in plainclothes, driving an unmarked vehicle. *Id.*; Iglitzin Decl. Ex. 6 at 1 (Miller Use of Force Report). The original plan was to arrest Taylor when he left the apartment building and before he reached the black Dodge Magnum. Iglitzin Decl. Ex. 1 at 19. Miller and Spaulding decided to use their "long guns"—a rifle and shotgun—to arrest Taylor, and Spaulding retrieved them from the rear of the Trailblazer. *Id.* at 20.

Taylor left the apartment about 20 minutes later, at 4:03 PM, but did not return to the black Dodge; he stood outside the building talking to several other unidentified people. *Id.* At that point, another vehicle parked in front of Miller and Spaulding, blocking their view of Taylor. *Id.* At 4:14 PM, Miller radioed that they had lost sight of Taylor. *Id.* One minute later, a white Ford Taurus drove past Miller and Spaulding from the south on 21st Avenue, and parked immediately behind the black Dodge Magnum. *Id.* at 21. In addition to the driver, there were two passengers in the white Taurus, one of whom was Taylor. *Id.* Taylor got out of the front passenger seat of the Taurus and stood between the open car door and the passenger compartment, facing west, talking to the

MOTION FOR SUMMARY JUDGMENT - 2
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

driver and other passenger. *Id.* Miller and Spaulding saw that it was Taylor and decided to make the arrest, directing officers Barnes and Acuesta, and officer Chuck Miller, to move in. *Id.*

As Acuesta and Barnes approached from the west in their marked patrol vehicle, and Chuck Miller approached from the east in his unmarked car, Miller and Spaulding exited their undercover vehicle and crossed the street, rounded the back of the white Taurus, and approached Taylor. Iglitzin Decl. Ex. 3 at 1038:22–1039:22; Iglitzin Decl. Ex. 6 at 1. Acuesta positioned the marked patrol vehicle in the middle of 21st Avenue, facing the white Taurus at a diagonal. Iglitzin Decl. Ex. 5 at 1; *see also* Iglitzin Decl. Ex. 2 at 4 (photo of the scene). Acuesta and Barnes's patrol vehicle was equipped with a dashboard video camera. Iglitzin Decl. Ex. 5 at 1.

Miller and Spaulding were wearing black SPD jackets with police markings on the back and chest, and were carrying their long guns up and in front of them, at least partially obscuring the lettering on their chests. Iglitzin Decl. Ex. 3 at 1190:13–1191:20. Spaulding carried the rifle; Miller, the shotgun. *Id.* at 1014:19–1015:2. Spaulding reached Taylor first, called him by name, "Che," and surprised him. *Id.* at 1039:23–1040:5. Miller, too, called out to Taylor by name, as "Che T." *Id.* at 1279:12. Both Miller and Spaulding ordered Taylor to show his hands and get on the ground. *Id.* at 1040:2–6, 1315:16.

Taylor appeared to comply with the officers' commands—he raised his hands, then moved toward the ground. *Id.* at 1040:14–18, 1074:6–7, 1194:11–25; Iglitzin Decl. Ex. 7 (SPD Video). As Taylor lowered himself to the ground, he was obscured from the camera's view by the white Taurus. Iglitzin Decl. Ex. 7. Miller and Spaulding claimed that, at that point, they perceived Taylor's right arm to move in a manner that indicated Taylor was attempting to draw the handgun that Miller (but not Spaulding) claimed to have seen in a holster on Taylor's hip roughly 30 minutes earlier. Iglitzin Decl. Ex. 3 at 1040:21–1041:12, 1257:16–1258:3. Spaulding fired his rifle six times while standing over Taylor at close range. *Id.* at 1160:9–20, 1207:16–19; Iglitzin Decl. Ex. 1 at 21. Miller fired his shotgun once. Iglitzin Decl. Ex. 1 at 21. Fifteen seconds elapsed between the time Miller and Spaulding radioed the other officers to move in and arrest Taylor and the time

MOTION FOR SUMMARY JUDGMENT - 3
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

that officer Acuesta radioed "Shots fired!" *Id.* at 8, 21. Taylor was later transported to the hospital where he was pronounced dead within the hour. *Id.* at 22.

Neither Miller nor Spaulding ever saw a gun in Taylor's hand. Iglitzin Decl. Ex. 3 at 1098:2–5, 1266:22–23. Miller was unequivocal that no one beside him had *ever* seen the gun he alleged Taylor was carrying. *Id.* at 1278:8–10. Taylor was also out of Miller and Spaulding's sight for a significant amount of time, between 20–30 minutes. *See* Iglitzin Decl. Ex. 1 at 7–8. An empty holster was found at the scene—a type that "can be removed without undoing a belt." Iglitzin Decl. Ex. 2 at 7. No gun was found on Taylor's person. Iglitzin Decl. Ex. 3 at 888:18–25. A handgun was recovered from underneath the passenger seat of the white Taurus. Iglitzin Decl. Ex. 8 at 4 (CSI Vehicle Report). It was found with the barrel facing the front of the car, covered in debris displaced when Miller fired his shotgun and the slug struck and passed through the passenger seat. *Id.* at 4, 6–8; Iglitzin Decl. Ex. 3 at 1525:7–25. There was no blood on the gun or the holster. Iglitzin Decl. Ex. 3 at 1551:3–6. Fingerprints and DNA taken from the gun, magazine, and ammunition could not be matched to Taylor. *Id.* at 1551:10–1552:13, 1552:23–1553:1. The gun was not purchased by or registered to Taylor. *Id.* at 1548:16–20, 1550:6–10. The gun was traced to its previous owner, Daniel Murphy, a former King County Sheriff's Deputy, but no explanation for how it ended up in the Ford Taurus was found. Iglitzin Decl. Ex. 1 at 44; Iglitzin Decl. Ex. 9.

SPD released video footage taken from Acuesta and Barnes's patrol vehicle to the public on February 22, 2016, one day after the shooting. Iglitzin Decl. Ex. 7. That video is one minute long, beginning shortly before Acuesta and Barnes arrived at the scene and ending after Spaulding and Miller shot Taylor. *See id.* The following day, SPD identified Miller and Spaulding as the officers that shot Taylor. *See* Iglitzin Decl. Ex. 10. The video sparked "outrage" by community members—at a February 24 press conference with the Taylor family, the President of the Seattle King County NAACP, Gerald Hankerson, described Taylor's death as a "coldblooded murder" and an "execution." *Id.* "It was clear to me that they came with the intent to kill, not to arrest," Hankerson said. *Id.*

18 WEST MERCER ST., STE. 400

SEATTLE, WASHINGTON 98119

TEL 800.238.4231 | FAX 206.378.4132

BARNARD

IGLITZIN &

LAVITT LLP

## II.    Seattle City Councilmember Kshama Sawant commented publicly on the death of Che Taylor on February 25, 2016.

Four days after Miller and Spaulding shot and killed Che Taylor, on February 25, 2016, around 100 people gathered in downtown Seattle outside SPD headquarters to protest the killing. Iglitzin Decl. Ex. 11. Protesters demanded that criminal charges be filed against the officers, and called for the Chief of SPD to be fired. *Id.* The SPD headquarters building is across the street from City Hall. Sawant Decl. ¶ 3.

Seattle City Councilmember Kshama Sawant was in her office at City Hall when the protest began. *Id.* ¶ 7. Sawant felt it was important, as a sitting Councilmember, to address the protesters. *Id.* She left her office and went outside to speak to them. *Id.* Many people present that day, including some of the speakers, called Che Taylor's death a "murder." *Id.* ¶ 8. Several other people spoke at the protest; Sawant decided to speak, as well. *Id.* ¶ 9.

