The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SCOTT MILLER, an individual, MICHAEL
SPAULDING, an individual,

                    Plaintiffs,

        v.

KSHAMA SAWANT, an individual. CITY OF
SEATTLE, a municipal corporation,

                    Defendants.

NO. 2:18-cv-00506-MJP

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

**Noted for Consideration:**
February 3, 2023

*"The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty."*

*Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S. Ct. 669, 679, 15 L. Ed. 2d 597 (1966)

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 1

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

7701457.1

1

2

### I.  INTRODUCTION

3      Detectives Scott Miller and Michael Spaulding (together "Plaintiffs"), Seattle police

4  officers, request that summary judgment be denied.  In the wake of a fatal police shooting

5  involving Che Taylor, Defendant Kshama Sawant—a sitting member of the Seattle City

6  Council (the same city for which Plaintiffs work as police officers)—announced to a crowd of

7  spectators and media right outside her offices at City Hall that this was a "murder" and the

8  product of "racial profiling" by the two officers.  In other words, she accused the officers of a

9  racially motivated murder.  That same day, Plaintiffs' names were publicized in the Seattle

10  Times (as they were the only two involved in the Che Taylor shooting).  The result was rapid

11  and devastating.  Detective Spaulding had to install a security system at his home and his

12  parents' home.  Detective Miller, whose children attended Seattle public school, had to move

13  as a result of the hateful attacks on them after Defendant's tortious defamatory remarks.

14      But rather than simply retract her damaging statements, Sawant doubled down on her

15  previous statements just a few months later.  On June 20, 2017, beginning at around 6:40 p.m.,

16  Sawant stated to another crowd of public gathered on the streets of Seattle claiming this time

17  that there could be no justice for anyone of color, just as there had been no justice for Che

18  Taylor after he died.  She proclaimed, again, that Che Taylor "was murdered by the police"

19  (again, clearly intimating that the only two officers involved in his death were the murderers)

20  after emphasizing that because he was "black" there would be no justice, again implicating that

21  his shooting death by the Plaintiffs was racially motivated.

22      This is preciously the type of conduct that is prohibited as is deemed defamation *per se*.

23  The various arguments put forth in Defendant's motion are conclusory and improperly attempt

24  to remove the pertinent facts and conclusions from the province of the jury.  Although she may

25

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 2

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

7701457.1

be free to make several of these arguments at trial, she is not entitled to summary relief at this stage in the litigation.  Summary judgment must be denied.

## II.   FACTS

### A.   The Che Taylor Shooting

This case arises out of what may be the single most justified police shooting in the history of the state.  In February 2016, Detectives Spaulding and Miller were called upon to serve a high-risk warrant in the Wedgewood/Lake City area.  The context was dangerous to begin with, as this was an area known for violence and narcotics.  But it became even more dangerous when Che Taylor arrived in a Black Dodge.  The officers immediately recognized him—*not* because of the color of his skin—but because Taylor was a known drug dealer, pimp, and repeat felon.  He was recently released from prison following a 23-year sentence for break-in and forcible rape, and already, was a suspect in an ongoing murder investigation, in which the victim was beaten to death with a hammer.  Dkt. 120, Exs. 1-6.

Perhaps more significantly, Taylor had two "strikes" and a visible gun in a holster on his right hip.  This was itself a felony and triggered an ATF hit on the officers' computer. From their training and experience, the officers knew that an arrest would likely precipitate a violent confrontation, as Taylor, if convicted, would go back to prison for the rest of his life. The officers called for backup and waited, intending to arrest Taylor for the visible felony he was committing.  In the interim, they watched as he went down to the nearby trailer park—a location known to be rife with narcotics—and attempted to pimp out the female who accompanied him.

Taylor returned a short time later, still armed, just as the arrest team was arriving.  As they approached, it drew Taylor's attention and the officers moved to the backside of the Taylor vehicle—and began shouting commands for him to show his hands.  Taylor refused to comply.   Instead, he ducked down and began reaching for the gun in his holster.

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 3

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

7701457.1

1   The police car's vehicle camera picked up the officers' final shouts, "hey no hey no hey
2   no!" before both were forced to open fire.  When Taylor fell, the gun—now completely out of
3   the holster and in his hand—landed in his vehicle.  Per standard protocol, the officers were
4   placed on administrative leave pending a departmental investigation.  Simultaneously, the King
5   County Prosecutor's Office began the process of convening an inquest to determine whether
6   criminal charges should be brought against the officers.  Dkt. 120, Ex. 15.

7   **B.** **Defendant Sawant, with Public and Media Present, Characterized Plaintiffs as Racist Murderers Who Needed To Be "Held Accountable"**
8
9   Approximately five days after the shooting, the facts were still daylighting and
10  investigations were underway as Sawant was well aware.  The public had yet to make up its
11  collective mind, but this is when the Defendant decided to appear before a crowd and the
12  media, all as a Seattle City Councilwoman.  She used her considerable platform and
13  presumptive inside-information (after all, certainly it can be inferred that in the City's highest
14  governmental department, she would have knowledge and information that the everyday
15  people in the City would not have about this shooting) as the police department's "top report,"
16  to inflict maximum harm on the plaintiffs:

17      ***This is dramatic racial injustice***, in this city and everywhere in this nation. ***The
18      brutal murder of Che Taylor, just a blatant murder at the hands of the police***,
        show how urgently we need to keep building our movement for basic human
        rights for black people and brown people. ***I want to let you know that I stand
19      here both as an elected official***, as a brown person, as an immigrant woman of
        color, and as someone who has been in solidarity with the Black Lives Matter
20      movement, and our movement for racial, economic and social justice.…

21      And I am here as an elected official because I am completely committed,
        unambiguously committed, to holding the Seattle Police Department
22      accountable for their ***reprehensible actions***, individual actions. ***We need justice
        on the individual actions*** and we need to turn the tide on the systematic police
23      brutality and ***racial profiling***.