Sawant has represented District 3 on the City Council since 2014. *Id.* ¶ 2. Councilmember Sawant has been outspoken in her criticism of police violence against people of color, and has been active in attempting to improve police accountability through legislative and policy work. *Id.* ¶ 4. Sawant has also publicly supported SPD's right to engage in collective bargaining. *Id.* She has heard many people describe police killings of Black people and other people of color as "murder," even before Che Taylor's death. *Id.* ¶ 5. In her experience, community members and laypeople do not use the term "murder" in a technical, legal sense, but to express a belief that a police killing is unjustified and should be subject to criminal prosecution. *Id.* Sawant is not a lawyer and has no formal legal education. *Id.*

When Councilmember Sawant spoke at the February 25 protest, she began by connecting the protest to a larger movement against racial injustice in Seattle and across the nation. Iglitzin Decl. Ex. 12 at 2:5–8 (Feb. 25, 2016 Speech Transcript). As other speakers had before her, Sawant described Taylor's death as a "murder," stating: "The brutal murder of Che Taylor, just a blatant murder at the hands of the police, shows how urgently we need to keep building our movement for basic human rights for [B]lack people and brown people." *Id.* at 2:8–12. Sawant was using the term "murder" as the others present that day used it—not in a technical, legal sense, but to express

MOTION FOR SUMMARY JUDGMENT - 5
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400    **BARNARD**
SEATTLE, WASHINGTON 98119    **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

a shared belief that Taylor's death was wrongful and should be considered criminal. Sawant Decl. ¶¶ 8–9. Sawant believed this to be true based on the video footage of the shooting released by SPD and her discussions with community members, including Gerald Hankerson, and those present at the protest. *Id.* ¶ 9. Sawant also believed it was important to act in solidarity with the protesters by using the same language. *Id.*

Councilmember Sawant assured the protesters that, "as an elected official, as a brown person, as an immigrant woman of color and as somebody who has been in solidarity with the Black Lives Matter movement and our movement for racial, economic and social justice," she was there "as an elected official because" she was "completely committed . . . to holding the Seattle Police Department accountable." Iglitzin Decl. Ex. 12 at 2:13–24. Sawant continued: "We need justice on the individual actions, and we need to turn the tide on the systematic police brutality and racial profiling." *Id.* at 3:2–4. "I am in solidarity with all the demands that were read," she stated, before concluding: "Let's hold Seattle Police accountable, [and] bring justice for Che Taylor . . . and our other slain sisters and brothers[.]" *Id.* at 3:4–8. Sawant did not name Miller or Spaulding, specifically—she did not know their names, and their identities were not relevant to her statement. Sawant Decl. ¶ 10. Their names were not widely reported on until after her speech. *See, e.g.*, Iglitzin Decl. Ex. 11.

### III.   SPD investigated the Taylor killing.

The SPD Force Investigation Team (FIT) investigated Miller and Spaulding's use of deadly force against Taylor. *See generally* Iglitzin Decl. Ex. 1. That investigation was reviewed by the Force Review Board (FRB), which concluded in June 2016 that Miller and Spaulding acted within SPD policy. Iglitzin Decl. Ex. 13. The FIT (and the process for reviewing FIT investigations) was created as part of a 2012 settlement agreement between the City of Seattle and the U.S. Department of Justice (DOJ). *See* Settlement Agreement ¶¶ 38, 66, 112, 124, *United States v. City of Seattle*, No. 12-CV-1282 (W.D. Wash. July 27, 2012) (Dkt. 3-1) ("Consent Decree").

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

In 2011, DOJ had found that SPD engaged in a pattern or practice of using unnecessary or excessive force, using force unconstitutionally "nearly 20% of the time." Iglitzin Decl. Ex. 14 at 5. DOJ also raised "serious concerns" about the possibility that SPD engaged in discriminatory policing against people of color, noting that of the cases reviewed in which officers' use of force was found to be unnecessary or excessive, "over 50% involved minorities." *Id.* at 7. DOJ "assert[ed] that many of the issues related to discriminatory policing are both aggravated by and contribute to the issues regarding the excessive use of force." Stipulation and Joint Findings of Fact and Conclusions of Law ¶ 7, *United States v. City of Seattle*, No. 12-CV-1282 (W.D. Wash. Sept. 21, 2012) (Dkt. 14). The Consent Decree was in effect at the time Miller and Spaulding killed Taylor, and remains in effect today. *See* SEATTLE POLICE DEP'T, *Settlement Agreement History*, https://www.seattle.gov/police/about-us/professional-standards-bureau/settlement-agreement-history (last visited Jan. 8, 2023)).

## IV.   A King County coroner's inquest was held into the cause of death of Che Taylor.

King County District Court Judge Janet Garrow presided over a coroner's inquest into the death of Che Taylor, which began on January 30, 2017. Iglitzin Decl. Ex. 3 at 1:10–14. As Judge Garrow explained: "The purpose of an inquest is to serve as a fact-finding hearing, to attempt to determine what events happened to cause" a person's death during an encounter with law enforcement. *Id.* at 17:25–18:2. "An inquest is not a trial to determine whether someone is guilty of a crime, nor is it an indictment process to determine whether someone should be charged with a crime." *Id.* at 18:3–5.

Miller and Spaulding were represented by counsel and testified under oath at the inquest. *Id.* at 6:2–6, 988:21–23, 1229:21–23. Their lawyers, as well as the Taylor family's lawyers, were only permitted to cross-examine witnesses called and questioned by the prosecuting attorney, who acted "as a neutral party . . . to assist the Court." *Id.* at 19:1–2, 19:8–12. Evidence and testimony related to SPD "tactics, policies, and practices" was precluded. *Id.* at 39:1–4.

MOTION FOR SUMMARY JUDGMENT - 7
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

Eight jurors were selected in the Taylor inquest. *Id.* at 1619:7. They answered 55 interrogatories based on whether they believed the answer to each was "more likely than not" "yes," "no," or "unknown." *Id.* at 1610:4–10, 1619:7–9. The jury delivered their answers to the final interrogatories on February 10, 2017. Iglitzin Decl. Ex. 15 (Inquest Interrogatory Answers).

The inquest jurors answered some questions unanimously, but were split on many others. Only six believed that Miller did, in fact, see a handgun on Taylor's hip. *Id.* at 3. All eight jurors agreed Spaulding did not see a gun. *Id.* Only two believed that Miller verbally identified himself as "police" when he approached Taylor. *Id.* at 7. Five jurors believed that Spaulding did *not* verbally identify himself as "police," while three answered "unknown." *Id.* The jurors answered unanimously that Miller and Spaulding ordered Taylor to both "show his hands" and "get on the ground." *Id.* at 7–8. The jurors split, four "yes" and four "no," as to whether Miller and Spaulding gave these orders "at the same time." *Id.* at 8. All eight agreed, however, that Taylor *did* show his hands and *did* "move downward" when commanded to "get on the ground." *Id.*

Only six jurors believed it was more likely than not that Spaulding saw Taylor "move his right hand to his right hip area." *Id.* at 9. All eight believed that Miller did *not* see Taylor move his right hand to his right hip. *Id.* at 10. The jurors were not unanimous in their beliefs as to whether Miller or Spaulding thought Taylor "posed a threat of death or serious bodily injury to either" officer or others—one juror answered "unknown" as to Spaulding, one answered "unknown" as to Miller, and one juror believed that Miller did not think Taylor posed such a threat. *Id.* at 9–10. The jury answered unanimously that no officer saw a gun in Taylor's hand, or in a holster on his hip, after he was shot. *Id.* at 11.