24  Dkt. 120, Ex. 12.  The same day that Sawant made these false and inflammatory statements,
25  the Seattle Times ran an article identifying the Plaintiffs by name.  *Id*., Ex. 11.

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 4

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

7701457.1

**C.**     **Plaintiffs Are Cleared of Wrongdoing by a Jury of Their Peers, Multiple Investigating Agencies, and the Seattle Police Department.**

As required by Washington State law, the King County prosecutor convened an inquest to determine whether charges should be brought for the shooting.  In February of 2017, approximately a year after the shooting, the inquest took place and an impartial jury cleared the Plaintiffs of any wrongdoing.  Any argument by Sawant that the officers are guilty of "murder" is simply unsupportable under the facts and under the law when she uttered such defamatory *per se* statements knowing that they had never been charged, let alone convicted of such a crime. Dkt. 120, Ex. 15.

In addition to the inquest process, the City's Force Investigation Team, in conjunction with the Office of Professional Accountability, performed a separate, independent investigation of the incident.  The Plaintiffs were again cleared of any wrongdoing.   The Force Investigation Team's findings were independently reviewed by the City's Firearms Review Board.  The Office of Professional Accountability again participated and the Plaintiffs were again cleared of any wrongdoing.   The Seattle Police Department also examined the incident and confirmed that the Plaintiffs' conduct complied with departmental policy.  Again, both Sawant and her counsel are well versed with all these facts, yet proceed to argue to the contrary before this Court without any support in the law.  Declaration of Michael Spaulding ("Spaulding Decl.), ¶ 4.

After Plaintiffs were cleared of wrongdoing, and Sawant's statements were proven to be false, Plaintiffs requested pursuant to statute that she retract her statements labeling them racist murderers. Sawant did not even bother to respond, much less retract or correct her defamatory statements (nor did she ever indicate to the public or the press that her statements were somehow only her "opinions" and no such evidence of these opinions can be found in her actual statements made before the press).

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 5

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

7701457.1

**D.** **Despite Being Cleared of Wrongdoing, Sawant Again Publicly Labels the Plaintiffs "Murderers" and States that They Evaded Accountability**

Ignoring the fact that the Plaintiffs were repeatedly cleared of any wrongdoing, on June 20, 2017, Sawant doubled-down on her inflammatory remarks, and again publicly proclaimed that the Che Taylor shooting was a *racially motivated murder* by the police:

> I join the NAACP in demanding such a transparent public hearing. ***When Che Taylor was murdered by the police***, the community and I demanded such a hearing from the Mayor and from Council member Gonzalez whose committee oversees the SPD, but neither the Mayor nor Council member Gonzalez responded. In . . . in light of the horrific killing of Charleena now I again urge . . . I publicly urge the City Council to hold such a hearing. I have also earlier today sent a number of important questions to the SPD.

> . . . We demand that the City of Seattle appoint an independent committee to review this case . . . with . . . with full public accountability. ***We cannot rely on the existing process to determine why Charleena was killed because that process has failed Che Taylor. . . that process has failed every person who was killed at the hands of the Police.*** Sisters and brothers, I will add one more thing for our movement that is standing with Charleena to think about, a deeply unequal society such as ours also implies that ***the lives of poor and low-income people, black and brown people, homeless people, those who have mental health issues and challenges . . . the system treats our lives as expendable***.

Dkt. 120, Ex. 26.

Sawant's public statements defining the Plaintiffs as racist murderers have wreaked havoc on plaintiffs' lives and the lives of their families. Declaration of Scott Miller ("Miller Decl.") and Spaulding Decl. The Plaintiffs and their families were publicly berated and chastised. Detective Miller was forced to move his family because his children were being bullied at school. Miller Decl., ¶ 2. Officer Spaulding had to install a security system at his parents' home after they received numerous death threats. Spaulding Decl., ¶ 3. The Plaintiffs' and their families' lives were collateral damage from Sawant's baseless political theater.

## III. EVIDENCE RELIED UPON

This opposition relies on the declarations of Plaintiffs Scott Miller and Blake Spaulding, John A. Hawkins (and his reports attached thereto), Jared Keller, Ashley Fitzgerald,

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT- 6

7701457.1

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

Lisa Smith, Michael Boggs, Stephen Eney, and Daniel A. Brown.  Plaintiffs also rely on the pleadings and files already in the record.

## IV.  AUTHORITY AND ARGUMENT

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986).  The Court must draw all reasonable inferences in favor of the non-moving party. *See*, *F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994).  The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 257.

Genuine factual issues are those for which the evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.  In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco*, Inc., 41 F.3d 547, 549 (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).

## A.  Motion to Strike Defendant Sawant's "Expert"

A trial court can only consider admissible evidence in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764 (9th Cir. 2002).  Defendant's motion, however, is partially based upon claims that are not supported by competent evidence from a qualified expert.  Defendant Sawant attempts to use former public defender, Lisa Daugaard, to opine that Che Taylor's killing *was* criminal and that "many lay people refer to all species of criminal homicide as 'murder'".  Dkt. 120, Ex. 29.  This testimony is inadmissible.