## V.   The King County Prosecutor declined to charge Miller or Spaulding.

On March 14, 2017, King County Prosecutor Dan Satterberg announced that his office would not file criminal charges against Miller or Spaulding for the death of Che Taylor. Iglitzin Decl. Ex. 17. At that time, Washington law required prosecutors to prove beyond a reasonable doubt that police acted with "malice" to be guilty of criminal homicide. RCW 9A.16.040(3) (2016)

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

(Iglitzin Decl. Ex. 18). Satterberg stated that there was "insufficient evidence to overcome this complete defense." Iglitzin Decl. Ex. 17. Taylor's family said they were "irate" that Miller and Spaulding were "not being charged with assassinating" Taylor, and they criticized the state law on "malice" as making it all but impossible to charge police officers with a crime. *Id.*

In 2015, the Seattle Times found that out of 213 fatal police shootings between 2005 and 2014, only one officer had been charged with a crime due to the extraordinarily high barrier for prosecution created by the "malice" requirement. Iglitzin Decl. Ex. 19. A disproportionate number of those killed were Black. *Id.* After Che Taylor's death, the Taylor family and other community members promoted the passage of legislation to remove the "malice" requirement from state law. Iglitzin Decl. Exs. 20–21. Councilmember Sawant also participated in legislative and political efforts, like Initiative 940, to remove the "malice" requirement from state law, and to require police officers to receive de-escalation and mental-health training, and to provide first aid. Sawant Decl. ¶ 14. These and other efforts were ultimately successful, and Washington law was amended to remove the "malice" requirement, to ban certain police practices and uses of force, and to make it easier to hold police officers accountable for using excessive force. Iglitzin Decl. Exs. 22–23.

## VI.  Councilmember Sawant briefly mentioned the killing of Che Taylor in a second speech on June 20, 2017.

Seattle Police officers shot and killed Charleena Lyles, a pregnant Black woman and mother of four, in her home and in front of her children, on June 18, 2017. Iglitzin Decl. Ex. 24. Two days later, hundreds gathered at a rally led by Andre Taylor, Che Taylor's brother, to protest Lyles' death. Iglitzin Decl. Ex. 25. James Bible, an attorney representing the Lyles family (who also represented the Taylor family), called Lyles' death a "murder," and led the crowd in chanting, "Murder is murder is murder is murder . . . ." *Id.*

Councilmember Sawant attended the rally and gave a short speech. Iglitzin Decl. Ex. 26 (June 20, 2017 Speech Transcript). She first placed Lyles' death into context with other police killings of Black people, including Che Taylor, noting: "As others have said, from Philando Castile, to Michael Brown, to Che Taylor, to Charleena Lyles, the message is clear: In this system

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

there is no justice for you if you're [B]lack." *Id.* at 2:21–25. Sawant described the NAACP's demand "that Seattle City Council and the Mayor hold a public hearing . . . where Charleena's family and our community can question SPD Chief O'Toole directly about this incident," and then stated that she "join[ed] the NAACP in demanding such a transparent public hearing." *Id.* at 3:17– 24. As Sawant explained: "When Che Taylor was murdered by the police, the community and I demanded such a hearing from the Mayor and from Councilmember Gonzalez, whose committee oversees the SPD." *Id.* at 3:24–4:3; *see* Sawant Decl. ¶ 11, Ex. A. "In light of the horrific killing of Charleena now," Sawant continued, "I publicly urge the City Council to hold such a hearing." Iglitzin Decl. Ex. 26 at 4:5–7.

Councilmember Sawant described a number of questions about SPD's policies on officers' use of force that she asked SPD to answer. *Id.* at 4:7–5:9. She also described community demands to end "the criminalization of people of color" and for democratic police oversight. *Id.* at 5:10–17. Sawant went on to say that the Washington state law requiring prosecutors to prove "malice" when charging police officers with criminal homicide "is a major obstacle to holding police accountable and getting justice for victims of police killings," and should be eliminated. *Id.* at 5:18–22. Sawant then "demand[ed] that the City of Seattle appoint an independent committee to review this case with full public accountability." *Id.* at 5:22–24. She explained: "We cannot rely on the existing process to determine why Charleena was killed because that process has failed Che Taylor, that process has failed every person who was killed at the hands of police." *Id.* at 5:25–6:3.

Councilmember Sawant was not the only or the last elected official to criticize the police killing of Che Taylor, or to connect his death to a larger history of police violence against people of color. After George Floyd was killed by Minneapolis police in 2020, Washington Senator Patty Murray included Che Taylor among a list of Black people and people of color killed by police (along with Charleena Lyles) in what she described as "senseless, repeated killings of Black people," "unjust tragedies," and "the countless Black people and people of color . . . whose lives have been unfairly taken." Iglitzin Decl. Ex. 27. Senator Murray described the protests of these police killings as being "driven by people . . . who are justifiably sick and tired of the systemic

MOTION FOR SUMMARY JUDGMENT - 10
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

racism behind those killings." *Id.* In Washington, Senator Murray noted, "between 2013 and 2019 Black people were more than three times more likely to be killed by police." *Id.* "And it is beyond clear that the disproportionate impact of police violence on Black communities, as well as other communities of color, is not some accident . . . ." *Id.*

Similarly, then-Seattle Mayor Jenny Durkan, responding to protests of Floyd's death, noted that "George Floyd's murder is not the only reason tens of thousands of Seattle residents are taking to the streets each day." Iglitzin Decl. Ex. 28. Rather, people in Seattle were "protesting a culture of systemic racism and police actions that exists right in our backyard." *Id.* Durkan then immediately noted Taylor and Lyles as examples of Black people killed by police, whose "killings remind us of the profound injustice of how they were failed by the city and the system." *Id.*

## VII. The Taylor family sued Miller, Spaulding, and the City of Seattle for Che Taylor's wrongful death.

In 2018, Che Taylor's family sued Miller and Spaulding, along with officers Acuesta and Barnes and the City of Seattle, for Taylor's wrongful death. *See Briscoe v. City of Seattle*, 483 F. Supp. 3d 999, 1002 (W.D. Wash. 2020). The court denied Miller and Spaulding's motion for summary judgment, insofar as they claimed to be entitled to qualified immunity for Taylor's death, because "the key questions of whether the officers involved reasonably believed Taylor was armed when they approached to arrest him and whether they reasonably believed he was reaching for a weapon at the time they shot him [could not] be decided on summary judgment." *Id.* at 1003.

After a detailed recitation of the facts, the court noted first that: "Given the amount of time and reasons that Taylor could not be observed, and his return to the scene as a passenger in a vehicle occupied by two other people, one of whom later denied seeing him with a gun on the day of the shooting," whether Miller and Spaulding still had probable cause to arrest Taylor over 30 minutes after Miller (and Miller alone) claimed to see him in possession of a gun could not be established as a matter of law on summary judgment. *Id.* at 1010–11. Next, the court found that "the reasonable inferences from the evidence provide some support for the propositions that Taylor was not armed at the time he was shot and that Taylor was not engaged in the nonsensical act of

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

drawing for a non-existent gun while multiple officers aimed their weapons at him." *Id.* at 1012. Furthermore, "Taylor might be viewed by a reasonable jury as having attempted to show his hands and get on the ground, as directed, but having difficulty doing so because the instructions were inconsistent," and because he did not have room to, given his positioning between the car and the curb. *Id.* "[H]aving considered 'the totality of the circumstances' from the perspective of a reasonable officer on the scene," Judge Zilly wrote that "the Court cannot determine, as a matter of law, whether Miller's and Spaulding's use of deadly force was reasonable." *Id.*

In April 2021, the City of Seattle and Miller and Spaulding settled with the Taylor family for $1.5 million. Order Approving Settlement, *Briscoe v. City of Seattle*, No. C18-262 TSZ (W.D. Wash. April 27, 2021) (Dkt. 149).