The Court should exclude "expert" Lisa Daugaard (and any testimony she offers now or might plan to offer later at trial).  This case is about *per se* defamation uttered repeatedly by Defendant Sawant claiming the Plaintiffs were murderers and, no less, racially based

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 7

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

murderers.  Years ago, Plaintiffs put their cards on the table, disclosing its expert John A. Hawkins, a Distinguished Professor of Linguistics at UC Davis, trained and educated in English linguists and its history, semantics, pragmatics, and the use of English in general.  Declaration of John A. Hawkins (Hawkins Decl.), Exs. A & B. This was done because Defendant Sawant's counsel repeatedly put in pleadings (without support from any declaration) that Sawant's utterances were harmless generalizations spoken to decry a broken system of justice and were not aimed specifically at the two plaintiff police offers.

Finally, five years later when Sawant finally had to go "on the record" everyone now knows better.  In her recent deposition, Defendant Sawant has rebutted her own prior legal pleadings by claiming, "yes", the officers are actually "criminals" for the "brutal murder" of Che Taylor.  Declaration of Daniel A. Brown ("Brown Decl."), Ex. A (Sawant Transcript, 95:13-19) ("As I said before, the statement I made at the speech…what seems like a wrongful death, a wrongful killing at the hands of the police department, and that it should be considered criminal…").  Still, apparently trying to have her cake and eat it too, counsel submits the "expert" declaration of Ms. Daugaard in a twisted attempt to justify Sawant's flawed legal indictment and conviction of the Plaintiffs.  A person neither a trained linguist nor a PHD in the English language, but an ex-public defender, now opines that "*Many, if not most, lay people refer to all species of criminal homicide as "murder."* Dkt. 120, Ex. 29, p. 7.  No support, no facts, just her conclusions as a lawyer, no less.

To start, Ms. Daugaard lacks the expertise to opine on this subject matter- and certainly cannot rebut John Hawkins' expert testimony and conclusions.  She has never before acted as such an expert and certainly lacks any relevant experiences or education in this regard.  Second, there is virtually no connection between her actual experience and her opinions here.  They are pure *ipse dixit*.  She relies on no authority, no standard, no rule, no regulation, no practice or other relevant factual basis for her "opinions."  Her subjective say-so

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1   does not qualify as "rigorous analytical connection" between expertise and

2   opinion. *Cf. Nimely v. City of New York,* 414 F.3d 381, 397 (2[d] Cir. 2005).

3        An expert witness may testify if such expert's "specialized knowledge will assist the

4   trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid.

5   702. Such a witness must be "qualified as an expert by knowledge, skill, experience, training,

6   or education" and may testify "if (1) the testimony is based upon sufficient facts or data, (2) the

7   testimony is the product of reliable principles and methods, and (3) the witness has applied the

8   principles and methods reliably to the facts of the case." *Id.* Ultimately, the "trial judge must

9   ensure that any and all scientific testimony [or any other expert testimony] or evidence

10   admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co.,*

11   *Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (extending *Daubert*'s requirements of relevance

12   and reliability to non-scientific testimony).

13        Here, there is no reliability about any of Ms. Daugaard's opinions in this matter. Her

14   opinion is precisely why *Daubert* exists. Although she has had a career in being a criminal

15   defense attorney, but with no discernible expertise or methodology, she simply declares that,

16   while she would not use the term murderer, she could see why Defendant Sawant or others

17   might. This belief is not grounded in any standard, rule, expertise or facts. It is based only on

18   her own subjective standard, which exists nowhere outside the courtroom, and it should be

19   excluded. A witness's qualifications must relate to the opinion she is espousing. *United States*

20   *v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000) (affirming exclusion of "international finance"

21   expert because he had "no experience in identifying counterfeit foreign securities."). A

22   proposed "expert" on a given topic, a witness must have "appropriate qualifications—*i.e.*, some

23   special knowledge, skill, experience, training or education *on that subject matter*." *United*

24   *States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (emphasis added). Unlike Plaintiffs'

25

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 9

1   expert, Mr. Hawkins, Ms. Daugaard, has not presented any sufficient qualifications to justify

2   the opinions she is espousing here.

3        Moreover, an expert opinion must be "based upon sufficient facts or data." Fed. R.

4   Evid. 702. "An expert's opinion must be supported by 'more than subjective belief and

5   unsupported speculation' and should be supported by 'good grounds,' based on what is

6   known." *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 801 (6th Cir. 2000) (quoting *Pomella*

7   *v. Regency Coach Lines, Ltd*., 899 F. Supp. 335, 342 (E.D.Mich.1995) (quoting *Daubert v.*

8   *Merrell Dow Pharms*., Inc., 509 U.S. 579, 590 (1993)).

9        This is, frankly, the bigger problem.  Ms. Daugaard's opinions are entirely subjective

10   and unmoored from any concrete grounds.  She could point to no standards, rules, regulations,

11   publications, treatises, guidance or other authoritative information.  Lastly, "[e]ncompassed in

12   the determination of whether expert testimony is relevant is whether it is helpful to the jury,

13   which is the 'central concern' of Rule 702." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d

14   1053, 1066 n.7 (9th Cir. 2002).  Accordingly, the general test regarding the admissibility of

15   expert testimony is whether the jury can receive "appreciable help" from such

16   testimony." *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986).  As noted, Ms.

17   Daugaard is not offering to do anything that the jurors cannot already do.  Unlike Professor

18   Hawkins, Ms. Daugaard is not distilling linguists down to an understandable level involving

19   certain words that have meaning only when they are referenced to something else.  For

20   instance, to call something a "planet" one must point to scientific literature to understand what

21   a planet is first.  This is equally true for medicine and other scientific terms as well as legal

22   phrases and concepts.   Ms. Daugaard simply asserts an opinion that others she claims would

23   have, although she does not actually espouse to that idea herself, and then asserts the opinion

24   based on that conclusion.  This is not only unhelpful, but would actually be confusing and

25   prejudicial.  Defendant is free to disagree with the Plaintiffs' expert, but she is not entitled to

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 10

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

outsource that job to a third-party that is not an expert.  Ms. Daugaard's report and deposition

excerpt should not be considered now when ruling on this motion or at trial.