## EVIDENCE RELIED UPON

This motion relies on the declarations of Defendant Kshama Sawant and Dmitri Iglitzin, Sawant's counsel, including all attached exhibits, and the pleadings.

## LEGAL STANDARD

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hen there are no genuine issues of material fact and the plaintiff has failed to establish a prima facie case, disposition by summary judgment is appropriate." *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ARGUMENT

### I.    Plaintiffs have failed to establish a prima facie case of defamation under state law.

Under Washington law, "[a] defamation action consists of four elements: (1) a false statement, (2) publication, (3) fault, and (4) damages." *Duc Tan v. Lee*, 177 Wn.2d 649, 662, 300

MOTION FOR SUMMARY JUDGMENT - 12
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

P.3d 356 (2013) (citing *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 768, 776 P.2d 98 (1989)). The Plaintiffs also have "the burden of proving that the communication was made of and concerning [them]." *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 36, 723 P.2d 1195 (1986) (citing *Sims v. KIRO, Inc.*, 20 Wn. App. 229, 233, 580 P.2d 642 (1978)). Plaintiffs' defamation claim fails as a matter of law because they have not established the existence of all five elements of their claim.

### A.    Plaintiffs cannot prove that Councilmember Sawant's speeches contained any false statements of fact.

Plaintiffs' defamation claim fails as a matter of law because they cannot show that Councilmember Sawant made any false statements of fact. "A defamation claim must be based on a provably false statement and the plaintiff bears the burden of proving the falsity." *Wood v. Battle Ground Sch. Dist.*, 107 Wn. App. 550, 571, 27 P.3d 1208 (2001) (citing *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590–91, 943 P.2d 350 (1997)). A statement of opinion is not provably false, and thus "[b]efore the truth or falsity of an allegedly defamatory statement can be assessed, a plaintiff must prove that the words constituted a statement of fact, not an opinion." *Robel v. Roundup Corp.*, 148 Wn.2d 35, 55, 59 P.3d 611 (2002).

### 1.    Sawant's statements were protected expressions of opinion.

The statements Plaintiffs allege to be defamatory are not actionable because they are protected expressions of opinion. *Id.* "Whether the allegedly defamatory words were intended as a statement of fact or an expression of opinion is a threshold question of law for the court." *Id.* "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Dunlap v. Wayne*, 105 Wn.2d 529, 538, 716 P.2d 842 (1986).

> [E]xamining a statement in the totality of the circumstances in which it was made is the best means to determine whether a statement should be characterized as nonactionable opinion. To determine whether a statement is nonactionable, a court should consider *at least* (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts.

MOTION FOR SUMMARY JUDGMENT - 13
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

1    *Id.* at 539 (emphasis added).

2    Sawant made the statements at issue orally at two public protests of police killings of Black

3    people, a medium and context that strongly support finding her speeches to be statements of

4    opinion. "[S]tatements of opinion are expected to be found more often in certain contexts, such as

5    editorial pages or political debates. The court should consider the entire communication and note

6    whether the speaker qualified the defamatory statement with cautionary 'terms of apparency.'" *Id.*

7    at 539 (citing *Info. Control Corp. v. Genesis One Comput. Corp.*, 611 F.2d 781, 784 (9th Cir.

8    1980)). "[B]oth the immediate as well as broader social context in which the statements occur

9    should be considered." *Camer*, 45 Wn. App. at 41.

10    The immediate context of Sawant's speeches was, in 2016, a rally organized to protest the

11    police killing of Che Taylor, specifically; and, in 2017, a rally to protest the police killing of

12    Charleena Lyles. These are settings that "invited exaggeration and personal opinion." *See Robel*,

13    148 Wn.2d at 56. The "broader social context" in which Sawant spoke was a long and public

14    debate about police killings of people of color, both in Washington and nationally; the Black Lives

15    Matter movement; SPD's pattern and practice of using unnecessary and excessive force,

16    particularly against people of color; and efforts in Washington to improve police accountability

17    and practices, and to remove the "malice" requirement from state law. Both of Sawant's speeches

18    repeatedly reference this broader social context, and her use of terms like "murder" and "racial

19    injustice" cannot be understood outside of that larger political debate. Sawant also used "terms of

20    apparency" throughout both speeches, as she repeatedly referred to "I," "we," and "you," as well

21    as "our movement," all of which conveyed that these were both Sawant's opinions, and opinions

22    shared by her audiences. *See Valdeman v. Martin*, No. 75849-7-1, 2017 WL 6336018, at *4 (Wash.

23    Ct. App. Dec. 11, 2017) (finding the use of "I" and "my" to be "terms of apparency that signal the

24    statements are [the defendant's] personal opinion").

25    Given the immediate and broader social context of Sawant's speeches, the audiences at

26    both protests would inevitably have understood Sawant's statements to be opinions. "In the context

27    of ongoing public debates, the audience is prepared for mischaracterizations and exaggerations,

MOTION FOR SUMMARY JUDGMENT - 14
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

and is likely to view such representations with an awareness of the subjective biases of the speaker." *Dunlap*, 105 Wn.2d at 539 (quotation omitted); *see also Camer*, 45 Wn. App. at 41 ("Even apparent statements of fact may assume the character of opinions, and thus be privileged, when made in public debate . . . or other circumstances in which an audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole . . . .") (cleaned up). "The court should thus consider whether the audience expected the speaker to use exaggeration, rhetoric, or hyperbole." *Dunlap*, 105 Wn.2d at 539. Because the purpose of the rallies at which Sawant spoke was to *protest* the police killings of Taylor and Lyles, the audiences at both reasonably would have expected Sawant's use of "rhetoric."

The content of Sawant's speeches also shows that she did not imply the existence of any undisclosed facts, but based her statements on true information equally available to the public. "A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is." *Id.* at 540 (quotation omitted). "Arguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statement themselves." *Id.* When a statement is "based on true information . . . equally available to the public," the speaker "simply deduces a particular fact about the defamed person from known facts . . . Those who receive the communication are in a position to judge for themselves the validity of the decision made." *Id.* (quotation omitted).

Neither of Sawant's speeches implied that her statements of opinion were based on any undisclosed facts. Sawant never suggested that she had access to information not available to the public. Her speeches justifiably assumed that the audience was familiar with the facts of Taylor's death—the audience was there in 2016 and 2017 to protest police killings of Black people, including Taylor. Even if anyone in either audience was not aware of the facts upon which Sawant based her statements, the information was "publicly available," and anyone who heard Sawant's speeches was "in a position to judge for themselves the validity of" Sawant's statements. *Id.* Moreover, "the context and audience often ensure that any implicit facts will be perceived as

MOTION FOR SUMMARY JUDGMENT - 15
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400          **BARNARD**
SEATTLE, WASHINGTON 98119          **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132          **LAVITT LLP**

'merely a characterization of those facts.'" *Robel*, 148 Wn.2d at 57 (quoting *Ollman v. Evans*, 750 F.2d 970, 985 (D.C. Cir. 1984)). Whether everyone in the audience knew the facts underlying Sawant's statements or not, they would perceive her statements as "merely a characterization of those facts," one with which they could either agree or disagree based on their own consideration of the same publicly available information.