**B.**     **Defamation Claim Under Washington Law**

Defendant Sawant correctly articulates the elements of a defamation claim under

Washington law: "[a] defamation action consists of four elements: (1) a false statement, (2)

publication, (3) fault, and (4) damages." *Duc Tan v. Lee*, 177 Wn.2d 649, 662 (2013).

**C.**     **Defendant Sawant's Statements are Defamation *Per Se***

What Sawant overlooks is that her statements were defamation *per se*.

> A publication is libelous or actionable *per se*, if, among other things, it tends to
> harm one in his business or occupation…***or imputes to him some criminal***
> ***offense*** involving moral turpitude…The interest protected is the reputation of
> the one alleged to be defamed. It is not necessary that the defamatory
> publication be in technical terms. It is sufficient if the language used imputes, to
> the recipient, the commission of a criminal offense by the one allegedly
> defamed…The inquiry is whether or not the words used are defamatory, in the
> sense in which they would be understood, correctly or mistakenly, but
> reasonably, by those to whom they are published….The court must determine,
> as a matter of law, whether a communication is libelous *per se*, where
> reasonable minds cannot differ either upon the defamatory meaning of the
> communication, or the manner in which it was understood by its recipients.

*Ward v. Painters' Local Union No. 300*, 41 Wn.2d 859, 863–64, (1953) (internal citations

omitted) (emphasis added).  In other words, "[d]efamation per se generally requires

imputation of a crime or communicable disease." *Davis v. Fred's Appliance, Inc.,* 171 Wn.

App. 348, 367 (2012).

Importantly, although defamation per se can sometimes be a question of fact or a

question of law, "[t]he imputation of a criminal offense involving moral turpitude has been

held to be clearly libelous per se."  *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App.

34, 43 (2005) *Caruso v. Local Union No. 690 of Int'l Brotherhood of Teamsters,* 100 Wn.2d

343, 353 (1983)).  As *Caruso* made clear: "Where the definition of what is libelous *per se* goes

far beyond the specifics of a charge of crime, or of unchastity in a woman, into the more

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

nebulous area of what exposes a person to hatred, contempt, ridicule or obloquy, or deprives him of public confidence or social intercourse, the matter of what constitutes libel *per se* becomes, in many instances, a question of fact for the jury." *Caruso,* at 354. Here, calling the Plaintiffs murderers is defamatory *per se* as a matter of law. Defendant thinking she can obtain summary judgment in her favor is simply hubris in the extreme.

These officers have been deprived of the "benefit of public confidence" and have had their "social intercourse" damaged by Defendant Sawant's defamatory statements. They are entitled to their day at trial. *Caruso*, 100 Wn.2d at 353. Defendant Sawant's comments ("[t]he brutal murder of Che Taylor, just a blatant murder at the hands of the police…" and "…when Che Taylor was murdered by the police…") constitute defamation *per se* because she imputed a criminal offense—murder—to Plaintiffs. In fact, Defendant Sawant confirms that when she used the word "murder" she did actually mean that the "killing was wrongful and should be considered criminal." Dkt. 121, Sawant Decl., ¶¶ 5, 8; *see also* Declaration of Daniel A. Brown ("Brown Decl."), Ex. A (Sawant Transcript, 95:13-19) ("As I said before, the statement I made at the speech…what seems like a wrongful death, a wrongful killing at the hands of the police department, and that it should be considered criminal…"). So ends the analysis.

The Court can and must find as a matter of law that Defendant Sawant's words are defamation *per se*. *See Ellwein v. Hartford Acc. & Indem. Co.*, 142 Wn.2d 766, 782 (2001) (confirming trial court's ability to grant summary judgment *sua sponte* for the non-moving party), *overruled on other grounds by Smith v. Safeco Ins. Co.*, 150 Wn. 2d 478 (2003); *Schuck v. Beck*, 19 Wn. App. 2d 465, 524 (2021) (court of appeals reversed summary judgment and remanded for summary judgment in favor of the nonmoving party).

**D.    <u>Defendant Sawant Admits That Her Statements Were Opinions AND Facts</u>**

As an initial matter, during her deposition, Defendant Sawant admitted that the public statements calling Plaintiffs "murderers" was a <u>fact</u>. *See e.g*., Brown Decl., Ex. A (Sawant Transcript, 76: 20-22) ("It's also a fact. It's very clear to everybody. It's not just my opinion.

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 12

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

It's also a fact.").  Even so, the fact that her statements are provably false—as Plaintiffs were never charged and certainly were never convicted of murder)—it does not matter whether her statements were opinions or facts:

> To establish the falsity element of defamation, the plaintiff must show the offensive statement was "provably false." *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590-91, 943 P.2d 350 (1997). " '[E]xpressions of opinion are protected by the First Amendment' " and " 'are not actionable.' " *Robel v. Roundup Corp.*, 148 Wn.2d 35, 55, 59 P.3d 611 (2002) (quoting *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 39, 723 P.2d 1195 (1986)). ***But a statement meets the provably false test to the extent it expresses or implies provable facts, regardless <u>of whether the statement is, in form, a statement of fact or a statement of opinion.</u>***

*Valdez-Zontek v. Eastmont Sch. Dist.*, 154 Wn. App. 147, 157-58  (2010) (emphasis added). Here, it does not matter whether Defendant Sawant's statements were in form opinion or fact because they were unequivocally false and involving claims of criminal conduct, were defamatory *per se*.  Her actual malice in uttering these tortious words is at the very least a question for the jury, if not deserving of summary judgment in Plaintiffs' favor.