Considering all of these factors, it is apparent that Sawant's use of the term "murder" was a statement of opinion and not a statement of fact. Examining Sawant's speeches "as a whole, it is evident that the tone is one of opinion." *Camer*, 45 Wn. App. at 40. Sawant is not a lawyer, and she used the word "murder" as laypeople do—and as many did to describe Taylor's death—to express a belief that a killing was wrongful and should be considered criminal. Sawant Decl. ¶¶ 5, 8–9; Iglitzin Decl. Ex. 29 at 5, 7 (Daugaard Expert Report). The truth or falsity of that opinion cannot be determined objectively. *See Robel*, 148 Wn.2d at 55; *Corbally v. Kennewick Sch. Dist.*, 94 Wn. App. 736, 741, 973 P.2d 1074 (1999). And there is no evidence that anyone at either protest understood Sawant's statements to mean that Miller or Spaulding "had been charged with a crime." *See Greenbelt Coop. Pub'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970).

Importantly, courts have held that similar uses of the word "murder" are nonactionable statements of opinion. In *Thuma v. Hearst Corp.*, for example, the court found that news articles quoting a father who called the shooting of his son by police a "cold-blooded murder" were not defamatory in an action by the police officer who killed the boy. 340 F. Supp. 867, 868, 871–72 (D. Md. 1972). The court found it "most improbable that persons seeing the words 'cold-blooded murder,' as they were used in the context of the events reported in the articles, would interpret them as meaning premeditated murder." *Id.* at 871. "Whatever those words may connote in other circumstances, in this situation they were rather clearly hyperbole expressing the father's most vehement feeling that the shooting was completely unnecessary." *Id.* The "clear import" of the words "cold-blooded murder," was that "family, friends and neighbors were as angry as they could be because they considered the shooting to have been unjustified and unnecessary." *Id.*

MOTION FOR SUMMARY JUDGMENT - 16
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

Similarly, in *Kevorkian v. American Medical Association*, the court held that statements accusing a doctor who assisted patients' suicide of being a "killer" and "criminal"—together suggesting the doctor was a "murderer"—were nonactionable "rhetorical hyperbole." 602 N.W.2d 233, 235–37 (Mich. Ct. App. 1999). The court found that "plaintiff's acts of assisted suicide . . . can be described as murder or mercy, and any reasonable person could understand that both *or neither* could be taken as stating actual facts about plaintiff." *Id.* at 237. That court later applied the same reasoning to a police officer's defamation claim against a defendant who referred to him as a "murderer" and "executioner" after the officer shot an unarmed person. *Porter v. Fieger*, No. 221349, 2001 WL 738398, at *1 (Mich. Ct. App. June 29, 2001). In that case, the court found that the defendant's "references to plaintiff as a 'murderer' and an 'executioner' would be understood by any reasonable listener as rhetorical hyperbole, designed to express the opinion that the shooting was unjustified." *Id.* at *2. Accordingly, the "statements could not be understood as stating actual facts about" the officer. *Id.* "Just as assisting someone to commit suicide may be viewed as mercy or murder, a police shooting of an unarmed person may be viewed as protecting society or murdering a citizen." *Id.* Because the defendant's statements "simply conveyed disapproval of the shooting," they could not "subject him to liability for defamation." *Id.*

Here, Sawant's use of the word "murder" conveyed disapproval of the Taylor killing, and given the circumstances of Taylor's death and the context of Sawant's statements when considered as a whole, her statements were nonactionable opinions. But even if Sawant's use of the term "murder" could be understood as a technical, legal accusation that Miller and Spaulding's actions met the predicate elements of the crime of murder (in some further unspecified degree), or that they had been charged with criminal homicide, that would not transform Sawant's statement of opinion into a statement of fact, because she is not a lawyer. As this Court has held, "statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Elec. Recycling Ass'n of Alberta v. Basel Action Network*, No. C18-1601-MJP, 2019 WL 1453575, at *3 (W.D. Wash. April 2, 2019) (Pechman, J.) (citing *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)); *see also*

MOTION FOR SUMMARY JUDGMENT - 17
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD
IGLITZIN &
LAVITT LLP

*Rodriguez v. Panayiotou*, 314 F.3d 979, 986 (9th Cir. 2002) (allegation by layperson that police officer "entrapped" him "cannot constitute defamation" under California law). To be clear, Sawant did not use the word "murder" in a technical sense, and there is no evidence that anyone present at either protest understood her statements that way. But even if she had, it would still have been a nonactionable statement of opinion, not a defamatory statement of false facts.

> ### 2. *Plaintiffs cannot prove that what Sawant said was false, because what she said was substantially true.*

Even if Sawant's statements were not protected expressions of opinion, Plaintiffs cannot prove that she said was false. "With respect to falsity, Washington does not require a defamation defendant to prove the literal truth of every claimed defamatory statement. A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting,' is true." *Mohr v. Grant*, 153 Wn.2d 812, 825, 108 P.3d 768 (2005) (cleaned up). "The gist or sting of a story is the story's substance when considered as a whole." *Id.*; *Sisley v. Seattle Pub. Schs.*, 180 Wn. App. 83, 88, 321 P.3d 276 (2014). Determining the gist of a report is a question for the court to decide. *Mohr*, 153 Wn.2d at 826. The undisputed facts clearly establish that the gist of Sawant's statements is true.

The gist of Sawant's comments is that Plaintiffs killed Che Taylor in a manner that reasonable people could consider wrongful and criminal. It is undisputed that Spaulding never saw Taylor in possession of a gun, yet he shot Taylor six times, at close range, with a rifle. It is also undisputed that Miller did not see Taylor in possession of a gun after he walked away from the black Dodge Magnum and entered the apartment building—roughly 30 minutes before Miller shot him once, with a shotgun. Before Plaintiffs shot Taylor, he appeared to comply with their commands. Plaintiffs never saw a gun in Taylor's hand, and Taylor never pointed a gun at anyone. Though Plaintiffs claim to have believed Taylor was attempting to draw a handgun from a holster on his right hip, after they shot him, no gun was found in his hand or on his person.

If Sawant had said only that Taylor was "killed" by police under the above circumstances, obviously Plaintiffs would have no claim for defamation, as that would undeniably be true. Their

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

cause of action necessarily depends on the contention that what Sawant said is provably false because "murder" has a substantially different meaning, one that could not apply to their actions. While it may be true that when the word "murder" is used by lawyers and judges it is understood to describe an alleged act that meets the requisite elements of a specific degree of criminal homicide, this is not the case when the word "murder" is used by laypeople. *See* Iglitzin Decl. Ex. 29 at 5, 7. The Washington Supreme Court has treated the words "killing" and "murder" to be essentially synonymous in some contexts, when used by non-lawyers. *See Bering v. SHARE*, 106 Wn.2d 212, 245–46, 721 P.2d 918 (1986) (injunction prohibiting anti-abortion protestors from using the words "murderer" and "killer" in oral speech was lawful under the Washington Constitution, but only when in the presence of young children); *Federal Way Phys. v. Tacoma Stands Up for Life*, 106 Wn.2d 261, 268, 721 P.2d 946 (1986) (constitutionally permissible to restrict oral use of "killers" and "murderers" in the presence of young children, but any further restriction was unlawful). Moreover, some experienced criminal defense attorneys and prosecutors believed that it was possible for a rational jury to conclude that it was technically and legally accurate to call the Taylor killing a "murder," even under then-existing state law requiring proof of "malice." *See* Iglitzin Decl. Ex. 29 at 5–8.