## E.     At Best, Defendant Sawant's Statements Are Ambiguous and a Jury Must Decide Whether They Were Opinions or Facts

Defendant Sawant cites the multi-factor test Washington courts use to help determine whether a statement was factual or opinion.  In *Dunlap v. Wayne*, 105 Wn.2d 529, 538 (1986), the Court outlined the three non-exhaustive factors as follows:

> [E]xamining a statement in the totality of the circumstances in which it was made is the best means to determine whether a statement should be characterized as nonactionable opinion. To determine whether a statement is nonactionable, a court should consider at least (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts.

*Id.* at 539.  These factors weigh in favor of actionable factual statements rather than opinion. Certainly in a light most favorable to the Plaintiffs and with all inferences in their favor, it is at best for Sawant, a jury question requiring the trial that is upcoming.

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 13

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    ***First***, Defendant Sawant argues that the context in which she made her statements

2    calling Plaintiffs murderers—*i.e.*, during two public speaking events she volunteered to attend

3    and speak as a councilwoman—made clear that both audiences would inevitably have

4    understood her statements to be opinion.  It is unclear how Sawant believes this argument can

5    prevail on summary judgment.  She interviewed no attendees, took no surveys, and offers no

6    proof on this point.  She claims that statements of opinions are "expected to be found more

7    often in certain contexts, such as editorial pages or political debates."  *Id.*  Her contention is

8    that because, she denominates the public event as a "protest," her audience somehow

9    automatically knew she was standing there in front of City Hall as a councilwoman just "giving

10   her opinion only."

11        Perhaps most noticeable in terms of the context of Defendant Sawant's statements is the

12   omission of any "cautionary 'terms of apparency'" used in her statements.  *Id.* at 539  (citing

13   *Info. Control Corp. v. Genesis One Comput. Corp.*, 611 F.2d 781, 784 (9th Cir. 1980)).  She

14   does not use qualifying words like "I believe" or "in my opinion" or "I think".  She

15   unequivocally labels Che Taylor's killing as a "brutal murder at the hands of the police."  It is

16   clear from her declaration included in support of this motion, that she only *now* uses these

17   qualifiers hoping to escape the consequences of her actions ("It was **my opinion** that Taylor's

18   death could fairly be described as a 'murder'…").  Dkt. 121, Sawant Decl., ¶ 9. (emphasis

19   added).  But she did *not* use these types of words in any way, shape or manner to preface what

20   she said when she spoke to the crowds of people.  It is just as likely that the people who heard

21   these words and read them when they were republished, thought "here is someone in the know,

22   the police department answers to the City Council, so she must have the inside truth of what

23   really happened."  Summary judgment for Sawant cannot be granted here.

24        Even more, Sawant's first defamatory statements—on February 25, 2016— were made,

25   as stated above, on the steps of City Hall, and she even stated that she was there "*both as an*

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 14

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

7701457.1

*elected official*, as a brown person, as an immigrant woman of color…" thus insinuating that she was there in some official capacity and with more information than a passerby on the street.  Dkt. 120, Ex. 12 (emphasis added).  She did the same on June 20, 2017, when she stated highlighted her official capacity by stating that she "publicly urge[s] the City Council to hold such a hearing…" (Dkt. 120, Ex. 26).  Given the location of the protest and her own statements that she had some authority to speak on the issue, it is reasonable that at least some audience members did not understand her statements to be mere opinions and in fact there is no evidence that anyone thought such defamatory *per se* statements were mere opinions.  At least this is what the Plaintiffs should be free to argue to the jury and have them decide what is and what is not actionable.

*Second*, Defendant Sawant claims – again without evidence – that the audience expected her to use rhetoric and exaggeration because the purpose of the rallies at which Defendant Sawant spoke was to protest the police killings.  Nothing in the record demonstrates that the audience should have been prepared for mischaracterization and exaggeration, particularly given that Sawant has internal access to the Seattle Police Chief (Dkt. 121, Sawant Decl., ¶ 11) and the King County's Prosecutor's Office (Brown Decl., Ex. A, Tr.: 130).  She spoke to the audience, not as someone hoping to run for office, but someone who had already been elected into office with access to departments, people, and high level governmental information that is not widely available.   This is most likely what people thought who heard her actionable and false words.  Again, the jury would need to resolve this argument at trial.

*Third*, given her position as an elected official—and that she has access to information not known generally to the public—her statements imply the existence of undisclosed facts.  Importantly, she did not indicate what information she based her statements on (*e.g*., by watching the dashboard video), nor did she state what information she specifically did *not* have

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

(*i.e.*, that no charges had been filed against Plaintiffs—although even if charges had been filed, that still would not provide her latitude to call Plaintiffs murderers).

At best, a jury must decide this issue as there are factual issues as to whether Defendant Sawant's audience understood her statements as opinion or fact or whether a jury even believed that was how she was speaking considering the absence of any such cautionary language in her accusations against the officers. *See, e.g., Good Government Group of Seal Beach, Inc. v. Superior Court,* 586 P.2d 572, 576 (CA 1978); *Myers v. Boston Magazine Co.,* 403 N.E.2d 376 (Mass 1980); *Nevada Independent Broadcasting Corp. v. Allen,* 664 P.2d 337, 342 (NV 1983); *Kutz v. Independent Pub. Co.,* 638 P.2d 1088 (NM Ct.App.1981). *See also* Restatement (Second) *Torts* § 566 comment *c* (1977).