Plaintiffs' principal argument is that "murder" was a provably false statement because they were "exonerated" by an SPD investigation and the inquest proceeding, but the facts are otherwise. The SPD investigation concluded that Miller and Spaulding's actions fell within SPD policy, but this says nothing about the adequacy of the investigation, or whether SPD policy itself aligned with best practices or constitutional requirements. *See* Iglitzin Decl. Ex. 30 (Gilbertson Expert Report); Iglitzin Decl. Ex. 14 at 4 ("Deficiencies in SPD's training, policies, and oversight with regard to the use of force contribute[d] to the constitutional violations" found by DOJ). The inquest jury did not consider whether Taylor's death was by criminal means, but the jury's answers only further reinforced why many people felt that Taylor's killing was wrongful, with all eight jurors unanimously answering that Taylor complied with officers' commands before he was shot, and that neither Plaintiff ever saw a gun in Taylor's hand. *See* Iglitzin Decl. Ex. 15 at 8, 11. The

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

circumstances of Taylor's death also caused a federal judge to deny Plaintiffs' motion for summary judgment based on qualified immunity in the Taylor family's civil lawsuit against them. *See Briscoe*, 483 F. Supp. 3d at 1013–14.

In short, what Sawant said in her speeches—the gist of her statements—was substantially true: Miller and Spaulding did kill Che Taylor under circumstances that laypeople reasonably could and did describe as "murder" in a non-technical sense. Thus, Miller and Spaulding cannot meet their higher burden of proving that Sawant's statements were false.

### B. Plaintiffs cannot establish that Sawant's statements were "unprivileged."

The "publication" element of defamation requires Plaintiffs to prove an "unprivileged communication." *Mohr*, 153 Wn.2d at 822. The Court should find that Sawant's statements were protected by an absolute privilege under Washington law, or it should certify the issue to the Washington Supreme Court.

Certification to the Washington Supreme Court is appropriate when "in the opinion of any federal court before whom a proceeding is pending, it is necessary to ascertain the local law of this state in order to dispose of such proceeding and the local law has not been clearly determined . . ." RCW 2.60.020. Certification is particularly appropriate when there is no state appellate authority on the legal issue, and when the issue has significant policy implications. *Perez-Farias v. Global Horizons*, 668 F.3d 588, 589, 593 (9th Cir. 2011).

### 1. The Court should find Sawant's statements were protected by an absolute legislative privilege.

Washington courts, like virtually all courts in other jurisdictions, recognize that absolute immunity protects certain legislative actions and statements. *See, e.g.*, *Fabre v. Town of Ruston*, 180 Wn. App. 150, 162–63, 321 P.3d 1208 (2014); *Miller v. Pacific County*, 91 Wn.2d 744, 747–48, 592 P.2d 639 (1979). In addition to enacting legislation, legislative bodies also conduct fact-finding hearings in order to decide whether to enact legislation. As the Supreme Court has explained, because "investigations . . . are an established part of representative government," an elected representative who conducts a legislative investigation is entitled to absolute immunity so

MOTION FOR SUMMARY JUDGMENT - 20
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD
IGLITZIN &
LAVITT LLP**

long as the committee was investigating a problem of legislative concern. *Tenney v. Brandhove*, 341 U.S. 367, 377–78 (1951). "The Supreme Court has also "held that the act of authorizing an investigation pursuant to which . . . materials were gathered is an integral part of the legislative process." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975).

Similarly, the Washington Supreme Court has held that the Attorney General has an absolute privilege that precludes him from being civilly sued for libel for statements made at a press conference concerning the filing of an enforcement complaint. *See Gold Seal Chinchillas, Inc. v. Washington*, 69 Wn.2d 828, 834, 420 P.2d 698 (1966). "As long as the acts complained of have more than a tenuous relation to their official capacity, state officials . . . are absolutely privileged with respect to the content of their oral pronouncements or written publications." *Id.* The Washington Supreme Court has never addressed legislative immunity in the context of a call for a fact-finding hearing, but the logic of the holding of *Gold Seal* indicates that a legislator who makes statements in connection with an effort to convene a legislative fact-finding hearing may also be protected by absolute immunity from a civil suit for defamation.

In her 2016 speech, Sawant stated that she was there "as an elected official because" she was "completely committed . . . to holding the Seattle Police Department accountable." Iglitzin Decl. Ex. 12 at 2:21–24. The next day, she requested that City Council convene a public hearing on the Taylor killing. Sawant Decl. ¶ 11, Ex. A. Notably, then-City Council President Bruce Harrell found that Sawant was acting within the scope of her duties as a Councilmember when she made the 2016 speech. Iglitzin Decl. Ex. 31 at 2–6 (Harrell Determination Letter). In Sawant's 2017 speech, she specifically called for a public hearing on the Lyles killing, and noted that she had requested the same for Taylor. Iglitzin Decl. Ex. 26 at 3:17–4:7.

The Court should find that both Sawant's 2016 and 2017 speeches are protected by an absolute legislative privilege, or by the Washington Constitution's Speech and Debate Clause. Alternatively, if the Court finds that "it is necessary to ascertain the local law of this state in order to dispose of [this] proceeding," it should certify the question to the Washington Supreme Court. RCW 2.60.020; *Perez-Farias*, 668 F.3d at 589, 593 (9th Cir. 2011).

MOTION FOR SUMMARY JUDGMENT - 21
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

1
2            2.   *The Court should find that Sawant's statements were protected by an absolute*
                  *privilege to criticize police officers' use of force.*
3
4        Both the Washington Court of Appeals and Washington Supreme Court have indicated a

5    willingness to consider recognizing "a common law absolute privilege for citizen complaints

6    concerning police conduct," if the argument is properly raised. *Richmond v. Thompson*, 130 Wn.2d

7    368, 383–84, 922 P.2d 1343 (1996) (noting other jurisdictions have recognized such a privilege

8    and citing cases). Such a privilege would comport with constitutional protections for free speech

9    on matters of public concern, as other jurisdictions have recognized. *See, e.g.*, *Craig v. Stafford*

10   *Constr., Inc.*, 78 Conn. App. 549, 827 A.2d 793, 798-99 (2003) (dismissing defamation suit by

11   police officer on the basis of absolute immunity, and finding that "if there were no absolute

12   immunity, good faith criticism of governmental misconduct might be deterred by concerns about

13   unwarranted litigation," and that "absolute immunity is thus undergirded by the constitutional

14   protection that we afford to free speech about matters of public concern").

15       Several Washington Supreme Court Justices have recognized that free-speech concerns

16   take on particular importance when criticism of the police relates to racial disparities in policing.

17   In *State v. EJJ*, the Court unanimously reversed a juvenile defendant's conviction for obstructing

18   a police officer on First Amendment grounds. 183 Wn.2d 497, 507–08, 354 P.3d 815 (2015). Chief

19   Justice Madsen, joined by two other justices, concurred and wrote that the Court should adopt a

20   common-law "non-escalation" requirement to prevent racially discriminatory uses of obstruction.

21   *Id.* at 509 (Madsen, C.J., concurring). Justice Gonzalez, in a separate concurrence, noted that "EJJ

22   is a young [B]lack man in a city where the police have been found by the [DOJ] to use excessive

23   force against nonviolent black youth," and even if his speech "impair[ed] the working efficiency"

24   of the officers at whom his speech was directed, it was "strongly protect[ed]" by both the

25   Washington and U.S. Constitutions. *Id.* at 527–29 (Gonzalez, J., concurring).

26       The Court should find that, if properly before it, the Washington Supreme Court would

27   recognize a common law absolute privilege for statements, like Sawant's, criticizing police

MOTION FOR SUMMARY JUDGMENT - 22
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

1    officers' use of force. Alternatively, if the Court finds that "it is necessary to ascertain the local

2    law of this state in order to dispose of [this] proceeding," it should certify the question to the

3    Washington Supreme Court. RCW 2.60.020; *Perez-Farias*, 668 F.3d at 589, 593.

4            **C.     Plaintiffs cannot show that Sawant acted with "actual malice."**

5            Plaintiffs' defamation claim fails as a matter of law because they cannot prove that Sawant

6    made the allegedly defamatory statements "with 'actual malice'—that is, with knowledge that it

7    was false or with reckless disregard of whether it was false or not." *Garrison v. Louisiana*, 379

8    U.S. 64, 67 (1964). "[T]he standard of fault in defamation cases depends on the nature of the

9    plaintiff. If the plaintiff is a public figure or public official, he must show actual malice." *LaMon*

10   *v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989). "A public figure defamation plaintiff must

11   prove with clear and convincing evidence that the defendant made the statements with 'actual

12   malice.'" *Duc Tan*, 177 Wn.2d at 668. "The question whether the evidence in the record in a

13   defamation case is sufficient to support a finding of actual malice is a question of law." *Duc Tan*,

14   177 Wn.2d at 668–69. Plaintiffs cannot present clear and convincing evidence of actual malice, so

15   their defamation claim fails as a matter of law.