## F.   The Statements Are Provably False

Defendant Sawant next argues that what she said was substantially true—that is, she doubles down and states that Plaintiffs <u>*did*</u> murder Che Taylor because "reasonable people could consider [his death] wrongful and criminal." Mot. at 18. Again, it is strange that Sawant believes her supposition justifies an order granting summary judgment in her favor. Regardless, to start, this Court cannot determine whether Plaintiffs committed murder or not. No criminal case is before the Court and those claims were never brought by a prosecutor. Only a judge and a jury can determine this.   Since this never happened, this is why such statements are labeled "defamation *per se"* because they either accuse someone of a crime that has never been found. The King County prosecutor convened an inquest to determine whether charges should be brought for the shooting.  After the inquest took place, an impartial jury cleared the Plaintiffs of any wrongdoing.  No charges were ever brought against the Plaintiffs, and certainly no conviction has ever occurred.

In addition to the inquest process, the City's Force Investigation Team, in conjunction with the Office of Professional Accountability, performed a separate, independent investigation of the incident.  The Plaintiffs were again cleared of any wrongdoing.   The Force Investigation

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 16

Team's findings were independently reviewed by the City's Firearms Review Board.  The Office of Professional Accountability again participated and the Plaintiffs were again cleared of any wrongdoing.   The Seattle Police Department also examined the incident and confirmed that the Plaintiffs' conduct complied with departmental policy.

Next, Sawant claims that she used the word "murder" as a layperson and not as a judge or lawyer, so the word somehow takes on a different meaning depending on who uses the word.  If this were true, this would gut the lengthy and long case law on statements that are defamatory *per se*.   "I didn't really mean he was a rapist, I meant that he had sex with that person and he should feel bad for doing so."   Moreover, if this is a defense, the jury must decide if that is how she meant it.  Certainly in her recent deposition, she doubled down during that legal process and again accused the Plaintiffs of murder:

```
17:16:11 10      Q.   To this day, no charges for murder, for
         11   homicide, for assault, murder in the second degree, or
         12   any criminal charges whatsoever have been filed by any
         13   law enforcement agency against Officer Miller or
         14   Officer Spaulding because of the Che Taylor incident;
17:16:32 15   isn't that correct?
         16      A.   It is unfortunately true, that virtually no
         17   incidents of unjust killings at the hands of the
         18   police have been delivered justice.  Che Taylor's is
         19   one of them.  As I said, that is why, as I said in my
17:16:49 20   statement, that as a layperson, I believe that this
         21   was murder, because it was completely unjust and just
         22   outrageous, and that it should -- that it should be
         23   considered criminal.
```

Brown Decl., Ex. A, Tr.: 146: 10-23.

In any event, Sawant argues that the gist of her statements are substantially true because

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 17

"Miller and Spaulding did kill Che Taylor under circumstances that laypeople reasonably could and did describe as 'murder' in a non-technical sense." Mot. at 20.  Despite being unclear what using the word in a "non-technical sense" means, it is important to note that Defendant Sawant herself repeatedly states that she specifically meant the word to mean "criminal." Dkt. 121, Sawant Decl., ¶ 5.  Even more, words do not change their meaning depending on who uses them in this context.  Again, summary judgment is not appropriate on this issue for Defendant Sawant.

### G.   Defendant Sawant's Statements Are Not Privileged

Defendant Sawant next argues that what she said was protected by an absolute legislative privilege, which is simply incorrect.  The Supreme Court "has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).  The legislature's role is to set policy and to draft and enact laws.  *Fabre v. Town of Ruston*, 180 Wn. App. 150, 154 (2014).  "To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts." *Patchak v. Zinke*, 200 L. Ed. 2d 92 (Feb. 27, 2018) (quoting  *Cmmw. of Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)).

Defendant Sawant is an elected councilmember – not a judge or a jury.  A legislator crosses the line into judicial powers by "usurping a court's power to interpret and apply the law to the circumstances before it." *Patchak v. Zinke*, 200 L. Ed. 2d 92 (Feb. 27, 2018) (internal citations omitted).  In her speeches, she usurped the role of judge and jury and effectively rendered her judgment on the facts when she called the shooting "a blatant murder" at the hands of Plaintiffs.  It is unclear how she was in any way legally conducting legislative work when she stood on the steps of City Hall yelling through a bullhorn.

In *Gold Seal Chinchillas, Inc. v. Washington*, 69 Wn.2d 828, 834 (1966), the Washington Supreme Court extended immunity and protection to the Attorney General's press

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 18

release because (1) he was charged with the administration and enforcement of the consumer protection laws at issue and (2) the public would want to know that these laws were being enforced and that General was duly performing his responsibilities to the electorate.  The Court pointed out that the press release "specifically refers  to 'alleged violations' of the State Consumer Protection Act. It does not purport to present or describe as judicially established facts those acts of the defendants which were the basis of the consumer protection lawsuit." *Id*. at 830. Ultimately, for absolute legislative privilege to apply, "the allegedly libelous publication or oral pronouncement must have some relation to the general matters committed by law to the control or supervision of the particular state official." *Id*.

Unlike in *Gold Seal*, Defendant Sawant specifically referred to Plaintiffs' carrying out "a blatant murder" – note the absence of any "alleged" portion of her statements.   She acted outside of the legislative process and without any relation to general matter the law authorized her to do. She also did not appropriately attempt to convene a legislative investigation. In fact, it was the day after her speech that she requested that the City Council convene a public hearing on the shooting. This demonstrates a clear divergence from her legislative mandate. Defendant Sawant did not have the authority to authorize a public hearing yet held one anyway, adjudicated the facts, and convicted the Plaintiffs of a "blatant murder" that was racially motivated.