16           The Court previously found that Plaintiffs are public figures: "Given Plaintiffs' concession

17   that they are public figures, Plaintiffs must demonstrate that Sawant's statements were made with

18   'actual malice.'" Dkt. 92 at 10 (citing Pls.' Opp., Dkt. 83 at 12–14). That finding is the law of this

19   case. *See Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988). But, regardless, Plaintiffs

20   are public officials because they are police officers, and this case concerns actions they took in the

21   performance of their official duties. *See Clawson v. Longview Publ'g Co.*, 91 Wn.2d 408, 416–17,

22   589 P.2d 1223 (1979); *Corbally*, 94 Wn. App. at 741.

23           Plaintiffs cannot establish by clear and convincing evidence that Sawant "knew" her

24   statements were false. Nor can they prove by clear and convincing evidence that she acted

25   recklessly. The Washington Supreme Court has said: "We do not measure reckless conduct by

26   asking whether a reasonably prudent person would have published or would have investigated

27

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

before publishing." *Duc Tan*, 177 Wn.2d at 669. "There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." *Herron*, 112 Wn.2d at 775. There is no such evidence here.

**D.      Plaintiffs cannot prove that Sawant's statements caused them any harm.**

Plaintiffs' defamation claim fails, as well, because they cannot prove that Sawant's statements caused them to suffer any damages. In Washington, "a defamation plaintiff can recover damages only if he or she proves harm *factually caused* by the defendant's wrongful conduct." *Schmalenberg*, 87 Wn. App. at 602 (emphasis added). But Sawant was far from the only speaker to describe Taylor's death as "murder." The President of the Seattle King County NAACP, for example, referred to Taylor's death as a "coldblooded murder," and stated that police "came with the intent to kill, not to arrest" Taylor. Iglitzin Decl. Ex. 10. These statements were widely reported, arguably more so than Sawant's comments. *See* Iglitzin Decl. Ex. 11 (quoting Hankerson but not Sawant). Former Seattle Mayor Jenny Durkan implied that Taylor's killing was a "murder" in 2020, comparing his death to George Floyd's and describing it as a "profound injustice." Iglitzin Decl. Ex. 28. Senator Murray described Taylor's killing as one of many "senseless, repeated killings of Black people," killings that were "unjust," and "unfair[]," and attributable to "systemic racism." Iglitzin Decl. Ex. 27. Plaintiffs apparently never sued anyone beside Sawant for criticizing the Taylor killing, but she was far from the only one to have made similar, if not more vociferous, comments. Plaintiffs' defamation claim fails because they cannot show that it was *Sawant's* use of the word "murder" that caused them any damages.

Moreover, "there is no liability when defendants' true factual statements create the 'sting' of the damaging publication and their additional false statements do not cause any separate or additional harm." *Duc Tan*, 177 Wn.2d at 666. Assuming solely for the sake of argument that "murder," as used by Sawant, was false, Plaintiffs must "show that the falsehood affects the 'sting' of a report as part of [their] showing of damage." *Herron*, 112 Wn.2d at 769. "The 'sting' of a report is defined as the gist or substance of a report when considered as a whole." *Id.* If the report

18 WEST MERCER ST., STE. 400

SEATTLE, WASHINGTON 98119

TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**

**IGLITZIN &**

**LAVITT LLP**

"contains a mixture of true and false statements, a false statement . . . affects the 'sting' of a report only when 'significantly greater opprobrium' results from the report containing the falsehood than would result from the report without the falsehood." *Id.*

> The question is whether the false statement has resulted in damage which is distinct from that caused by true negative statements also contained in the same report. If it has not, then whatever damage the plaintiff has suffered does not amount to defamation because it is not solely attributable to the falsehood. In that case, the plaintiff has not made a prima facie case.

*Id.* at 771–72. Plaintiffs cannot establish this element of their defamation claim because whatever damages they suffered are not "solely attributable" to Sawant's use of the word "murder."

The gist of Sawant's speeches was that Che Taylor was killed by police under circumstances that reasonable people could consider wrongful, and that the police have a history of killing Black people and people of color disproportionately and without sufficient justification. The undisputed facts show the gist of Sawant's speeches to be true, as discussed above. The only additional, allegedly "false" statement is her use of the word "murder." But any damage to Plaintiffs' reputations was not caused by Sawant's use of the word "murder"; it was caused by their identification (by the SPD, not Sawant) as the officers that killed Che Taylor under what were undeniably problematic, if not outright suspicious, circumstances.

In *Mark*, the Washington Supreme Court considered the difference between a report that claimed the plaintiff "bilked the state out of at least $300,000," and the truth, which was that "he was charged with larceny based on an audit sample revealing 'over $200,000 in fraudulent billing." *Mark*, 96 Wn.2d at 496. The Court found that: "The inaccuracy, if any, does not alter the 'sting' of the publication as a whole and does not have a materially different effect on a viewer, listener, or reader than that which the literal truth would produce." *Id.* As the Court later explained, "it was the theft, not the amount of the theft, that constituted the story's sting." *Herron*, 112 Wn.2d at 773. "Being called a major thief rather than a petty thief did not add a separate and distinct type of damage to the story. A thief is a thief." *Id.*

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

So, too, here: the "sting" of Sawant's speeches comes from the fact that Miller and Spaulding did kill Che Taylor under circumstances so concerning that multiple people described his death as a "murder." The fact that Sawant, specifically, said Taylor was "murdered" does not "add a separate and distinct type of damage" that would not have occurred had she used different words to describe his death. *See id.* Even if Sawant's use of the word "murder" was "inaccur[ate]," it "does not alter the 'sting' of the publication as a whole," nor does it "have a materially different effect" on the audience "than that which the literal truth would produce." *Mark*, 96 Wn.2d at 496. Because any damages Plaintiffs suffered are not "solely attributable" to Sawant's use of the term "murder" to describe their killing of Che Taylor, their damages "do[] not amount to defamation," and they have failed to establish a prima facie case. *Herron*, 112 Wn.2d at 771–72.

### E. Plaintiffs cannot establish that Sawant's statements were made "of and concerning" them.

Because Sawant never named Plaintiffs directly, they must show that her statements were made "of and concerning" them. *Camer*, 45 Wn. App. at 36. "The identification of the one defamed must be certain and apparent from the words themselves. One cannot by implication identify oneself as the target of an alleged libel if the allegedly libelous statement does not point to him or her." *Id.* at 37. It is the law of this case that Plaintiffs adequately pleaded that Sawant's 2016 speech could reasonably be understood as having been made "of and concerning them," but their claim fails as a matter of law on summary judgment because they cannot show that anyone did, in fact, understand either of Sawant's speeches to be made "of and concerning" them.