Moreover, a public speech is not an integral part of deliberative and communicative processes. "[E]verything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause. The Clause has not been extended beyond the legislative sphere, and legislative acts are not all-encompassing. *Doe v. McMillan*, 412 U.S. 306, 313 (1973). Rather, a protected matter "must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 19

respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. U. S.*, 408 U.S. 606, 625 (1972).

Additionally, the Court does not need to reach the question as to whether the Washington Supreme Court would extend legislative immunity to Defendant Sawant because the federal constitution prohibits legislative encroachment upon the judiciary. *Cmmw. of Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts."). However, if the Court considers the matter under the Washington Constitution, then in a diversity action, the Court is bound by the decisions of the Washington Supreme Court. *McKown v. Simon Prop. Group Inc.*, 689 F.3d 1086, 1091 (9th Cir. 2012). In the absence of such a decision, the Court's "task is to predict how the highest state court would decide the issue using intermediate appellate court decisions, among other sources of authority." *Id.*

While the Washington State Supreme Court has extended legislative immunity to the Attorney General, it would not do so here. Underlying the court's reasoning in *Gold Seal* is the same reasoning found throughout federal case law: the legislator may not usurp the authority of the Judiciary.  Here, Defendant Sawant tried to do just that.   Again, summary judgment fails.

**H.**    **Defendant Sawant Acted With Actual Malice**

"Actual malice ordinarily may be inferred from objective facts, and evidence of negligence, motive and intent, by cumulation and appropriate inferences, may establish the defendant's recklessness or knowledge of falsity. Further, the defendant's mere statement of h[er] belief in the publication's truth must be weighed against evidence adduced that supports a finding of knowing falsity or recklessness." *Maison de France v. Mais Oui!*, 126 Wn. App. 34, 44, 108 P.3d 787, 794 (2005).  *Duc Tan v. Le*, 177 Wn.2d 649, 662 (2013) is instructive on this issue:

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT- 20

We do not measure reckless conduct by asking whether a reasonably prudent person would have published or would have investigated before publishing. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968). ***Actual malice can, however, be inferred from circumstantial evidence, including a defendant's hostility or spite, knowledge that a source of information about a plaintiff is hostile, and failure to properly investigate an allegation***…However, "***recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports***." *St. Amant*, 390 U.S. at 732. ***Evidence of intent to avoid the truth may also be sufficient to show actual malice***. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 693, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989). ***Professions of good faith are unpersuasive when a publisher's allegations are so inherently improbable that actual malice may be inferred from the act of putting such extreme statements in circulation***.

Here, Defendant Sawant did not investigate anything before she spoke, yet it is reasonable that people hearing the vile statements would assume she did and was speaking with advance and superior knowledge being who she was and where she was when pronouncing her verdict.  There had been no conviction of the Plaintiffs, no trial of the Plaintiffs, no charges even brought (ever) against the Plaintiffs.  Any profession of good faith by Defendant Sawant is quickly overcome in light of her own admissions that she did nothing to investigate the facts other than watch a video.  Brown Decl., Ex. A, Tr. 162-165.  She did not wait to review statements given by the officers, did not wait for the City's many processes to be completed in its investigation of the shooting.  She did nothing but defame these officers in a forum where they could not fight back.  At a minimum, the circumstantial evidence is something that needs to go to the jury.

Summary judgment cannot be granted to Sawant on this argument either.

I.   **Defendant Sawant's Statements Were "Of and Concerning" Plaintiffs**

The Ninth Circuit has essentially ruled on this issue in its prior reversal, indicating that whether a reasonable person could understand her statements to be "of and concerning" Plaintiffs is an issue for the jury to decide:

The panel disagreed with the district court's conclusion that no reasonable person could conclude that Sawant's remarks concerned the individual officers

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 21

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

but rather spoke to broader issues of police accountability. ***The panel held that at most, the district court identified one reasonable interpretation of Sawant's words, not the only reasonable interpretation. Where a communication is capable of two meanings, one defamatory and one not, it is for a jury, not a judge, to determine which meaning controls. Here, Sawant's words reasonably carried with them the defamatory meaning Plaintiffs had assigned to them.***

*Miller v. Sawant*, 18 F.4th 328, 344 (9th Cir. 2021) (emphasis added).

Here, multiple witnesses have testified that they understood Sawant's statements referred to Plaintiffs specifically. *See e.g.*, Declaration of Jared Keller ("Keller Decl."), ¶ 4 ("I didn't know which officers were involved in the shooting when I first learned about Kshama Sawant's statement, but quickly learned that she was referring to Officers Miller and Spaulding because their names were also published by the media around the same time as the statement."); Declaration of Ashley Fitzgerald ("Fitzgerald Decl."), ¶ 6 ("When I watched the video I knew she was speaking about Officers Miller and Spaulding because I knew they were police officers involved in the Che Taylor shooting."); Declaration of Lisa Smith ("Smith Decl."), ¶ 6 ("… I saw a video on Twitter in which Kshama Sawant stated to a large crowd that Che Taylor was murdered by the police and that the investigative process had failed Che Taylor. At this point, I…knew immediately that Kshama Sawant's statements in the video were directed at Officers Miller and Spaulding because they are the officers that were involved in the shooting."); Declaration of Michael Boggs ("Boggs Decl."), ¶ 10 ("Even though Kshama Sawant did not identify Miller and Spaulding by name, I knew her statements were directed at them because she spoke about the police involved in the shooting and I knew they were the only police officers that were involved."); Declaration of Stephen Eney ("Eney Decl."), ¶ 5 ("Even though she didn't identify Miller and Spaulding by name, I knew she was talking about them because Spaulding had discussed the details of the shooting with me so I knew he and Officer Miller were the only police officers that her statements could apply to.").  In light of

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 22

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

7701457.1

1    the 9th Circuit's ruling, any argument about what Sawant meant is, at best for her, a question

2    for the jury.