As an initial matter, only Sawant's 2016 speech referred to "individual accountability," the language that the Ninth Circuit found, at the motion to dismiss stage, a listener might have interpreted to refer to Plaintiffs. *Miller v. Sawant*, 18 F.4th 328, 338 (9th Cir. 2021). At the summary judgment stage, however, it is now clear as a factual matter that Sawant's 2016 speech was not "of and concerning" Plaintiffs, because she did not know their identities. Sawant Decl. ¶ 10. And even if she had known their names, her reference to "need[ing] individual accountability" was not a reference to Miller or Spaulding, specifically. *Id.* Sawant intended to

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

make a broader point about the need for reform to how SPD investigates and holds its officers accountable, as well as to how police officers in general are held accountable when they use unnecessary or excessive force. *Id.*; *see also* Iglitzin Decl. Ex. 16 at 53:1–55:25 (Deposition of Lisa Daugaard). Plaintiffs have not rebutted this understanding of her 2016 speech through any admissible evidence.

Sawant's 2017 speech makes this point more clearly, and the evidence now before the Court shows that this speech also does not satisfy the "of and concerning" element. In that speech, she did not make the same reference to "individual accountability," nor did she refer to Miller or Spaulding even indirectly. *See generally* Iglitzin Decl. Ex. 26. Sawant's 2017 speech was not even primarily about Che Taylor. Rather, she mentioned Taylor as another example of a Black person killed by Seattle police, while mainly discussing Charleena Lyles and the need for broader, systemic reforms to SPD and the state law on police killings. There is no language in that speech that would support the conclusion that it was made "of and concerning" Plaintiffs, and Plaintiffs can produce no evidence that anyone understood it to be "of and concerning" them.

## II.  Sawant's statements are protected by the Washington State Constitution.

Article I, § 5 of the Washington Constitution states: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." When deciding whether that right has been violated, a Washington court first decides whether there has been an abuse of the right of free speech, and then decides the extent to which that right may be restricted when abuse has been shown. *Bering*, 106 Wn.2d at 233. The Washington Supreme Court has often held that the Washington Constitution provides greater protection for speech than the First Amendment. *See, e.g.*, *Collier v. Tacoma*, 121 Wn.2d 737, 747, 854 P.2d 1046 (1993); *State v. Coe*, 101 Wn.2d 364, 374, 679 P.2d 353 (1984).

The State Supreme Court has also held that "because of its broad language, Const. art. I, § 5 has been interpreted to offer greater protection than the First Amendment in the context of pure noncommercial speech in a traditional public forum." *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

103, 118, 937 P.2d 154 (1997). In this case, defendant Sawant's speech took place outdoors on the streets of Seattle. Streets and sidewalks are the quintessential traditional public forum. *Collier*, 121 Wn.2d at 747. Government's ability to restrict speech in a traditional public forum is very limited. *Id*. Given that the Washington Constitution provides greater protection for speech than the First Amendment, Sawant's statements are not actionable as defamation under Washington's Constitution, for several reasons.

### A.   The Washington Constitution protects Sawant's right to call a police killing a "murder," because she did not "abuse" the right "to freely speak."

Under article 1, § 5 of the Washington Constitution, absent an abuse of the right to freely speak, there can be no restriction on the content of speech and, even if there is an abuse of the right, there can be no restriction on content unless there is a compelling state interest which cannot be achieved in any less restrictive manner. *See Bering*, 106 Wn.2d at 245–46; *Tacoma Stands Up for Life*, 106 Wn.2d at 268. By not naming Plaintiffs directly, Sawant did not "abuse" her right "to freely speak." Further, there is no compelling state interest in prohibiting Sawant's speech.

Whether or not the Washington Constitution imposes a more stringent "of and concerning" requirement than the First Amendment has never been decided by a state appellate court (nor was it decided by the Ninth Circuit in this case). But, given the Washington Constitution's greater protection for free speech, this Court should find that, regardless of whether any listener independently understood Sawant's comments to be "of and concerning" Plaintiffs, she did not abuse her right to freely criticize the police in either her 2016 or 2017 statements because she did not name Plaintiffs individually, and she was not responsible for identifying them publicly as the officers who shot Taylor. Alternatively, if the Court finds that "it is necessary to ascertain the local law of this state in order to dispose of [this] proceeding," it should certify the question to the Washington Supreme Court. RCW 2.60.020; *Perez-Farias*, 668 F.3d at 589, 593.

### B.   Imposing civil liability for defamation for calling a police killing a "murder" would lead to self-censorship and function as a prior restraint on speech.

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

The Washington Constitution is generally intolerant of prior restraints on speech. *See Coe*, 101 Wn.2d at 374; *Ino Ino*, 132 Wn.2d at 117. The Washington Supreme Court has recognized that state action that chills free speech prior to publication "may rise to the level of a prior restraint." *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 764, 871 P.2d 1050 (1994). Here, allowing civil liability for defamation based on comments critical of the police generally, without naming any individual police officer, will necessarily lead to self-censorship and the chilling of free speech. This Court should find that allowing such a defamation action to proceed would violate article 1, § 5 of the Washington Constitution, because it would function as a prior restraint on speech. Alternatively, if the Court considers it "necessary to ascertain the local law of this state in order to dispose of [this] proceeding," it should certify the question to the Washington Supreme Court. RCW 2.60.020; *Perez-Farias*, 668 F.3d at 589, 593.

**III.   Summary judgment is warranted on Plaintiffs' state-law outrage claim.**

Plaintiffs' state-law claim for "outrage" is entirely dependent on their defamation claim. *See Harris v. City of Seattle*, 315 F. Supp. 2d 1112, 1124 (W.D. Wash. 2004) (Pechman, J.) ("Outrage claims are inseparable from emotional distress claims."); *Leidholt v. L.F.P. Inc.*, 860 F.2d 890, 893 n.4 (9th Cir. 1988) ("An emotional distress claim based on the same facts as an unsuccessful libel claim cannot survive as an independent cause of action."). Because Plaintiffs have failed to establish a prima facie case of defamation, summary judgment should also be granted on their outrage claim.

## CONCLUSION

For these reasons, summary judgment should be granted on Plaintiffs' defamation and outrage claims. If the Court finds it cannot dispose of this action on summary judgment, it should certify the questions of Washington law identified above to the Washington Supreme Court.

//

//

MOTION FOR SUMMARY JUDGMENT - 29
Case No. 2:18-cv-00506-MJP

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

**TEL** 800.238.4231 | **FAX** 206.378.4132   **LAVITT LLP**

1    RESPECTFULLY SUBMITTED this 9th day of January, 2023.

2

3                    *s/Dmitri Iglitzin*
                    Dmitri Iglitzin, WSBA No. 17673

4                    *s/Darin M. Dalmat*
                    Darin M. Dalmat, WSBA No. 51384

5                    *s/Jacob Harksen*
                    Jacob Harksen, MNBA No. 0400097*

6                    *pro hac vice pending

7                    **BARNARD IGLITZIN & LAVITT LLP**

8                    18 W Mercer St, Suite 400
                    Seattle, WA 98119

9                    (206) 257-6003
                    (206) 257-6038

10                  iglitzin@workerlaw.com
                  dalmat@workerlaw.com

11                  harksen@workerlaw.com

12                  *s/James E. Lobsenz*

13                  James E. Lobsenz, WSBA No. 8787
                  **CARNEY BADLEY SPELLMAN, P.S.**

14                  701 Fifth Avenue, Suite 3600
                  Seattle, WA 98104

15                  (206) 622-8020
                  (206) 622-8983

16                  lobsenz@carneylaw.com

17

18

19

20

21

22

23

24

25

26

27

MOTION FOR SUMMARY JUDGMENT - 30
Case No. 2:18-cv-00506-MJP