**J.        Plaintiffs Were Damaged By Defendant Sawant's Statements**

3

4           To start, because this is defamation *per se*, damages are presumed.  Defamation *per se*

5    is actionable without proof of special damages.  *Amsbury v. Cowles Publ'g Co.*, 76 Wn.2d at

6    737 (1969).  Conversely, a defamation plaintiff may recover presumptive damages if he shows

7    he has been referred to by words libelous *per se*.  *Haueter v. Cowles Publ'g Co.*, 61 Wn.App.

8    560, 578 (1991). The defamed person is entitled to substantial damages without proving actual

9    damages. *Waechter v. Carnation Co.*, 5 Wn. App. at 128, 132 (1971).  Statements falling

10   within the *per se* categories are thought to be so obviously and materially harmful to a plaintiff

11   that damage can be presumed. *Arnold v. Nat'l Union of Marine Cooks & Stewards*, 44 Wn.2d

12   183, 187 (1954).  Certainly today calling someone a racist murderer would fit into that

13   category.

14          For example, in *Demopolis v. Peoples National Bank of Washington,* 59 Wn. App. 105

15   (1990), the trial court directed a verdict in favor of the defendant in a defamation case, in part

16   because plaintiff had proved no damages.  The court reversed on the ground that defendant

17   accused plaintiff of a crime. Since plaintiff established an action for defamation *per se*,

18   plaintiff did not need to prove any actual damages; see also *Maison de France, Ltd. v. Mais*

19   *Oui!, Inc.,* 126 Wn. App. 34, 37 (2005) (reversing trial court's finding of no damages and

20   instructing the trial court to award presume damages after defendant falsely claimed that law

21   enforcement agencies investigated the plaintiff for fraud).

22          Damages to Plaintiffs can be presumed here.  But even if that were not the case,

23   Plaintiffs have been damaged by Defendant Sawant—they have had to move, they have

24   installed security cameras, they have been ridiculed, etc.  *See* Miller Decl. and Spaulding Decl.

25

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 23

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

7701457.1

**K.**     **Defendant Sawant Can Criticize the Police, But She Cannot Defame Them**

Defendant argues that she has a protected right to call a police killing a "murder" because she has a right to "freely speak."  Additionally, she claims that censorship would function as a prior restraint on speech. To be clear, Sawant is free to criticize the police.  She just cannot defame Plaintiffs by calling them murderers.  Furthermore, the relief sought by Plaintiffs in damages is not a 'prior restraint'. "A 'prior restraint is an administrative or judicial order forbidding communications prior to their occurrence. Simply stated, a prior restraint prohibits future speech, as opposed to punishing past speech." *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 764 (1994).  Here, Plaintiffs seek to be compensated by an award of monetary damages for the reputational harm and damages they suffered by Sawant's tortious and outrageous behavior.

"While prior restraints prohibit exercise of the right before any abuse of the right can be shown, post-publication sanctions simply prohibit further exercise of the right after a showing of abuse.  Post-publication sanctions can accordingly be imposed consistent with article I, section 5, so long as they are narrowly drawn to serve a compelling state interest." *Littleton v. Grover*, 7 Wn. App. 2d 1073 (Wash. App. Div. 2 2019), *amended on reconsideration in part* (July 2, 2019). Sawant abused her right to free speech, if that is what it ever was, by using her public platform to defame Plaintiffs, and the state has a compelling interest in righting private wrongs and protecting the public from the type of harm inflicted as a result of her poor choice of words and harmful content.

## V.  CONCLUSION

Former Washington Attorney General Rob McKenna's comments on Sawant's statements is illuminating:

> It's pretty serious because accusing someone of murder is a very serious statement. In my opinion, the councilmember has crossed over from political rhetoric to defamation. I think the case can possibly be made, even though it is a high standard.  There's not much to say about someone that's worse than accusing them of being a murderer. Maybe a rapist or child molester, etc. In this

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 24

era we live in when people make reckless, inflammatory statements for political
purpose –particularly when the statements are made by a public figure with the
following that the councilmember has —  I think the law ought to take it
seriously.

Brown Decl., Ex. B.  Defendant Sawant said about the worst thing a person could say about

another individual—besides calling them rapists or child molesters.  She cannot escape the

consequences of her actions now and this Court must take it seriously.  Summary judgment

should be denied and this case should proceed to trial.

DATED this 30th day of January, 2023.

/s/ Daniel A. Brown
Daniel A. Brown, WSBA #22028
Jessica M. Cox, WSBA #53027
Attorneys for Plaintiff
WILLIAMS, KASTNER & GIBBS PLLC
601 Union Street, Suite 4100
Seattle, WA  98101-2380
Tel:  (206) 628-6600 Fax:  (206) 628-6611
Email:dbrown@williamskastner.com
jcox@williamskastner.com

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury of the laws of the State of Washington that on the below date, I electronically filed the foregoing document with the Clerk of the court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Signed at Seattle, Washington this 30th day of January, 2023.

s/Daniel A. Brown
Daniel A. Brown, WSBA #22028
Attorneys for Plaintiffs Teriyaki & Wok
WILLIAMS, KASTNER & GIBBS PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
Tel:  (206) 628-6600 Fax:  (206) 628-6611
dbrown@williamskastner.com

PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT- 26

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

7701457.1