1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SCOTT MILLER, an individual, MICHAEL SPAULDING, an individual,

          Plaintiffs,

    v.

KSHAMA SAWANT, an individual. CITY OF SEATTLE, a municipal corporation,

          Defendant.

NO. C18-0506MJP

DECLARATION OF DANIEL A. BROWN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Noted for Consideration:
February 3, 2023**

I, Daniel A. Brown, declare as follows:

1.     I am a member at Williams Kastner, attorneys for Plaintiffs in this action, and I make this declaration based on my personal knowledge.  If called to testify I would be competent to do so.

2.     Attached hereto as Exhibit A is a true and correct copy of the Transcript of Deposition of Defendant Kshama Sawant, dated January 12, 2023.

3.     Attached hereto as Exhibit B is a true and correct copy of a MyNorthwest article, "Attorneys Weigh In on Police Officers' Lawsuit Against Kshama Sawant," dated August 22, 2017.

DECLARATION OF DANIEL A. BROWN IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 1
  (2:18-cv-00506-MJP)

7701945.1

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    The foregoing statement is made under penalty of perjury under the laws of the United

2    States of America and is true and correct.

3            DATED this 30th day of January, 2023, at Seattle, Washington.

4

5                                                s/Daniel A. Brown
                                                 Daniel A. Brown, WSBA #22028
6                                                WILLIAMS, KASTNER & GIBBS PLLC
                                                 601 Union Street, Suite 4100
7                                                Seattle, WA 98101-2380
                                                 Telephone:  (206) 628-6600
8                                                Fax:  (206) 628-6611
                                                 Email:  dbrown@williamskastner.com
9                                                Attorneys for Plaintiffs Miller and Spaulding

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF DANIEL A. BROWN IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 2
(2:18-cv-00506-MJP)

7701945.1

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1

## <u>CERTIFICATE OF SERVICE</u>

2

3       I hereby certify that on January 30, 2023, I electronically filed the foregoing with the

4       Clerk of the Court using the CM/ECF system which will send notification of such filing to all

5       CM/ECF participants.

<u>s/ Daniel A. Brown</u>
Daniel A. Brown, WSBA #22028
WILLIAMS, KASTNER & GIBBS PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
Telephone:  (206) 628-6600
Fax:  (206) 628-6611
dbrown@williamskastner.com
Attorneys for Plaintiffs Miller and Spaulding

DECLARATION OF DANIEL A. BROWN IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 3
(2:18-cv-00506-MJP)

7701945.1

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

Exhibit 1

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---------------------------------------------------------

SCOTT MILLER, an individual,      )  No. 2:18-cv-00506

MICHAEL SPAULDING, an             )  MJP

individual,                       )

               Plaintiffs,    )

      vs.                        )

KSHAMA SAWANT, an individual.     )

CITY OF SEATTLE, a municipal      )

corporation,                      )

              Defendants.    )


---------------------------------------------------

Deposition Upon Oral Examination Of

KSHAMA IYENGAR SAWANT

---------------------------------------------------

January 12, 2023

601 Union Street, Suite 4100

Seattle, Washington



REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Kshama Iyengar Sawant                                January 12, 2023

---

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiffs:  SUMEER SINGLA
 3               JESSICA COX
 4               Williams, Kastner & Gibbs PLLC
 5               601 Union Street
 6               Suite 4100
 7               Seattle, Washington  98101-2380
 8               (206) 628-6600
 9               Ssingla@williamskastner.com
10               Jcox@williamskastner.com
11   For the Defendants:  DMITRI L. IGLITZIN
12               JACOB HARKSEN (via telephone)
13               Barnard Iglitzin & Lavitt LLP
14               18 West Mercer Street
15               Suite 400
16               Seattle, Washington  98119-3971
17               (206) 257-6003
18               iglitzin@workerlaw.com
19
20
21
22
23
24
25
```

Page 4

```
 1   E X H I B I T S CONT'D
 2   NO.   DESCRIPTION              MARKED
 3   10   Merriam-Webster excerpt definition   91
 4        "murder"
 5   11   Merriam-Webster excerpt definition   91
 6        "unlawful"
 7   12   Merriam-Webster excerpt definition   91
 8        "wrongful"
 9   13   Merriam-Webster excerpt definition   91
10        "criminal"
11   14   KUOW article, "Inquest jury finds    141
12        Che Taylor posed a threat to Seattle
13        Police
14   15   Transcript Excerpt of Recorded       147
15        Facebook Post Entitled: KOMO News
16        was live - at Magnuson Park,
17        June 20, 2017, Rally and vigil for
18        Charleena Lyles
19   16   Video recording  (postmarked.)
20
21   E X A M I N A T I O N
22   BY             PAGES
23   ATTORNEY SINGLA  5 - 174
24
25   ***** (* Denotes phonetic spelling.)
```

---

Page 3

```
 1   E X H I B I T S
 2   NO.   DESCRIPTION              MARKED
 3   1    Defendant Kshama Sawant's Answer    42
 4        and Affirmative Defenses to
 5        Plaintiffs' Third Amended Complaint
 6   2    Third Amended Complaint and Jury    42
 7        Demand
 8   3    Transcript of Recording Entitled:   42
 9        "CM Sawant 02-25-16 Speech"
10   4    Plaintiffs' First Written Discovery   42   13:07:57
11        to Defendant Sawant and Defendant's
12        First Supplemental Responses and
13        Objections
14   5    Audio recording  (postmarked.)
15   6    Local News The Seattle Times, 'Black  52   13:08:56
16        Lives Matter' protesters demand
17        firing of police chief after fatal
18        shooting
19   7    Final Interrogatories to the Inquest  53
20        Jury                                       13:09:04
21   8    Declaration of Kshama Sawant in      53
22        Support of Defendant Sawant's Motion
23        for Summary Judgment
24   9    November 14, 2017, email to Kshama    70
25        Sawant from Adam Ziemkowski              13:09:20
```

Page 5

```
 1   Seattle, Washington; Thursday, January 12, 2023
 2   1:08 p.m.
 3   -----------------------
 4   KSHAMA SAWANT:    witness herein, having been
 5        duly sworn by the Court Reporter
 6        testified as follows:
 7
 8   *   *   *
 9   E-X-A-M-I-N-A-T-I-O-N
10   BY ATTORNEY SINGLA:
11   Q.  Good afternoon, Councilmember.  My name is
12   Sumeer Singla.  I work for Williams, Kastner, & Gibbs,
13   and my firm represents the plaintiffs in this case,
14   Officer Spaulding and Officer Miller.
15       Before we get started, have you ever had
16   your deposition taken before?
17   A.  Yes.
18   Q.  How many times?
19   A.  Once.
20   Q.  And when was that?
21   A.  I don't remember exactly when, but maybe a
22   year, maybe a couple of years ago.
23   Q.  And what was that regarding, that deposition?
24   A.  That was regarding a campaign, public
25   campaign that my office was involved in in relation to
```

2 (Pages 2 to 5)

Kshama Iyengar Sawant                                    January 12, 2023

### Page 6

1    the Showbox Building.
2        Q.  Was that part of a lawsuit, or just part of
3    an investigation?
4        A.  I believe it was part of an initial
13:09:36  5    investigation the opposing counsel was doing in
6    preparation for a lawsuit, but I couldn't tell you
7    precisely.
8        Q.  Okay.  So you kind of understand how this is
9    going to go.  And that's the only time you've been
13:09:48 10    deposed?
11        A.  That's correct.
12        Q.  So to set the ground rules, I'm going to ask
13    a series of questions.  You are under oath, so you'll
14    have to answer those questions.  Mr. Iglitzin is going
13:10:01 15    to make some objections, and that's to preserve the
16    record.  You still have to answer those questions,
17    despite the objections.  There may be some objections
18    he makes directing you not to answer the question
19    based upon privilege, and I'll leave that between you
13:10:19 20    two to work out.
21            I'm going to assume you understand my
22    question if I get an answer from you.  If you don't
23    understand my question, just let me know.  I'm more
24    than happy to rephrase it or explain a little bit
13:10:33 25    more.  Fair enough?

### Page 7

1        A.  (Witness nods head.)
2        Q.  The other thing we're going to have to do --
3    Dmitri knows exactly where I'm going -- is no head
4    nods, no um-hums, uh-uh.  We'll have to do a yes or
13:10:43  5    no, because everything is going to be written down by
6    the court reporter.  If we were on video, we could
7    maybe get away with it a little bit.  But she's, the
8    court reporter is looking at me saying, Yeah, maybe
9    not.
13:10:55 10        A.  Um-hum, understood.
11        Q.  Before we get started, let's put your full
12    name on the record, and spell your last name.
13        A.  My full name is Kshama Iyengar Sawant, and my
14    last name is spelled S-a-w-a-n-t.
13:11:09 15        Q.  Okay.  And my understanding is that -- well,
16    we're going to start with your educational background.
17    My understanding is you have a bachelor's degree in
18    computer science; is that right?
19        A.  Computer engineering, yes; but...
13:11:25 20        Q.  When did you get that degree?
21        A.  In 1994.
22        Q.  From where?
23        A.  India.
24        Q.  Where in India?
13:11:31 25        A.  University of Mumbai.

### Page 8

1        Q.  And I'm going to go a little bit back.
2    Before your degree from University of Mumbai, where
3    did you go to school?
4        A.  At St. John's High School.
13:11:50  5        Q.  Where was that?
6        A.  In Mumbai.
7        Q.  What did you do after you obtained your
8    computer engineering degree in 1994?
9        A.  I worked for maybe close to two years, and
13:12:09 10    then after that, I moved to the United States upon
11    marriage.
12        Q.  And where did you work for those two years?
13        A.  The last place I worked at was a place called
14    DCS, Data Consulting Services, and before that, I had
13:12:38 15    at a place called Bellwether Technologies, which was
16    the place where I worked for the longest period.
17        Q.  And what kind of work did you do?
18        A.  It was software development and design.
19        Q.  And was that in India?
13:12:51 20        A.  Yes.
21        Q.  In Mumbai?
22        A.  Yes.
23        Q.  Where did you move to when you moved here
24    into the United States?
13:12:58 25        A.  North Carolina.

### Page 9

1        Q.  That would be approximately 1996?
2        A.  Yes.
3        Q.  Did you work in the computer industry when
4    you were in North Carolina?
13:13:10  5        A.  I did work there.
6        Q.  Where?
7        A.  At Nortel Network.
8        Q.  Where in North Carolina did you move to?
9        A.  In the Raleigh-Durham area.  It's called "The
13:13:24 10    Triangle."
11        Q.  And how long did you work for Nortel?
12        A.  Probably for a year and a half or so, and --
13    yeah.  I mean, I couldn't tell you, exactly, but along
14    that time.
13:13:40 15        Q.  I don't need the exact dates.  Just kind of
16    an approximation.  I'm trying to kind of understand
17    your background.
18            My understanding is you started your Ph.D.
19    program in North Carolina; right?
13:13:53 20        A.  I did.
21        Q.  Where was that?
22        A.  At North Carolina State University.
23        Q.  And how long did that take?
24        A.  So I enrolled in the program in 2000.  And I
13:14:09 25    was taking some classes before then, but I, you know,

3 (Pages 6 to 9)

Kshama Iyengar Sawant                                    January 12, 2023

---

### Page 10

1  enrolled in the master's program, and then went on to
2  doing my Ph.D. And I moved to Seattle as I was doing
3  my final work on my dissertation.
4      Q.  Were you working during that time?
13:14:27  5      A.  I was, on campus.
6      Q.  Oh, okay.
7      A.  It was, it was a fully funded Ph.D. program,
8  and part of that was for me to work either as a
9  teaching assistant or research assistant.  And I
13:14:41 10  worked in both functions at different times.
11      Q.  Let's button this up.  When did you move to
12  Seattle?
13      A.  I moved in 2006.
14      Q.  Okay.  Now I'm going to go back to your
13:15:00 15  teaching responsibilities while you were in your Ph.D.
16  program.  What did you teach?
17      A.  I taught various classes in economics.
18      Q.  Can you give me an idea what kinds of
19  classes?
13:15:11 20      A.  Yes.  Microeconomics, macroeconomics,
21  something called mathematical economics or mathematics
22  for economists.  It's called in different ways.
23      Q.  Were you the professor or teaching assistant?
24      A.  I was the professor.
13:15:31 25      Q.  And what kind of research assistant jobs did

### Page 11

1  you do?
2      A.  I did research for Dr. Robert Clark, who was
3  also my principal dissertation advisor, and his
4  research -- and so I assisted him in his research.
13:15:48  5      Q.  And what kind of research was that?
6      A.  His area of focus was on the economics of
7  aging, and so it was to do with various aspects of
8  statistical analysis and other economic analysis
9  related to economics of aging.
13:16:10 10      Q.  Now I'm going to take you all the way back to
11  your BA program when you were in Mumbai.  Did you take
12  any classes, law classes at that time?
13      A.  I did not.
14      Q.  Any business law classes?
13:16:26 15      A.  No.
16      Q.  International --
17      A.  Just to clarify.  It was not a BA.  It was a
18  bachelor of engineering.
19      Q.  Bachelor of engineering.  BA is bachelor of
13:16:35 20  arts.
21          Any economics classes -- not economics,
22  business law classes in your engineering program?
23      A.  No.
24      Q.  Any international law classes?
13:16:44 25      A.  No.

### Page 12

1      Q.  Okay.  Any kind of classes dealing with the
2  law during your engineering program?
3      A.  No.
4      Q.  Now, coming to your program when you are
13:16:56  5  getting ready to get into your master's and your
6  Ph.D., did you take any law classes at that time?
7      A.  There weren't any law classes, because it was
8  an economics program, but it's not uncommon in the
9  economics program to have classes that focus on the
13:17:12 10  economics of any particular area; like for example,
11  environmental economics or economics of a particular
12  industry.  So similarly there were classes being
13  offered like related to law, so I did take one
14  law-in-economics class.
13:17:31 15      Q.  Right.  That's where I was going to go.  So
16  there's classes like law in economics, if you are
17  getting an MBA.  There's a business law class.  Any
18  kind of classes you took, if you remember?
19      A.  That's what I'm saying.  I took one
13:17:44 20  law-in-economics class in my graduate program.
21      Q.  What did that entail?
22      A.  It was to look at how economic outcomes, you
23  know, macroeconomic, and even microeconomic in terms
24  of individual behavior, how they might be related to
13:18:03 25  current -- the status quo of the law.  But it was

### Page 13

1  mostly economics, not law.
2      Q.  Okay.  That's fair enough.  Any international
3  law classes?
4      A.  No.
13:18:15  5      Q.  Any criminal law classes?
6      A.  No.
7      Q.  Fair to say you haven't been to law school?
8      A.  It is accurate to say that I have not been to
9  law school.
13:18:23 10      Q.  And you are not a lawyer?
11      A.  I'm not a lawyer.
12      Q.  You are not a judge?
13      A.  No.
14      Q.  Okay.  What did you do when you moved to
13:18:33 15  Seattle in 2006?
16      A.  I was still working on my dissertation at
17  that time, so that was my primary responsibility.
18      Q.  And how long did you work on your
19  dissertation?
13:18:46 20      A.  I was working on it and then I was also doing
21  some internship type of work, and also just looking
22  for political organizations around that time.  So I
23  defended my dissertation in 2008.
24      Q.  Okay.  And what did you do after that?
13:19:13 25      A.  I -- just the process of the dissertation is,

4 (Pages 10 to 13)

Kshama Iyengar Sawant                                    January 12, 2023

---

Page 14

```
         1    I mean, it goes in this way:  First, you defend your
         2    dissertation, so that's what I did in 2008.  And that
         3    is pretty much the final step in terms of getting your
         4    dissertation, but it doesn't finally get entered as a
13:19:37 5    dissertation until you finish the writing of it.  From
         6    the time I defended my dissertation till early 2010, I
         7    think which is when my dissertation officially got
         8    recorded, so that's what I was working on.
         9       Q.  So between 2006 and 2010, were you employed
13:19:54 10   anywhere in the city of Seattle?  In Washington state,
         11   I should say.
         12      A.  No, I was not employed.
         13      Q.  My understanding is after -- so would it be
         14   fair -- my understanding is you taught some classes at
13:20:06 15   some local colleges and universities here in
         16   Washington state; is that correct?
         17      A.  That is correct.
         18      Q.  And where did you teach?
         19      A.  I believe I started in 2010, and I started in
13:20:18 20   various locations.  One was at Seattle Central
         21   College.  One -- and not one, as in many classes, but
         22   one of those places was Seattle Central College.
         23   Another place was Seattle University, and another was
         24   the University of Washington in Tacoma, and I also
13:20:39 25   taught classes at University of Washington.  You know,
```

---

Page 15

```
         1    I was invited as a guest lecturer at the University of
         2    Washington in Seattle.
         3       Q.  I'm just going to give you a little bit of
         4    forecast on where we are going to go.  We're going to
13:20:55 5    break down each one of these.
         6           When did you teach at Seattle Central
         7    College?
         8       A.  I don't remember exact, the term of my
         9    employment there, but it was around the time of
13:21:10 10   2000- -- in the period of 2010 to 2012.
         11      Q.  What did you teach?
         12      A.  Economics classes.
         13      Q.  What kind of economics classes?
         14      A.  I taught microeconomics and macroeconomics.
13:21:26 15   I think I also taught a class related to environment
         16   economics, but I don't recall, exactly.
         17      Q.  And what about at Seattle U?  When did you
         18   teach there?
         19      A.  All those places were all around that time,
13:21:40 20   and there were periods when I was teaching classes at
         21   more than one place.
         22      Q.  Fair to say, then, between 2010 and 2012, you
         23   were teaching either at Seattle Central College,
         24   Seattle University, University of Washington Tacoma,
13:21:56 25   or University Washington as a guest lecturer, the main
```

---

Page 16

```
         1    campus, you were teaching in one or more of those
         2    places?
         3       A.  That's correct.
         4       Q.  And what were you teaching?  What kind of
13:22:09 5    subjects were you teaching?
         6       A.  Overall, I would say, if you combine all of
         7    the teaching I did, primarily it's microeconomics and
         8    macroeconomics, because those are basic classes that
         9    all students who want a major have to take.  But I
13:22:25 10   also taught, like, for example, in the University of
         11   Washington Tacoma, I taught a class on global poverty
         12   and another class on the political economy of India.
         13   And I also taught some statistics classes at UW
         14   Tacoma.
13:22:52 15      Q.  So this is going to be a little bit of a
         16   broader question.  Between 1996, when you came over to
         17   the United States, until 2016, did you ever serve as a
         18   judge in the United States?
         19      A.  No.
13:23:08 20      Q.  Did you ever serve as a lawyer?
         21      A.  No.
         22      Q.  Did you ever serve as a legal advocate of any
         23   kind?
         24      A.  No.
13:23:20 25      Q.  In 2013, my understanding is you ran for the
```

---

Page 17

```
         1    House of Representatives in the 43rd in 2012; is that
         2    right?
         3       A.  That's correct.
         4       Q.  And then in 2013 you ran for city council; is
13:23:37 5    that right?
         6       A.  That is correct.
         7       Q.  Why did you run for city council?
         8       A.  It was a collective decision by my
         9    organization, which I'm a part of, and we collectively
13:23:49 10   decided it was a good time to show an example of what
         11   a genuine of representative of working people looks
         12   like, what the campaign would look like, and how we
         13   should push back against the status quo.
         14      Q.  I appreciate it was a collective decision.
13:24:06 15   My question wasn't whose decision it was.  My question
         16   was, why did you, Councilmember Sawant, personally
         17   decide to run for city council?
         18      A.  As I said, I was among the members of
         19   Socialists Alternatives, my organization, who all
13:24:24 20   believed, and that includes me, that it was a really
         21   good moment to demonstrate what a genuine elected
         22   representative looks like, or at the very least, show
         23   what that campaign looks like.  This was in the wake
         24   of the occupy movement.
13:24:38 25      Q.  Why you and not somebody else from that
```

---

                                                5 (Pages 14 to 17)

Kshama Iyengar Sawant                              January 12, 2023

---

Page 18

```
            1    movement?
            2        A.  That was not my personal decision.
            3        Q.  Who made the decision to put your name up?
            4        A.  The membership of Socialist Alternative voted
13:24:49    5    on who the candidate should be.
            6        Q.  And that was, they voted on you?
            7        A.  Yes.
            8        Q.  Why did you accept their vote?
            9        A.  Because it was the correct thing to do.
13:24:59   10        Q.  What do you mean by that?
           11        A.  One is because we are a democratic
           12    organization.  Unlike the Democratic and Republican
           13    parties, we actually take the discussion that happens,
           14    the democratic discussion that happens in the
13:25:18   15    organization very seriously, and we, we -- you know,
           16    it shows how political parties should actually
           17    operate, where the rank-and-file members have a say in
           18    who runs, what the campaign platform should be.
           19    Things like that.
13:25:37   20            And suddenly if I didn't agree -- if I
           21    personally hadn't agreed with the idea that we should
           22    run a genuine campaign at this moment, then I would
           23    not have agreed.  But I agreed with that decision, so
           24    I agreed with the overall decision, which included my
13:25:55   25    candidacy.
```

Page 19

```
            1        Q.  Did you inform your membership that you were
            2    interested in being put up as a candidate?
            3        A.  I did not.
            4        Q.  Have you ever served on a jury in any
13:26:10    5    context?
            6        A.  I have not.
            7        Q.  My understanding is you got elected in 2013
            8    and began your service in, I believe, 2014; right?
            9        A.  That's correct.
13:26:25   10        Q.  Can you describe your understanding of your
           11    role as a city council member between 2014 and 2016?
           12        A.  I can, except I'm not clear why you are
           13    demarcating that period, because I don't know that I
           14    would define my role differently in any given period.
13:26:51   15        Q.  You can wonder about that.  That's the
           16    question I get to ask.  My question is, between 2014
           17    and 2016, what did you believe your role was as a
           18    Seattle city council member?
           19        A.  As any year in my nearly ten-year -- I mean
13:27:11   20    ten-year, decade-long city council office tenure, in
           21    that period, just like in any other period of my
           22    tenure, I believed that my duty, political and moral
           23    duty was to serve working people and marginalized and
           24    oppressed communities.
13:27:50   25        Q.  Anything else?
```

Page 20

```
            1        A.  Well, it's a lot, but that encapsulates
            2    broadly the role we believe of an elected
            3    representative.
            4        Q.  That sounds more like a philosophy on your
13:28:07    5    governance.  My question is more about, as a sitting
            6    city council member when you started in 2014, what did
            7    you believe your duties and your role was in the
            8    structure of Seattle city government?
            9        A.  As I said before, I believe that at any
13:28:28   10    moment an elected representative's role, an elected
           11    representative of working people, their role is to
           12    serve the people they claim to represent.
           13            So I can say that, specifically, in 2014,
           14    for example, we had just won our election campaign
13:28:46   15    with a campaign platform that prominently brought up
           16    the question of the $15 minimum wage.  So concretely,
           17    the first task that my office -- when I say "we," I
           18    mean my office took on -- is the Fight for 15.  For
           19    example, in the first few weeks of my first year, we
13:29:07   20    launched the 15 Now campaign and launched the Fight
           21    for 15, alongside labor unions.
           22        Q.  So let me try a different way.  Do you
           23    believe you had to perform certain legislative duties
           24    as a Seattle city council member between 2014 and
13:29:26   25    2016?
```

Page 21

```
            1        A.  Fighting for 15 was a legislative duty, so
            2    maybe you should define what you mean by "legislative
            3    duty," and then I can answer.
            4        Q.  Sure.  What do you think legislative duty
13:29:38    5    means?
            6        A.  To me, the role of a city council member as
            7    an elected representative is to fight for working
            8    people.  Part of it is winning actual reforms, like
            9    $15 an hour, like the Amazon tax.  Those are concrete
13:29:54   10    pieces of legislation.  They're ordinances, so that is
           11    part of the legislative responsibility.
           12            I'm sure that other elected officials
           13    define it differently, so that's my definition.
           14        Q.  My understanding of your definition is that
13:30:09   15    you would be passing ordinances and other laws within
           16    the City of Seattle structure to forward your
           17    ideological beliefs.  Would that be fair to say is
           18    your legislative duties?
           19            ATTORNEY IGLITZIN:  I object to the form
13:30:26   20    of the question.
           21        Q.  Go ahead.
           22        A.  Can you clarify what you mean by --
           23        Q.  Well, I'm just trying to figure out what you
           24    just --
           25            ATTORNEY SINGLA:  Well, actually, Madam
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Kshama Iyengar Sawant                                    January 12, 2023

Page 22

1    Reporter, do you mind reading back the answer,
2    councilmember's answer to, What do you believe the
3    legislative duties are.
4           (Reporter read back as requested
13:31:15   5        the last answer.)
6        Q.  So I want to focus on that.  One of the
7    things you said in defining it for yourself was that
8    you believe that part of your legislative duties was
9    passing concrete pieces of legislation and ordinances.
13:31:31 10   Would that be fair to say?
11       A.  That's part of the legislative
12   responsibility, yes.
13       Q.  Do you believe that setting the budget is
14   part of the legislative duties that you have as a City
13:31:42 15   of Seattle council member?
16       A.  It's part of the work that the city council
17   as a whole, obviously to pass a budget, so that goes
18   without saying.
19       Q.  And you sit as a city council member and are
13:31:56 20   engaged in participating in the discussions regarding
21   passing the budget; correct?
22       A.  Sorry.  Are you saying am I involved in the
23   discussion?
24       Q.  Yes.
13:32:04 25       A.  Yes, I am involved in the discussion.

Page 23

1        Q.  And you vote on whether or not a budget is
2    passed; right?
3        A.  Yes, that's -- every council member has to
4    vote on it.
13:32:13   5        Q.  And part of the legislative duties for a city
6    of Seattle council member is also to pass regulation
7    and ordinances like we spoke about; right?
8        A.  That's correct.
9        Q.  And you participate in that process of
13:32:25 10   developing regulations and ordinates; correct?
11       A.  Depends on which regulation and ordinance you
12   are talking about, but yes, in general, that's true.
13       Q.  Any legislation and ordinance, even if it
14   comes out of committee, at the end of the day gets
13:32:42 15   voted by the entire council; right?
16       A.  Yes.  In the sense, when you say involved,
17   one might assume that it's a committee hearing.  Not
18   all council members are in every committee.
19       Q.  Right.
13:32:51 20       A.  So in that sense, yes, when the vote -- when
21   the legislation finally comes to a vote to the full
22   city council, yes, my office reviews everything, and
23   then we decide which way to vote.
24       Q.  And --
13:33:05 25       A.  And in some cases, we are involved much more

Page 24

1    directly if we are in the committee.
2        Q.  Right.  So you get more involvement if you
3    are in a committee in formulating the legislation, and
4    a little bit less involved if the legislation comes
13:33:20   5    out of committee that you are not on, and then you get
6    to participate during the entire council meeting
7    process; fair to say?
8           ATTORNEY IGLITZIN:  Object to the form.
9           And I wanted to ask you to pause for a
13:33:30 10   second after his question to give me a chance to
11   object, if I think it's appropriate.
12       Q.  Would that be fair to say, the way that I
13   described?
14       A.  Please repeat.  Sorry.
13:33:39 15       Q.  Sure.  Absolutely.  Your involvement in a
16   piece of legislation would be a little bit more if you
17   served on a committee where that piece of legislation
18   started, initiated, or was first reviewed, as compared
19   to your involvement in a piece of legislation if you
13:33:55 20   were reviewing it as part of the entire city council
21   when you were in, what I would call, the committee
22   of the whole.  Is that fair to say?
23       A.  I think it would depend on what kind of
24   legislation we're talking about.  Because the
13:34:15 25   involvement, as you are calling it, or I would say as

Page 25

1    a role of an elected representative I think is
2    partially determined by whether you are a member of
3    the committee or not, but it's also very much
4    determined by how important or relevant a given
13:34:35   5    proposed legislation is to working people.  And so it
6    could -- my engagement on a particular issue wouldn't
7    just be limited to the committee.  It could be
8    attending a town hall on the given issue, for example.
9        Q.  Not talking about town halls.  Not talking
13:35:00 10   about external.  Right now I'm just talking about you
11   working in city hall and how legislation works and how
12   it moves through the process.  Okay?  So when it moves
13   through the process -- let me shift gears for a
14   second -- you have an opportunity to propose any
13:35:16 15   amendments that you would like to a certain piece of
16   legislation at a certain point during the process;
17   right?
18       A.  Again, it depends if it is something that can
19   be presented as an amendment in that given situation.
13:35:36 20       Q.  Right.  So let me break it down for you even
21   further.  When a piece of legislation comes to the
22   entire city council, the committee as a whole to be
23   voted on -- do you follow me so far?
24       A.  Yes.
13:35:48 25       Q.  When that piece of legislation or ordinance,

7 (Pages 22 to 25)

Kshama Iyengar Sawant                                    January 12, 2023

Page 26

1    regulation, that is being proposed, comes to the city
2    as a whole, you as a council member can propose any
3    amendments that you would want to that legislation;
4    correct?  Is that true?
13:36:08   5        A.  I don't know what you mean by "any."  It
6    depends on what the situation is.
7        Q.  Well, if you wanted to change something that
8    was in that legislation and that ordinance, you could
9    process an amendment to change it; right?
13:36:21  10        A.  It depends on what the situation is.  But if
11    we -- if it was possible within the framework of that
12    legislation, and if we felt -- "we," meaning my
13    office -- felt it was warranted, then, yes, we would
14    process a legislation -- I mean, an amendment.
13:36:37  15        Q.  Let me in ask it the other way.  Nothing
16    prevents you from proposing amendments to ordinances
17    to a city charter; right?
18        A.  I don't know which amendments you are talking
19    about.
13:36:53  20        Q.  Amendments to an ordinance.  What I'm talking
21    about is amendments to an ordinance.  If a piece of
22    ordinance comes up for your vote as a committee as a
23    whole, nothing prevents you from proposing an
24    amendment to that ordinance when you are sitting in a
13:37:11  25    meeting of the whole; right?

Page 27

1        A.  It's a question of whether we want to present
2    an amendment or not.  I'm not exactly sure if I
3    understand.  When you say "nothing prevents," what
4    does that mean?
13:37:25   5        Q.  Is there any law or rule that prevents you
6    from proposing an amendment?  I know you may not want
7    to do it, but is there anything that prevents you, as
8    far as a law or a rule or anything in the charter?
9        A.  The charter says that you should present
13:37:42  10    amendment -- I mean, not the charter says, but the
11    understanding is that you would present amendments if
12    they're relevant to that legislation.
13        Q.  And the same would apply to the city budget;
14    right?  If you wanted to present amendments to the
13:37:56  15    city budget, you could do that; right?
16        A.  Yes.
17        Q.  Okay.  Now, part of the policy, or part of
18    the legislation or the policies that you would vote on
19    or review when you are sitting on the committee of the
13:38:13  20    whole, those policies includes policy governing police
21    departments; right?
22        A.  The police department is one of the
23    departments that the city council reviews the policies
24    of.
13:38:32  25        Q.  And in doing that review, you, as a council

Page 28

1    member, would review the Seattle Police Department's
2    policies and procedures if you wanted to; right?
3        A.  The city council does review policies and
4    procedures.  However, I believe that a lot of the
13:38:52   5    discussion on that happens in the committee -- I'm
6    forgetting exactly what it's called, but there's a
7    committee of council members and the mayor, a few
8    council members and the mayor, that go over the
9    policies and procedures with the police guild.
13:39:16  10        Q.  Not talking about the police guild.  I want
11    to focus on the first sentence that you said in your
12    answer, which is, the city council also reviews the
13    policies and procedures of the Seattle Police
14    Department.  You, as part of the city council, one of
13:39:33  15    nine members of the city council, you can also review
16    the policies and procedures for the Seattle Police
17    Department; correct?
18        A.  That is correct.
19        Q.  And if you wanted to offer any changes, you
13:39:47  20    could formulate legislation in the form of an
21    ordinance or a regulation to impact the change in the
22    City of Seattle Police Department's policies and
23    procedures; correct?
24        A.  I'm not actually sure how that process would
13:40:00  25    be, so that is why I am not being -- I'm not being

Page 29

1    very exact about this, because I don't know exactly
2    what you are asking, and I'm also not sure if at that
3    level, we can do it.
4            What I do know, and which I have done
13:40:20   5    repeatedly and that's available for the public to see,
6    is express my opinions on what, what kind of overview
7    or review there should be for police policies and
8    procedures, and overall what say ordinary people, you
9    know, Seattle's voters should have on those policies
13:40:47  10    and procedures.
11        Q.  We're not talking about expressing -- giving
12    a speech in a city council meeting or expressing an
13    opinion.  What I'm talking about is actual votes;
14    right?  I'm talking about you taking action, so let me
13:40:57  15    ask the question a different way.
16            You, as one of nine council members, vote
17    on who the chief of police is going to be; right?
18        A.  That is correct.
19        Q.  You, as one of nine council members, vote on
13:41:09  20    what the budget for the Seattle Police Department is
21    going to be; correct?
22        A.  That is correct.
23        Q.  You, as one of nine council members, in
24    voting on the budget for the Seattle Police
13:41:19  25    Department, have an understanding of how many Seattle

8  (Pages 26 to 29)

Kshama Iyengar Sawant                              January 12, 2023

---

Page 30

```
          1    police officers are going to be hired as part of that
          2    budgeting process; right?
          3        A.  That's correct.
          4        Q.  And you also, you said that you also serve --
13:41:31  5    as one of those nine council members, you also serve
          6    as a policy making role that oversees the Seattle
          7    Police Department; right?
          8        A.  That is what I'm saying.  I don't think that
          9    the -- I mean, at least to my knowledge, the city
13:41:48 10    council -- when you say the police chief, yes, but I
         11    don't consider that a policy structure.  When you
         12    say, how many police officers, which is discussed in
         13    the budget because that's part of the budget
         14    procedure, I don't consider that policy or procedure.
13:42:03 15    I consider that -- you know, how many police officers
         16    is a very specific thing.
         17            Those kinds of things, yes, are routinely
         18    discussed every budget.  Every year the budget
         19    discusses those things.  Every time there is a police
13:42:18 20    chief, you know, the need to appoint a new police
         21    chief, that comes to the city council, yes.
         22        Q.  So my understanding is, it's your testimony
         23    here that you don't have any direct role in guiding
         24    policy for the Seattle Police Department?
13:42:37 25        A.  As an elected representative of working
```

Page 31

```
          1    people, I do have a role in expressing my opinion on
          2    what I believe might be problematic in any given
          3    department, and that it needs to be changed.
          4        Q.  Do you have a role in conducting
13:43:02  5    investigations of agencies in the City of Seattle
          6    government?
          7        A.  Can you explain?
          8        Q.  Sure.  The City of Seattle government has a
          9    number of agencies, from FAS to the human resources
13:43:19 10    department to the public utilities, Seattle Police
         11    Department.  It has a number of agencies; right?
         12        A.  That's correct.
         13        Q.  And do you believe that you, as a council
         14    member, have a role in overseeing those agencies?
13:43:34 15        A.  The agencies report to the mayor, and the
         16    city council has a role in trying to ensure that the,
         17    the requirements that have been set by the city
         18    council are being followed.  For example, if you
         19    know, in the budget vote, if a certain amount of money
13:44:01 20    has been allocated for a certain task, then that
         21    review, okay, has that been accomplished and was that
         22    money used for that.  That's an example of what you
         23    are talking about.
         24        Q.  So how would one go about ensuring and
13:44:16 25    overseeing the role that certain budgetary
```

Page 32

```
          1    requirements -- let's just leave it at that for a
          2    second -- certain budgetary requirements were, in
          3    fact, being followed by an agency?  My question was,
          4    what would the city council do, or what would your
13:44:32  5    role be?
          6        A.  I mean, it's a very sweeping question, so I
          7    don't know if you can narrow it down a little bit.
          8        Q.  I'm just following along with your answer.
          9    You said that the agencies report to the mayor, the
13:44:48 10    city council's role as far as overseeing is to ensure
         11    that the agencies are doing what the requirements are
         12    as they would be set by the city council through the
         13    budget process.
         14            So my question is:  How does the city
13:45:02 15    council go about ensuring that the agencies are
         16    following the requirements that were set by the city
         17    council through the budget process?
         18        A.  One aspect of this is to use the, you know,
         19    the relevant committees and to bring back the
13:45:24 20    questions that were -- like, for example, if there was
         21    an allocation done in a given budget, then go over it
         22    in a period of a few months to review it.
         23            And then the city council also relies on
         24    various kinds of staff, so the city council has the
13:45:45 25    staff or the department staff themselves.
```

Page 33

```
          1            But all of this is, the way you are
          2    defining it is narrowly in terms of what happens in
          3    the designated meetings.  In my view, the role of an
          4    elected representative in terms of demanding
13:46:07  5    accountability, especially with the police department,
          6    goes well beyond that.  And in terms of really
          7    engaging working people, or the public, maybe you want
          8    to call it in, really understanding what's going
          9    wrong, what is -- and in some cases, what is
13:46:29 10    completely broken and how it can be fixed.
         11        Q.  I just want to be clear.  I'm not defining
         12    anything.  I'm just asking further questions based
         13    upon the answers that you are giving.  Let me ask the
         14    next question.
13:46:41 15            ATTORNEY IGLITZIN:  I'm going to object,
         16    for the record.  I think that's not a question, and
         17    it's sort of argumentative.  You can believe you are
         18    doing whatever you believe you are doing, but you
         19    can't say that if it's a given.
13:46:55 20        Q.  I'm going to clarify.  I'm not putting any
         21    definitions.  If you think I'm putting a definition,
         22    you let me know, and I'll --
         23        A.  I do think you are putting definitions.
         24        Q.  Let me ask it this way:  I'm going to
13:47:06 25    separate your job when you are working as a city
```

9 (Pages 30 to 33)

Kshama Iyengar Sawant                           January 12, 2023

---

Page 34

```
          1    council member versus what you do external as far as
          2    calling for town halls or calling for meetings.  When
          3    you are doing the work as a city council member in the
          4    legislative process, do you believe that that is
13:47:26  5    the -- well, let me put it this way:  Do you believe,
          6    aside from ensuring that agencies are adhering to the
          7    budget, the budget requirements that you've put into
          8    place, do you believe that you have any other role in
          9    overseeing agencies?
13:47:45 10              ATTORNEY IGLITZIN:  I want to object.  I'm
         11    trying not to make this be an argumentative objection.
         12    I'm going to object that question has embedded
         13    premises that the councilmember has not agreed to.
         14         Q.  So let me rephrase the question, then.  We
13:48:01 15    just got done talking about and discussing where you
         16    said that the agencies report to the mayor, and that
         17    your job, you believe your job as a city council
         18    member in overseeing those agencies is to ensure that
         19    they're meeting the requirements pursuant to the
13:48:18 20    budgetary process.
         21         A.  I did not exactly say that.  I said the city
         22    council has -- you know, does that overview.
         23              But the issue here is that, the way you
         24    are defining -- and you are defining.  You say you are
13:48:32 25    not defining, but you are defining -- it's one aspect
```

---

Page 35

```
          1    of what I believe a city council member should do.  So
          2    it's hard for me to answer these questions, because
          3    you say, Well, but leave aside the external things, as
          4    a council member this is what you do.  But I do many
13:48:54  5    things as a council member.
          6         Q.  And we'll get to those.  We'll get to the
          7    other ones.  I just want to focus on this aspect for a
          8    moment.  Okay?
          9              So in this aspect, you are one of the nine
13:49:04 10    council members that wants to ensure that the agencies
         11    are following the requirements that are set forth in
         12    the budget; correct?
         13         A.  I don't assume that every other council
         14    member has the same goal as me, which is ensuring
13:49:22 15    accountability.  In fact, I don't believe that.
         16         Q.  Are there any other ways that you,
         17    Councilmember Sawant, believe that you have an
         18    overseeing process for overseeing agencies, aside from
         19    the public process, just as a legislative process?
13:49:45 20    I'll be more direct.  Do you believe that you can call
         21    for investigations of certain agencies and
         22    departments?
         23         A.  I have called for public hearings, which is
         24    my definition of what an -- and also of public
13:50:09 25    investigation -- or independent investigation, sorry.
```

---

Page 36

```
          1    I've called for public hearings on various occasions.
          2    I also called for independent investigations on
          3    various occasions.  And you can see that I have done
          4    that.  So if your question is, can you do that as a
13:50:27  5    council member?  Yes.
          6         Q.  Okay.
          7         A.  But I want to be clear that what I have
          8    called for are either public hearings or independent
          9    investigations.  And I'm being very particular about
13:50:45 10    that terminology, because I actually don't belong
         11    that behind-the-scenes investigations yield anything
         12    useful for working people.  So when I say "independent
         13    investigation," what I mean, a publicly appointed
         14    independent group of people, for example --
13:51:07 15         Q.  Okay.
         16         A.  -- whose findings are available for the
         17    public to see, and they can be a hearing on findings
         18    and that kind of thing.
         19         Q.  What do you mean by "public investigations"?
13:51:19 20         A.  That's what I meant.  I meant public
         21    investigations or -- independent investigations is
         22    what I've said, not public investigations.
         23         Q.  So what I envision -- and I'm sure, I don't
         24    know, that would be assuming, and I'd probably get an
13:51:33 25    objection Dmitri, but have you seen the types of
```

---

Page 37

```
          1    hearings that Congress does from time to time on
          2    certain issues, whether it be -- I don't know what
          3    they're doing the hearings on this time.  Whether it
          4    be the January 6th hearings, have you seen those
13:51:49  5    hearings?
          6         A.  I know that those hearings are happening.
          7         Q.  Do you believe that the city council can
          8    conduct a hearing such as that January 6th hearing in
          9    a public forum on a certain issue?
13:52:02 10         A.  I believe the city council can and should do
         11    them, but they don't and they haven't really.
         12         Q.  I want to shift gears a little bit and talk
         13    about your role in comparison as it relates to the
         14    chief of police.  We mentioned -- we've talked about
13:52:29 15    the fact that you get to vote on the chief of police.
         16    Before you vote on the chief of police, have you
         17    conducted meetings or interviews with the candidates?
         18         A.  You mean on a separate occasion, or in
         19    relation to the appointment?
13:52:45 20         Q.  In relation to the appointment, first.
         21         A.  Yes, in relation to the appointment, I have
         22    had meetings.
         23         Q.  Okay.  And so this would include, well, now
         24    it's which Chief Diaz as of -- I don't know if he's
13:52:59 25    been sworn in today or not, but it would be Chief
```

---

10  (Pages 34 to 37)

Kshama Iyengar Sawant                          January 12, 2023

Page 38

1    Diaz; right?
2        A. Chief Diaz is the latest one.
3        Q. And then it would be Chief O'Toole?
4        A. Chief O'Toole, Carmen Best before that.
13:53:14  5        Q. Right. So Carmen Best and Chief O'Toole
6    before that?
7        A. That's right.
8        Q. You had interviews with them before they were
9    selected as chief; correct?
13:53:23 10        A. I had meetings with Kathleen O'Toole and with
11    Carmen Best.
12        Q. And once they were appointed and voted in as
13    chief, did you continue to have meetings with Kathleen
14    O'Toole?
13:53:46 15        A. I'm not sure if I remember, but as far as I
16    can remember, I don't believe so. It may have been on
17    one or two occasions. I'm not sure.
18        Q. Did you have Kathleen O'Toole, Chief
19    O'Toole's cell phone number?
13:54:11 20        A. I don't think so, no.
21        Q. Did your staff have access to her contact
22    information, her cell phone number?
23        A. I'm not sure if they had her cell phone
24    number, but I know we had -- as a city council office,
13:54:26 25    of course my staff have contact information in

Page 39

1    general.
2        Q. Describe to me a little bit about the extent
3    of your interaction with Chief O'Toole when she was
4    chief for the Seattle Police Department.
13:54:44  5        A. My interaction with Chief O'Toole was
6    primarily when she would appear in committee to speak
7    to the city council members.
8        Q. And so that means that she gave presentations
9    to all of the city council members?
13:55:11 10        A. That's correct.
11        Q. How much access did your staff have with the,
12    I want to call it the upper brass, but with these
13    chiefs and assistant chiefs of the Seattle Police
14    Department?
13:55:32 15        A. When you say "access," you mean like, how
16    much contact did we have?
17        Q. Contact, yeah.
18        A. It's hard to quantify, when you say "how
19    much."
13:55:42 20        Q. Give me an idea. Was there regular email
21    exchanges? People picking up the phone and talking to
22    each other? Can you give me an idea?
23        A. I wouldn't call it "regular," but I also
24    wouldn't say that it was anything -- it wasn't
13:56:00 25    anything out of the ordinary in the sense that, in the

Page 40

1    sense that it wasn't anything extraordinary about that
2    particular department, because we as an office
3    consciously spend a lot of time talking to either
4    rank-and-file staff of departments or to ordinary
13:56:20  5    working people, as a whole, about what their
6    experience is as a result of city policy, because I
7    believe that is where our focus should be.
8        Q. Okay. So let me follow up on that. How much
9    contact did you have with rank-and-file officers at
13:56:35 10    the Seattle Police Department?
11        A. Not, not a whole lot.
12        Q. So that was part of the rank-and-file staff
13    you didn't have much contact with compared to others?
14        A. That is accurate, because the police
13:56:49 15    department is not the same as, for example, the human
16    services department or City Light. It's fundamentally
17    a different kind of department.
18        Q. It's an agency, part of the City of Seattle;
19    correct?
13:57:04 20        A. Formally it is, but the role of the police
21    that they play is quite different.
22        Q. It's an agency part of the City of Seattle;
23    right?
24        A. Yes, formally it is part of the City of
13:57:15 25    Seattle.

Page 41

1        Q. It's funded by the City of Seattle; right?
2        A. It is funded by the City of Seattle.
3        Q. The human services department is an agency of
4    the City of Seattle; right?
13:57:26  5        A. That's correct.
6        Q. And it's also funded by the City of Seattle?
7        A. That's correct.
8        Q. As a city council member, did you ever play
9    any role in determining whether a crime had been
13:57:51 10    committed within the City of Seattle?
11        A. I'm not sure what you mean by that.
12        Q. What part of my question didn't you
13    understand, so I can clarify?
14        A. What do you mean by "role"? Like "role,"
13:58:05 15    what do you mean?
16        Q. In your capacity as a Seattle city council
17    member, did you ever have an opportunity to make a
18    determination on whether or not a crime had been
19    committed in the City of Seattle?
13:58:20 20        A. If you -- if by "role" you mean was my office
21    involved in making a legalistic determination, then
22    the answer is no, because we're not lawyers.
23        Q. You do pass laws, though?
24        A. But that's a political action. It's not -- I
13:58:39 25    just mean that we're not trained lawyers to decide on

11 (Pages 38 to 41)

Kshama Iyengar Sawant                           January 12, 2023

---

**Page 42**

1    a legal basis, but we do have political opinions.

2        Q.  Let's separate that out for a second.  I

3    didn't ask for the role.  My actual question was, in

4    your capacity as a Seattle city council member, have

13:59:01  5    you ever made a determination on whether or not a

6    crime has been committed in the City of Seattle?

7        A.  Well, I think it depends on what you mean by

8    that.  I mean, if you mean like a legalistic

9    definition, then, no, we can't claim to do that

13:59:23 10    because we're not lawyers.  However, we do have

11    political and social opinions about something that is

12    completely unjust or outrageous or unacceptable.

13        ATTORNEY IGLITZIN:  Let me jump in for a

14    second.  Sumeer neglected to say earlier, if at any

13:59:43 15    point you need a personal break for any reason, you

16    should just say so.  You are entitled.

17        Q.  Do you want to take a break?

18        A.  Yes.  I didn't know I was allowed to do that.

19        ATTORNEY SINGLA:  How long do you need?

14:00:00 20        ATTORNEY IGLITZIN:  Five to ten minutes.

21        (Discussion off record.)

22        (Recess.)

23        (Exhibits-1 through -4 marked.)

24        Q.  I want to start back and kind of go to

14:15:59 25    something that we talked about before the break,

---

**Page 43**

1    Councilmember.  One of the things you said -- and I

2    just want to get it right and confirm it.  One of the

3    things you said is that you do encourage in your role

4    as a council member, to call for independent

14:16:15  5    investigations.  Do you remember saying that?

6        A.  That's correct.

7        Q.  And my notes say that when you do that, what

8    your understanding of independent -- what your

9    definition of independent investigations, and tell me

14:16:29 10    if I'm wrong, what my notes say your definition of

11    independent investigations is a publicly appointed

12    independent group of people, the process is in public,

13    and then the findings are made publicly available; is

14    that correct?

14:16:46 15        A.  That's a big part of it, yes.

16        Q.  Anything else?

17        A.  Nothing specifically.  I only meant that

18    ultimately, because we are talking about a deeply

19    unequal system that we live in, capitalism, that shows

14:17:07 20    up in various contexts, and so it does matter who is

21    appointed.  So in other words, first of all, it

22    matters that the members of the public get to win an

23    independent investigation, and if it is won, then who

24    is part of that investigation, you know, who oversees

14:17:33 25    it or who does conduct it.

---

**Page 44**

1        That is why I'm placing a lot of emphasis

2    on it being public, because that is at least a

3    starting point to demand genuine accountability.

4        But I want to be clear that I don't

14:17:51  5    believe, one, that winning an independent

6    investigation is easy, because we haven't won that.

7    So when I say there should be an independent

8    investigation, I have said that, but I am one of nine

9    council members, and I don't -- we haven't won it, you

14:18:07 10    know.  But that is something that I feel and my office

11    feels that should happen.  And we have talked to many

12    people, and people may disagree on different things,

13    but they do agree that, yes, there should be this

14    public process of accountability.

14:18:24 15        Q.  And the participants in that public process

16    should be impartial; correct?

17        A.  I don't think "impartial" is the word I would

18    use, because the status quo is far from neutral.  So

19    as a matter of fact, we need individuals and we need a

14:18:44 20    whole process that whichever issue it might be talking

21    about understands what those issues are.

22        Q.  Okay.  I'm going to start with, let's start

23    with, I'm going to put a few exhibits in front of you

24    at the same time.

14:19:07 25        ATTORNEY SINGLA:  Dmitri, this is

---

**Page 45**

1    Exhibit-1, and this is Exhibit-2.

2        ATTORNEY IGLITZIN:  I'm sorry.  Is the

3    answer and affirmative defense -2?

4        ATTORNEY SINGLA:  -2.

14:19:52  5        ATTORNEY IGLITZIN:  And the third amended

6    complaint is?

7        ATTORNEY SINGLA:  -1.

8        ATTORNEY IGLITZIN:  Got it.

9        ATTORNEY SINGLA:  And this is Exhibit-3.

14:20:03 10        Q.  This is a lawyer question that all of us are

11    trained to ask.  Have you ever seen these documents

12    before, Exhibits-1 -2, and -3?

13        A.  Well, I'm not a lawyer, so all of these

14    documents are very opaque to me, but I believe I have

14:20:37 15    seen the first one that you handed out.

16        ATTORNEY IGLITZIN:  I'm sorry.  Is that

17    Exhibit-1?

18        ATTORNEY SINGLA:  Exhibit-1, yeah, the

19    first one.

14:20:50 20        ATTORNEY IGLITZIN:  Thank you.

21        Actually, I'm sorry.  Since I'm sitting

22    next to Councilmember Sawant, it looks as if you've

23    got the answer as Exhibit-1 and the complaint as

24    Exhibit-2.

14:21:09 25        ATTORNEY SINGLA:  Is that right?  Okay.

---

12 (Pages 42 to 45)

Kshama Iyengar Sawant                          January 12, 2023

## Page 46

1    Let's do that.
2          THE WITNESS:  It's the other way around.
3          ATTORNEY IGLITZIN:  No.  Exhibit-1 you
4    believe you've seen before?
14:21:26  5          THE WITNESS:  I think so, but I can't be
6    positive.
7          ATTORNEY SINGLA:  You are right.  Sorry.
8    Q.  So let's start with these documents.  You
9    don't have to be a lawyer to understand these
14:21:34 10    documents.  These are just the initial complaint,
11    which is what the allegations are alleged by my
12    clients in this case, which is Exhibit-2; and
13    Exhibit-1 is your answer; and Exhibit-3 is a
14    transcript of your speech from February 25th of 2016.
14:21:54 15    I kind of want to work through these documents.
16          So I'm going to ask you to turn to page 5
17    of Exhibit-2.  I'll have you turn to page 5 of
18    Exhibit-2, and I'm going to have you take a look at
19    paragraph 37.  This was the allegation my clients
14:22:27 20    made, which was stated basically -- and I'm going to
21    read a part of it, and then you can go ahead and read
22    the rest -- "With gravitas established, she went on to
23    pronounce Che Taylor's death a 'brutal murder' and
24    product of 'racial profiling,' stating, in relevant
14:22:48 25    part, as follows," and then there's a quotation with

## Page 47

1    bolded words.
2          Go ahead and read that, if you want, and
3    let me know when you are done.
4    A.  I'm done reading.
14:23:32  5    Q.  Okay.  Now, I want to go to No. 37 in
6    Exhibit-1, which is on page 6.  And this is what your
7    answer, Councilmember, was to the specific allegation.
8          What I want to kind of clarify, so we're
9    all on the same page, the last sentence says:
14:24:06 10    "Defendant denies that the quotations in paragraph 37
11    are true and correct transcript of the speech, and, on
12    that basis, denies paragraph 37."  Do you read that?
13    A.  Um-hum.  Sorry, yes.
14    Q.  And Exhibit-3 is your transcript of that
14:24:22 15    speech.  Go ahead and read that and confirm for me if
16    that is a true and accurate transcript of your speech.
17    It's three paragraphs.
18    A.  If you are asking if this is an accurate
19    transcript, it generally reads like something I would
14:25:09 20    agree with, but I haven't looked at the speech
21    recently, I assume it is.
22    Q.  Also as part of discovery, we also got the
23    audio recording of your speech as well.  I was going
24    to play that as well.
14:25:25 25          ATTORNEY SINGLA:  And we can email that to

## Page 48

1    you and mark that as Exhibit-5.
2          ATTORNEY IGLITZIN:  That's -5, recognizing
3    you are skipping over Exhibit-4?
4          ATTORNEY SINGLA:  Yes.  Those recordings
14:25:46  5    came from your office.
6          ATTORNEY IGLITZIN:  I don't doubt that we
7    have them.
8    A.  Actually -- I was going to say, after you
9    play and before you ask a question, can I take a break
14:25:57 10    to talk to Dmitri?
11    Q.  I don't have a pending question.  Why don't
12    we do that now.
13    A.  Okay.
14    Q.  You can do that now.
14:26:10 15          (Discussion off record.)
16    Q.  Councilmember, this is just going to be an
17    exercise in just kind of affirming your speech from
18    that day, which we have a recording on with a
19    transcript, and seeing whether or not you hearing the
14:28:32 20    speech and reading the transcript, you can affirm
21    that's an accurate transcript of your speech.
22          ATTORNEY IGLITZIN:  I do want to clarify.
23    I think that's right, since multitasking is hard for
24    all of us, you are not actually asking her at this
14:28:47 25    point to compare the language in paragraph 37 to the

## Page 49

1    audiotape, so she can just look at the transcript?
2          ATTORNEY SINGLA:  Yes.
3          ATTORNEY IGLITZIN:  It's hard to look at
4    two different transcripts at the same time.
14:28:59  5          ATTORNEY SINGLA:  Yes, I was going to
6    break it down, so we didn't do that.
7    Q.  If you wouldn't mind looking at Exhibit-3 as
8    I play Exhibit-5 and confirm for me that the audio
9    recording of Exhibit-5 matches the transcription of
14:29:13 10    Exhibit-3.
11    A.  Okay.
12          (Audio playing.)
13    Q.  So we just got through reviewing Exhibit-5.
14    Is there anything in that transcript on Exhibit-3 that
14:31:05 15    needs to be changed?
16    A.  I don't believe so, from what I heard.  I
17    mean, it's possible that I didn't hear everything
18    exactly.  But as far as I heard, it looks, it looks
19    accurate, compared -- I mean, with relation to the
14:31:37 20    audio.
21    Q.  And then now what we're going to do, because
22    we promised you we will break it down, now we're going
23    to take Exhibit-3, and compare it to paragraph 37 of
24    Exhibit-2.  And not counting the first sentence that
14:32:01 25    starts with "This" and ends with "nation," we don't

13 (Pages 46 to 49)

Kshama Iyengar Sawant                    January 12, 2023

## Page 50

1    have to count that one.  Starting with "The brutal,"
2    do you follow me on line 5?
3        A.  Yes.
4        Q.  Would you agree with me that the paragraph
14:32:15  5    where the sentence starting with "The brutal" all the
6    way to the end, "racial profiling," is the same also
7    in the transcript that we have been talking about in
8    Exhibit-3?
9        A.  I believe that is matching the two things.
14:33:50  10        ATTORNEY IGLITZIN:  I just want to note
11    that paragraph 33 indicates through ellipses where
12    it's not included certain lines in the transcript.
13        ATTORNEY SINGLA:  Correct.
14        A.  And also there is -- you said review
14:34:05  15    everything before that first sentence, so everything
16    before that first sentence is the same.
17        Q.  Yes.
18        A.  But in that sentence, there's a difference.
19        Q.  In the first sentence, there is.  That's why
14:34:20  20    I said from the second sentence onwards.
21        (Discussion off record.)
22        Q.  Sorry for the fits and starts.  I want to
23    compare that to your declaration, while Jessica is
24    printing those out, so we can economize our time.
14:35:23  25        Councilmember, the first question to wrap

## Page 51

1    this part up:  The transcript, which is marked as
2    Exhibit-3, is the speech that you gave in front of a
3    crowd on February 25th of 2016; correct?
4        A.  The transcript Exhibit-3 matches the words
14:35:44  5    that you played to me.
6        Q.  Okay.  And that was on February 25th of 2016;
7    correct?
8        A.  I mean, I don't remember the date offhand,
9    but, yes, I know that was in 2016.
14:35:56  10        Q.  Turn to the first page.  The first page of
11    Exhibit-3, it says it's the transcript of the speech
12    on February 25th.  Do you remember giving a speech on
13    February 25th?
14        A.  I remember giving a speech at a rally outside
14:36:16  15    city hall on the issue of Che Taylor and the overall
16    issues of the police department in relation to
17    communities of color.
18        Q.  And that would be the speech that we're
19    talking about, right, in Exhibit-3 that you gave?
14:36:36  20        A.  Like I said, this transcript matches what you
21    played, but at this point after so many years, I can't
22    remember if that was all of the speech or not.  I'm
23    saying, yes, that transcript matches the audio that
24    you played.
14:36:49  25        Q.  And I'm trying to button it up.  And that's

## Page 52

1    what you said in front of city hall about Che Taylor;
2    right?
3        A.  I said -- yeah, I said this.  This was -- or
4    rather, this was a speech that I gave outside city
14:37:04  5    hall at that rally.
6        Q.  Okay.  And that was four days after the
7    incident where Che Taylor had passed; correct?
8        A.  That's what I'm trying to say.  I don't
9    remember exactly the chronology of, you know, in terms
14:37:25  10    of how many days passed and which date exactly it was,
11    but I do know that this was the speech I gave at the
12    Che Taylor rally outside city hall.
13        (Exhibit-6 marked.)
14        Q.  This is going to be Exhibit-6.  Do you see --
14:37:52  15    this is a Seattle Times article from February 26th.
16    Do you see that?
17        A.  I do.
18        Q.  Go ahead and take a look at that article, and
19    then I'll ask a few more questions about it.
14:38:04  20        A.  (Witness complied.)
21        Q.  I'll represent to you, February 26th was a
22    Friday.  Would you agree with me, then, the rally
23    happened on Thursday, February 25th?
24        A.  Yes.
14:39:59  25        Q.  I'm going to give you this.  This will be

## Page 53

1    Exhibit-7.
2        (Exhibit-7 marked.)
3        Q.  And these are the final interrogatories to
4    the inquest jury in this matter, Exhibit-7.  I just
14:40:26  5    want, as a frame of reference -- we are going to talk
6    more about this later, but as a frame of reference,
7    you would agree with me after reviewing even the first
8    question on this, that the incident involving Che
9    Taylor happened on February 21st of 2016; correct?
14:40:49  10        A.  Correct.
11        Q.  So the rally that you attended was four days
12    after the incident with Che Taylor; correct?
13        A.  Correct.
14        Q.  You can put these aside for a second.  We are
14:41:33  15    going to mark Exhibit-8.
16        (Exhibit-8 marked.)
17        Q.  We are going to talk about Exhibit-8 for a
18    second.  Now, Exhibit-8 is entitled, "Declaration of
19    Kshama Sawant in Support of Defendant Sawant's Motion
14:41:47  20    Support for Summary Judgment."  Do you see that?
21        A.  I do.
22        Q.  Did you write this declaration yourself?
23        A.  I did.
24        Q.  So by writing it, you are the one who typed
14:42:03  25    it up?

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Kshama Iyengar Sawant                                    January 12, 2023

---

Page 54

1    A.  No.  I mean, I did it with the assistance of
2    counsel.
3    Q.  That's the distinction I want to kind of
4    figure out is, did you type this yourself -- and this
14:42:15  5  happens all the time -- or did your lawyers send you
6    something and then you affirmed it as your own
7    statements?
8    ATTORNEY IGLITZIN:  Object to the form of
9    the question.
14:42:29  10  Q.  Go ahead.
11    A.  To be honest with you, I don't remember where
12    it was initiated.  I do know that it's something --
13    it's a statement developed by me and my counsel
14    together.
14:42:56  15  Q.  Okay.  And then you at some point reviewed it
16    and adopted these statements as your own; correct?
17    A.  When you say that at some point I adopted
18    this as my own, that would imply that my counsel wrote
19    things and then I agreed with them, or my counsel
14:43:28  20  decided what happened.  That's not accurate.
21    Q.  Okay.
22    A.  It's the truth.
23    Q.  Okay.  So that's what I'm trying to get to
24    is, this is a declaration.  It's got your signature on
14:43:40  25  it.  If you take a look at page 5.

Page 55

1    A.  Yes.
2    Q.  And if you look at page 4, you say, "I
3    declare under penalty of perjury under the laws of the
4    United States...that the foregoing is true and
14:43:54  5  correct; do you see that?
6    A.  I do.
7    Q.  So with your signature, you confirm that
8    everything from paragraph 1 through 14 was true and
9    correct; correct?
14:44:08  10  A.  I do affirm.
11    Q.  Okay.  So that's what I'm getting to.  So my
12    question was -- my question is this:  Did you sit down
13    on a laptop and type up this declaration yourself from
14    a blank piece of paper?
14:44:31  15  A.  As I said, I don't actually remember how much
16    of it I typed.  But in all honesty, this is a
17    statement, as you yourself said, is something I've
18    signed and affirmed as truthful, and I think that that
19    is what matters.
14:44:54  20  Q.  Not what matters.  My question is:  Your
21    answer is, you don't remember whether or not you typed
22    this out yourself; right?
23    A.  I do remember that I wrote in relation to
24    this document, but I cannot honestly remember how much
14:45:15  25  of it was initiated in terms of words by my counsel

Page 56

1    and then me reviewing it, or me writing the initial
2    draft and sending it to counsel.
3    Q.  Okay.
4    A.  However, as I said, it is a statement from
14:45:34  5  me, as truthful by me.
6    Q.  Okay.  Let's go through your statement, and
7    I'm going to take you to page 3.  I'm going to go to
8    paragraph 9.  Do you see that?
9    A.  I do.
14:46:00  10  Q.  You write, and I'm going to read a few
11    sentences, "Alongside the protesters, I, too,
12    described the police killing of Che Taylor as a,
13    quote-unquote, murder.  It was my opinion that
14    Taylor's death could fairly be described as,
14:46:28  15  quote-unquote, murder, by which, as a layperson, I
16    meant to convey that I believed the officers' actions
17    were wrongful and should be considered criminal."  Did
18    I read that correctly?
19    A.  Yes.
14:46:48  20  Q.  I want to focus on starting with, "I meant to
21    convey" all the way to "criminal."  Okay?
22    A.  Okay.
23    Q.  Now, when we're talking about you said you
24    believe the officers' actions, in that you are talking
14:47:05  25  about Officer Miller and Officer Spaulding's actions;

Page 57

1    correct?
2    A.  As I later after I made the speech found out
3    their names, were what you just related.  When I was
4    speaking at the rally, I had no knowledge of their
14:47:30  5  names, and I was talking about the death of Che
6    Taylor, which I believed to be wrongful and unjust.
7    So I was referring to that incident.
8    Q.  When you are talking about -- I fully
9    appreciate that you found out their names later on.
14:47:50  10  In your declaration, when you are saying that you
11    believed the officers' actions, you were talking about
12    on February 26th, 2016 -- on February 25th, 2016, you
13    were talking about the officers that shot Che Taylor;
14    right?
14:48:14  15  A.  The complete answer to your question is, I
16    was talking about Che Taylor, because that was, that
17    was the incident that had happened recently.  But as
18    you just played my speech, I'm clearly talking about
19    Che Taylor's demise as part of a systematic problem of
14:48:35  20  the police department targeting people of color.
21    Q.  Now, this is your deposition -- I mean, this
22    is your declaration under oath.  You just told me this
23    was the truth.  You filed it three days ago.  And in
24    that declaration under oath, you said that it was your
14:48:53  25  opinion when you were sitting there with the

15 (Pages 54 to 57)

Kshama Iyengar Sawant                          January 12, 2023

---

Page 58

```
            1    protesters, that you could fairly -- the Taylor's
            2    death could be fairly described as murder; right?
            3    That's what you wrote on line 6.
            4        A. Yes.
14:49:09    5        Q. Am I reading that correctly?
            6        A. You read that correctly.
            7        Q. What you said just three days ago, you meant
            8    to convey when you said that Che Taylor's death was
            9    murder, was that you believed the officers', S
14:49:24   10    apostrophe, actions were wrongful; right?
           11        A. That's correct.
           12        Q. That's what you meant to convey. You meant
           13    to convey that the officers that shot Che Taylor,
           14    their actions were wrongful when you referred to his
14:49:41   15    death as "murder" on February 25th, 2016; correct?
           16        A. I am referring to Che Taylor's death. And I
           17    do believe, as I said in my speech, that individual
           18    officers do need to be held accountable for what I
           19    believe are completely unjust and, and what I believe
14:50:07   20    to be criminal killings. And unless individual
           21    officers are held accountable, it will not -- that has
           22    to be part of the process of holding the police
           23    department as a whole accountable.
           24        Q. You didn't write any of that in this
14:50:24   25    sentence; did you? What you just said in this
```

Page 59

```
            1    testimony in this deposition is not what's written in
            2    this sentence; right?
            3        A. I said a lot of things about this issue that
            4    are not in this declaration.
14:50:40    5        Q. Right. This was your chance, Councilmember,
            6    to clarify and tell the Court what you meant to
            7    convey. And what you told the Court in support of
            8    your summary judgment that you meant to convey was
            9    that you believed that the officers' actions were
14:50:57   10    wrongful and should be considered criminal; right?
           11        A. That's correct. But if you look at No. 10,
           12    it further clarifies the point I just made, which is
           13    also in my declaration.
           14        ATTORNEY IGLITZIN: Let her finish her
14:51:10   15    answer, Counsel.
           16        A. Your question, this was my chance to clarify,
           17    and I did clarify in number 10, where I said, "When I
           18    spoke of 'individual accountability,' I intended to
           19    make a broader point about the need for reform to how
14:51:22   20    police officers' use of force is investigated and how
           21    police officers, in general, can be held accountable
           22    for any unnecessary or excessive use of force. I was
           23    aware that almost no police officers had ever been
           24    charged with a crime, in Washington or nationally, for
14:51:38   25    killing people, and in particular Black people and
```

Page 60

```
            1    people of color, even when their use of deadly force
            2    appeared to be wrongful, and it was that type of
            3    systemic racism I intended to address when I referred
            4    to needing 'individual accountability.'"
14:51:52    5        Q. We're going to get to that, trust me. I
            6    promise you. We are going to get to paragraph 10 and
            7    individual accountability. I'm not there yet.
            8        A. But you implied that I did not clarify what
            9    you just explained, so I'm telling you I clarified it.
14:52:08   10    It's just in the following paragraph.
           11        Q. We'll get to individual accountability in a
           12    second. I'm just going to focus on paragraph 9. This
           13    is my only opportunity as counsel for the plaintiffs
           14    to ask you questions, so please answer the questions
14:52:24   15    that I ask of you. Mr. Iglitzin, after I'm done, will
           16    have ample time to ask questions for any
           17    clarifications.
           18        My question is, right now I'm focused on
           19    paragraph 9 and I'm going to be focused on your
14:52:38   20    transcript, starting with the sentence, "The brutal
           21    murder of Che Taylor, just a blatant murder at the
           22    hands of the police." Do you see that?
           23        A. I do.
           24        Q. Now, when you are in paragraph 9 stating
14:52:53   25    that, when you described it as a layperson, the word
```

Page 61

```
            1    "murder," is what you are saying that you meant to
            2    convey that you believed that the officers' actions
            3    were wrongful and should be criminal; correct?
            4        A. I believe, as I have said, that individual
14:53:18    5    accountability is important, and I did use the word
            6    "murder," and I stand by it. I still think it is
            7    murder.
            8        Q. Great. So then you also -- this is what you
            9    put down in your declaration is that, by the word
14:53:35   10    "murder," you want to convey the officers' actions
           11    were wrongful and should be considered criminal;
           12    right?
           13        A. I'm speaking not as a lawyer, and I was not
           14    speaking as a lawyer. I was speaking as the idea of
14:53:50   15    what, what in common parlance is understood as
           16    unjustifiable or wrongful killing, and that is, the
           17    word "murder" is understood as wrongful or
           18    unjustifiable killing in common parlance in terms of
           19    just understanding what happened with Che Taylor. And
14:54:12   20    as you see, I was far from the only one who had drawn
           21    this conclusion after having watched the video of the
           22    shooting.
           23        Q. Now, here, this is the reason I went through
           24    the exercises. You adopted these words in this
14:54:28   25    declaration as your own. Not a lawyer. You said,
```

16 (Pages 58 to 61)

Kshama Iyengar Sawant                                    January 12, 2023

---

Page 62

1    yep, these are my words; right?
2        A.   This is my declaration, yes.
3        Q.   And in that declaration, what you are saying
4    is, you mean to convey that you believe the officers'
14:54:43  5    actions were wrongful and should be criminal when you
6    were using the word "murder"; right?
7        A.   As I said, I believed what happened to Che
8    Taylor was completely wrongful and unjustifiable and
9    unjust, and I spoke as my common person's
14:55:07 10    understanding of what that would be described as, and
11    that is murder.  And to the extent that myself and
12    many other community members believed that what
13    happened to Che Taylor was murder, yes, it is
14    associated with individual --
14:55:27 15        Any time this happens and when community
16    members think it was wrongful, it is -- it was --
17    those specific acts were committed by individuals,
18    yes.  To that extent, that is what I believe.
19        But as I said in point No. 10, I clarify
14:55:45 20    what I mean and why, especially why I think that
21    individual accountability is part of, you know,
22    beginning to hold police departments accountable.
23        Q.   Let's go to your speech here.  Can you pull
24    up your Exhibit-3.  On Exhibit-3, circle for me
14:56:13 25    anywhere where you said the phrase, "I believe."

Page 63

1        ATTORNEY IGLITZIN:  That's not a question,
2    Counsel.  That's a directive, and you can't give her a
3    directive at a deposition.  You can ask her a
4    question.
14:56:25  5        Q.   I will ask the question, then.  Is there
6    anywhere in this one-and-a-half page speech where the
7    words "I believe" appear?
8        A.   The words don't appear, but it is implied.
9    I'm speaking as an elected official, and I am speaking
14:57:01 10    for what I believe, and it is implied when I say that
11    this was a "brutal murder of Che Taylor," that this is
12    what I believe.
13        Q.   So the answer is no, the words "I believe" do
14    not appear in that one-and-a-half-page speech;
15    correct?
16        A.   The words "I believe" do not appear.  But
17    this was a public speech, and I have no conception in
18    my mind that anybody, any ordinary person who heard
19    the speech, would think that the words that came out
14:57:43 20    of my mouth at that speech were not things that I
21    believed.  It is implied that I believe.
22        Q.   So the answer is, again, no, "I believe"
23    doesn't appear; right?
24        A.   As I said, the words "I believe" don't
14:57:56 25    appear, because it is implied that people understand

Page 64

1    that these are words that I believe.
2        Q.   And the same thing would go with the words
3    "it is my opinion" don't appear in that speech;
4    correct?
14:58:13  5        A.   Similarly, it is absurd, that -- I mean, are
6    you saying that people would think that what I'm
7    saying is not my opinion?  Of course, anybody who --
8        ATTORNEY IGLITZIN:  Let her finish her
9    answer.
14:58:26 10        ATTORNEY SINGLA:  Yeah.
11        A.   Anybody who has any conception of what an
12    elected official does when they speak, let alone
13    somebody, a socialist like me, would have a clear
14    understanding, whether you agree with the opinion or
14:58:44 15    not, that when an elected official speaks, it's their
16    opinion or it is something they believe.
17        Q.   So the answer is no, "it is my opinion" does
18    not appear in that speech; correct?
19        A.   Like I said before, the words "my opinion,"
14:59:03 20    "in my opinion," or "I believe" are implied in the
21    fact that I am an elected official making a speech, so
22    when I say something, it is reflecting what I believe
23    or something that is my opinion.
24        Q.   Okay.  And there's no other equivocations
14:59:20 25    when you are talking about the "brutal murder" or

Page 65

1    "racial profiling" in your speech, as in Che Taylor's
2    murder may be -- I mean, his killing may be considered
3    a murder or it could be considered a murder, there's
4    no qualifications before the term "brutal murder" or
14:59:39  5    "racial profiling"; right?
6        ATTORNEY IGLITZIN:  Object to the form of
7    the question.
8        Q.   Go ahead.
9        ATTORNEY IGLITZIN:  If you understand the
14:59:45 10    question.
11        A.   I don't actually understand the question.
12        Q.   Sure.  So we've talked about that you in your
13    speech nowhere "I believe" appears, no where "it's my
14    opinion" appears.  So now I'm saying, you don't even,
14:59:57 15    you don't even have a qualifier as in it may be a
16    murder or it could be considered a murder.  Nothing
17    like that appears in this speech either; right?
18        A.   Like I said before, as an elected official,
19    when I make a speech or even when I'm speaking
15:00:15 20    publicly in any context, whether it's at a rally or at
21    the dais, when I speak or when any of the elected
22    officials speak, the understanding of anybody would be
23    that that elected official is expressing their opinion
24    or saying what they believe.
15:00:37 25        Furthermore, furthermore, as I said

17 (Pages 62 to 65)

Kshama Iyengar Sawant                    January 12, 2023

## Page 66

1  before, when I used the word "murder," which I still
2  believe it was murder, I'm speaking not as a lawyer.
3  I am not using the word in any legal sense, because I
4  don't -- I'm not a lawyer.  I don't have any
15:00:57  5  experience or expertise.  I'm speaking as an elected
6  representative and as a common person who saw what was
7  to anybody who had any, any modicum of honesty what
8  that video -- when you watch the video of Che Taylor
9  being killed, it is like an execution.
15:01:21 10      And so when I say -- when I said "murder,"
11  when I say now as an elected official, as an elected
12  representative, this was a "brutal murder," I'm not
13  speaking in a legal sense.  I'm speaking in the sense
14  of, as I said before, common parlance, what is
15:01:37 15  commonly understood by ordinary people.  What is
16  murder?  It is completely un- -- wrongful, outrageous,
17  unjust -- that's the word I was looking for -- unjust
18  taking of human life.  When I'm speaking in that
19  sense, I can't imagine why I would equivocate or
15:01:57 20  qualify, because that is precisely what I don't want
21  to qualify or equivocate on, because it was such a
22  brazenly unjust taking of life.
23      Q.  I want to go back to the very first thing you
24  said in your answer, which was that --
15:02:18 25      ATTORNEY SINGLA:  And if we could go to

## Page 67

1  the very first sentence of councilmember's answer.
2      (Reporter read back as an
3      as follows:  Like I said before, as an
4      elected official, when I make a speech or even
5      when I'm speaking publicly in any context,
6      whether it's at a rally or at the dais, when I
7      speak or when any of the elected officials
8      speak, the understanding of anybody would be
9      that that elected official is expressing
15:02:59 10      their opinion or saying what they believe.)
11      Q.  If I read that correctly, are you saying that
12  any time any elected official speaks, the receiver of
13  that information at a rally should presume that it is
14  that elected official's opinion and opinion only?
15:03:15 15      A.  I don't understand your question.
16      Q.  You just answered my previous question by
17  saying, Hey, look, any time an elected official speaks
18  at a rally, it should be presumed what they are saying
19  is simply opinion and nothing else.
15:03:31 20      ATTORNEY IGLITZIN:  I object.  That
21  actually misstates what her prior answer was.
22      ATTORNEY SINGLA:  Let's read that answer
23  again.
24      (Reporter read back as requested
25      as follows:  Like I said before, as an

## Page 68

1  elected official, when I make a speech or even
2  when I'm speaking publicly in any context,
3  whether it's at a rally or at the dais, when I
4  speak or when any of the elected officials
5  speak, the understanding of anybody would be
6  that that elected official is expressing their
7  opinion or saying what they believe.)
8      Q.  Is that correct?  Isn't that your statement,
9  that it is your belief that any time an elected
15:04:19 10  official speaks at a rally, it should be taken as if
11  they're expressing an opinion or their belief?
12      A.  I think you are mischaracterizing what I
13  said.  What I said, yes, because you asked, is your
14  opinion opinion only.  I don't understand what that
15:04:38 15  means, because something can be a politician's opinion
16  and it could also be factual.  So it's not -- you
17  know, it's somewhere -- you know, there could be
18  statements anywhere in that spectrum.
19      What I'm saying is, an elected official is
15:04:57 20  hardly going to use a characterization if they didn't
21  believe that that was the -- that was an accurate
22  characterization in their mind.  And that is what I
23  meant, as an elected representative, as a common
24  person who is not a lawyer, that was my opinion, and
25  that is still my opinion.

## Page 69

1      ATTORNEY SINGLA:  Let's read the first
2  sentence of what councilmember just got done saying,
3  and I want to ask questions about that.
4      (Reporter read back as requested
5      as follows:  I think you are
6      mischaracterizing what I said.  What I said,
7      yes, because you asked, is your opinion
8      opinion only.  I don't understand what that
9      means, because something can be a politician's
15:05:47 10      opinion and it could also be factual.)
11      Q.  So what did you mean when you said that it
12  could be something that could be a politician's
13  opinion and could also be factual?
14      A.  Well, one example is, if I were to say, which
15:06:03 15  I have said many times, that the -- you know,
16  paraphrasing myself, I'm not -- I don't want you to
17  ask me, Is it exactly what you said.  I'm paraphrasing
18  my opinion that I have stated many times, which is
19  something like, the inequality is extremely harsh in
15:06:27 20  the United States.  Economic inequality is harsh.
21  That is my opinion.
22      But if you were to ask another economist
23  who maybe doesn't share my political beliefs would
24  actually also verify that, because they would have
25  studied data from the past decades and see it actually

18 (Pages 66 to 69)

Kshama Iyengar Sawant                          January 12, 2023

## Page 70

1    has gotten worse.  In this sense, it is a fact, but
2    the way I'm stating it is my opinion.  But the same
3    facts an elected official with different political
4    beliefs would state that same fact differently.
15:06:59  5           ATTORNEY IGLITZIN:  Can we take another
6    short break?
7           ATTORNEY SINGLA:  Let's go.
8           (Recess.)
9           ATTORNEY SINGLA:  Back on the record.
15:16:17  10   (Exhibit-9 marked.)
11       Q.  So when we left off, Councilmember, one of
12   the things you said, that it would be clear to anybody
13   who was either at the rally or looked at your speech
14   from the rally understood that it was opinion.  The
15:16:35  15   next day you received a letter via email from who, I
16   believe, is somebody who reviewed your statements at
17   your rally, Glenn MacDonald, in your office.  Do you
18   see that?
19       A.  I am looking at what you just handed out.
15:16:52  20       Q.  Go ahead and take a chance to review it.
21   Have you read it?
22       A.  I did.
23       Q.  Okay.  Did your office contact Mr. MacDonald
24   in any way to explain to him the difference between
15:17:57  25   how an opinion could be both an opinion and factual

## Page 71

1    both at the same time?
2           ATTORNEY IGLITZIN:  Object to the form of
3    the question.
4       Q.  Go ahead.
5       A.  This formulation that you just used, you just
15:18:06  6    came up with a few minutes ago.  This email is from,
7    you know, nearly seven years ago, so please ask me a
8    question that would make sense for that moment.
9       Q.  Sure.  What you said before this break and
15:18:25  10   before you talked to Mr. Iglitzin was, that an opinion
11   can both be an opinion and factual at the same time.
12   My question is:  When your office received this email
13   on February 26th of 2016, did you or anyone from your
14   office contact or call back or email Mr. MacDonald
15:18:48  15   back to explain to him that you were expressing an
16   opinion and there was no factual basis on which your
17   statements were?
18          ATTORNEY IGLITZIN:  Object to the form of
19   the question.
15:18:59  20       A.  I think you are asking the question in a very
21   leading way, where there's a premise in the question.
22   And for me to answer the question, if I were to answer
23   the question in the way you want me to, then it would
24   implicitly be accepting the premise you have laid out
15:19:18  25   in the question, which I don't agree with.  But I will

## Page 72

1    respond, based on what I think is accurate and true.
2           First of all, this is nearly seven years
3    ago, so I couldn't in all honesty remember if we
4    responded to this constituent or not.  My office
15:19:42  5    responds to many, many, at this point countless
6    constituents, so I could not honestly answer that
7    question.
8           But as far as the premise you are trying
9    to set up here, where, where you were stating your
15:19:58  10   opinion and it was not a fact, that is why I gave the
11   example of inequality; where is there inequality?
12   Tremendous inequality that has dramatically increased
13   in the United States?  It's a fact.  But how a
14   particular elected representative or even just an
15:20:19  15   ordinary person talks about it or expresses about it,
16   it really is depending on their opinion.
17          I mean, a billionaire would have a
18   completely different opinion about inequality as I
19   would as a socialist, so the same facts are expressed
15:20:36  20   differently.
21          However, I would also say that in this
22   case, it's, it's -- we're talking about the word I
23   used, "murder," which, as I have said before, I used
24   as a -- in common parlance, what I believed to be an
15:20:59  25   unjust and absolutely unacceptable taking of human

## Page 73

1    life.  But that's, that's where -- you know, that is
2    where the question of opinion comes in.  That was my
3    opinion.  That was an opinion -- that was the opinion
4    and still the opinion of at this point hundreds of
15:21:17  5    thousands of people in the region, especially since
6    the George Floyd movement.
7           But are there people who don't share that
8    opinion?  Of course, and this is one of them
9    (indicating).  So I completely accept that there is a
15:21:32  10   range of opinions on how the taking of Che Taylor's
11   life should be characterized.  My opinion is that it
12   was murder.  But I certainly not -- as I said
13   before, in a legal sense, that determination cannot be
14   made by me as an elected representative and a
15:21:50  15   nonlawyer.
16          But even if I were, I'm not the one who is
17   adjudicating, or I was not the one adjudicating this
18   case.  It would be to the judge.  And I believe
19   that while there are -- there's a range of opinions,
15:22:05  20   and this constituent is an example of a person who
21   didn't share my opinion, I believe that even he and,
22   you know, everybody listening to me as an elected
23   representative would understand that when I say
24   "murder," I'm expressing my opinion.  That I am not
15:22:23  25   the judge who is going to be -- who is the only person

19 (Pages 70 to 73)

Kshama Iyengar Sawant                                      January 12, 2023

Page 74

1  in the legal framework to make a determination.
2      So Glenn MacDonald may disagree with my
3  opinion, but I do not believe that he would in any
4  moment think that I'm delivering a statement of fact
15:22:42  5  as a judge.
6      Q.  Not my question at all.  My question was --
7  and I think you answered my question at the very
8  beginning, so I'll ask it again and have you confirm
9  it.  As you sit here today, you don't remember whether
15:22:56  10  anybody from your office contacted Glenn MacDonald
11  back; correct?
12      A.  So just to, just to make note, the way you
13  asked the question just now is not the same as the way
14  you asked the question earlier use.  When you asked
15:23:12  15  the question earlier, you laid in a premise that I did
16  not agree with, and so if I were to -- if I were to
17  have answered your question then, with that premise,
18  then it would have given a misinterpretation of my
19  position.
15:23:29  20      That is why I stated my position correctly
21  and what I believe to be true, which is, people can
22  have different opinions.  But I do not believe that
23  anybody thought at that moment I was speaking as a
24  judge or as a legal person or using legal parlance.
15:23:42  25      But you just restated the question by

Page 75

1  saying simply, you don't remember if your office
2  responded to Glenn MacDonald.  If your question is
3  simply, do you remember if my office responded to
4  Glenn MacDonald, yes, the answer is, no, I do not
15:23:58  5  remember.
6      Q.  I'm going to break it down, because that's
7  what I think is going to work best.  Now, you don't
8  remember whether your office responded to Glenn
9  MacDonald.  What will most likely happen if this case
15:24:12  10  goes to trial -- I'm giving you guys a heads-up.  If
11  there's anything you can do in the meantime, I think
12  this question will be asked again, whether or not your
13  office contacted Glenn MacDonald.  You'll have a
14  chance to answer that question at trial.
15:24:28  15      ATTORNEY IGLITZIN:  Is that a question?
16      ATTORNEY SINGLA:  No.  I'm giving you a
17  heads-up that's a question that Dan will probably ask.
18      ATTORNEY IGLITZIN:  That's the same
19  question you already asked?
20      ATTORNEY SINGLA:  Yes.
21      Q.  And he'll say, You didn't remember it in your
22  deposition, have you had a chance to review anything
23  as to whether or not you can confirm whether your
24  office contacted Glenn MacDonald?
15:24:46  25      My next question is, you are saying that

Page 76

1  everybody who listens to a politician would understand
2  what is opinion and what is fact.  Is that what you
3  are saying?
4      A.  I'm saying that within any reasonable
15:25:00  5  understanding, you know, it's hard to answer your
6  question, because you are putting it in a such a
7  blanket way.  But if you were to talk about general
8  things, I think that, for example, in this case, when
9  I said "murder," I believe that everybody
15:25:21  10  understands -- and I can say this -- I don't
11  understand how anybody would think that I was speaking
12  as if a judge would be speaking, where they're
13  actually delivering a legal, you know, legal verdict.
14      This is -- everybody knows I'm not a
15:25:40  15  lawyer, and everybody knows I was there at the rally
16  as an elected representative when I was expressing my
17  opinion, and that it is not being spoken in a legal
18  framework as a judge.  I mean, you know, but it's
19  slightly different than if I were to say, Today is
15:26:00  20  Thursday.  Today is Thursday.  It's also a fact.  It's
21  very clear to everybody.  It's not just my opinion.
22  It's also a fact.
23      But I think reasonable people have the
24  ability to understand that when it is something like
15:26:16  25  this, that this is not being said from a legal -- when

Page 77

1  Kshama Sawant, the city council member, said this was
2  a brutal murder of Che Taylor, reasonable people, as
3  far as I know, everybody would understand that this is
4  your opinion.  Whether you share that opinion or not
15:26:32  5  is a different story.
6      Q.  Let me ask you this:  Did you survey people
7  to understand that everybody knew you were not a
8  lawyer, you were not a lawyer at that rally?  You just
9  said, Everybody knows I'm not a lawyer.  Everybody
15:26:47  10  knows I wasn't a lawyer at the rally.  How do you know
11  that, that everybody doesn't know that you were not a
12  lawyer?
13      A.  Everybody does know that and everybody knew
14  at that time that I was speaking as an elected
15:26:59  15  representative.  And I also said before, that even if
16  an elected representative is a lawyer, I think people
17  understand that when you are speaking there as an
18  elected representative, you are not giving your legal
19  opinion.  You are speaking as an elected
15:27:12  20  representative, because you are not the judge who is
21  in charge of having a legal opinion about this.
22      Q.  That's what I'm asking.  There were about
23  60 to 80 people at that rally.  After you got done
24  giving your speech, did you talk to those people and
15:27:27  25  say, Hey, did you understand I wasn't speaking as a

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com            206.622.6661            800.657.1110

Kshama Iyengar Sawant                              January 12, 2023

---

Page 78

1    judge?
2          ATTORNEY IGLITZIN:  Object to the form of
3    the question.
4          Q.  Go ahead.
15:27:32   5     A.  Quite frankly, I think what you are saying is
6    an absurd thing, because everybody -- my opinion is
7    that everybody understands that I'm not speaking as a
8    lawyer.  I'm speaking as an elected representative.
9          Q.  My question is:  How do you know that
15:27:49  10   everybody knows you are not a lawyer?  You haven't
11   talked to everybody in the world.  You didn't talk to
12   everybody at the rally.  How did you know that
13   everybody knew you weren't a lawyer?
14         A.  I'm making a reasonable understanding of
15:28:03  15   what people understand as an elected representatives.
16         Q.  That's just according to you; right?
17         A.  I'm sorry.  You also are interrupting me, so
18   you are --
19         Q.  I'm sorry.  I thought you were done.  I
15:28:17  20   thought you were done.  Go ahead.  If you are, I'll
21   ask the next question.  How do you know that everybody
22   understood that you were making an opinion and weren't
23   speaking in fact, when you didn't talk to everybody at
24   the rally?
15:28:38  25         A.  I believe that anybody who was at the rally

---

Page 79

1    who knew that I was speaking as a council member,
2    understands that I'm speaking as a council member,
3    because of the simple reason I'm not a judge in this
4    case, who is the only person who is in the position to
15:28:58   5     speak in the -- to use the word "murder," or whatever
6    it is.  I'm not a lawyer, so I don't know what they
7    would say.
8          But I was there speaking as an elected
9    representative giving my opinion, and I believe that
15:29:13  10   people understood that I was speaking as an elected
11   representative.
12         Q.  Can you accept the premise that there could
13   be people at the rally that don't know that you are
14   not a lawyer?
15:29:25  15         A.  I believe that everybody understood I was
16   speaking as an elected representative.
17         Q.  That's your belief.  That's not my question.
18   My question was:  Can you accept the premise that
19   there were people at the rally that did not know you
15:29:43  20   are not a lawyer?
21         ATTORNEY IGLITZIN:  I'm going object to
22   the form of the question.
23         Q.  Go ahead.
24         A.  I don't understand.  I mean, I think you
15:29:53  25   should ask the question in a way that makes sense for

---

Page 80

1    the rally.
2          Q.  That's what I'm doing.
3          A.  I just saying, everybody understood I was
4    there as an elected representative, so I'm not clear
15:30:07   5     why anybody would then think about the question of
6    whether or not I'm a lawyer, because everybody
7    understood I was there as an elected representative.
8    I was introduced as a council member who had attended
9    the rally.  I'm not sure in what context it would come
15:30:26  10   up --
11         Q.  Sure.
12         A.  -- whether I'm a lawyer or not.  As I said, I
13   was using the murder, word "murder" not as a lawyer.
14   The people, the other people, the community leaders
15:30:35  15   who spoke at the rally also said "murder."  They
16   weren't speaking as lawyers.  That was my reasonable
17   belief.
18         So I don't see why others would not
19   reasonably think that -- would reasonably not
15:30:48  20   understand that I was speaking as an elected
21   representative, just as Gerald Hankerson was speaking
22   as the leader of the NAACP.
23         Q.  Not talking about Gerald Hankerson.  My
24   question was just a yes-or-no question.  I'll give you
15:31:02  25   context for it.

---

Page 81

1          When you were there as a council member
2    between 2014 and 2016, there were three lawyers who
3    were both lawyers and council members:  Debora Juarez,
4    Bruce Harrell, Lorena González.  What you said was, I
15:31:19   5     don't understand.  I just came up there and everybody
6    knew I was a council member.  My question was, at that
7    rally, are you at least willing to accept the premise
8    that there were some people that didn't know you were
9    not a lawyer?
15:31:32  10         A.  I think that's a problematic premise, the way
11   you are setting it up, because what I am saying to you
12   is that I don't believe, just in any reasonable
13   framework of thinking about that rally, that anybody
14   was thinking about who's a lawyer and who's not.  Yes,
15:31:49  15   there are elected officials who are also lawyers, but
16   I can, again, say, reasonably speaking, virtually
17   anybody when they heard Debora Juarez or whoever
18   speak, Bruce Harrell, the mayor, speak, they assume
19   that he is speaking as a mayor.  That's my reasonable
15:32:07  20   belief.
21         So in that given that, I don't accept your
22   premise.  I'm stating what I think the premise
23   actually is, which is, when an elected official comes
24   out and speaks publicly, who do people see?  They see
15:32:24  25   an elected official.  So when Mayor Harrell speaks, I

---

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com              206.622.6661              800.657.1110

Kshama Iyengar Sawant                                    January 12, 2023

Page 82

1   think it would be reasonable to assume that people,
2   when they hear him, they're thinking of him as
3   Mayor Harrell, and not as a lawyer.
4         And, yes, it's true some people know he's
15:32:38  5   a lawyer.  Some people may not know he's a lawyer.  I
6   don't know.  But I don't think that's actually
7   relevant, because when you are serving as an elected
8   representative, everyone knows you are speaking as an
9   elected representative.
15:32:51 10      Q.  That's my point; right?  You just said it.  I
11  want to get to that.  You don't know within those 60
12  to 80 people, that all 60 to 80 people believed the
13  same way that you do in the concept that, when you
14  speak as an elected official, you are only doing that.
15:33:07 15      A.  No, that is not what I said.  I said that,
16  regardless of which community members know what the
17  previous professions were of those elected officials,
18  when they are sitting elected officials and they speak
19  as sitting elected officials, I'm saying the exact
15:33:24 20  opposite of what you claimed I said.  I'm saying, when
21  Mayor Harrell speaks, virtually anybody would
22  understand that this person is speaking as the mayor,
23  and his previous profession before he was speaking is
24  not relevant.  That's what I said.
15:33:39 25        So when I speak as an elected

Page 83

1   representative, I don't know if people know what my
2   previous profession was, but I do know when I speak as
3   city council member, what they see is a council member
4   speaking.
15:33:51  5      Q.  Right.  And they see a council member saying,
6   Che Taylor was murdered.  That's what they hear the
7   council member saying; right?
8      A.  They're hearing an elected representative, a
9   council member speaking, and they understand that when
15:34:10 10  the council member says there was a brutal murder,
11  they understand it's an opinion.
12      Q.  How do you know that if you didn't survey
13  those people to get the understanding that it's an
14  opinion versus fact?
15:34:24 15      A.  I am making a reasonable understanding based
16  on just general human knowledge, because I'm not a
17  lawyer, so -- and I don't, I don't -- I honestly don't
18  agree that I need to survey, I literally need to ask
19  each person, because I was not even thinking about
15:34:44 20  that.  At that moment and now, nothing has changed
21  between that moment and now.  I was not a lawyer then.
22  I'm not a lawyer now.  I was not speaking in a legal
23  sense, and I was speaking as a matter of opinion, just
24  like others were speaking as a matter of opinion.
15:34:59 25        And there might have been people who

Page 84

1   actually spoke as lawyers, and they clarified that
2   they were lawyers.  But others were speaking as
3   community members, and I was speaking as a community
4   member and an elected representative, and I was
15:35:14  5   delivering my opinion.
6      Q.  Right.  And, ma'am, I'm not asking you to be
7   a lawyer.  You just got done saying that you, as a
8   council member, you spoke at the rally as a council
9   member, and as a City of Seattle council member, you
15:35:27 10  said those words, saying that Che Taylor was brutally
11  murdered.  That's what you said, right, as a council
12  member?
13      A.  I said those words as an elected
14  representative and a council member.
15:35:40 15      Q.  Right.  When you said those words, what is
16  the basis for you to say, then, that everybody at that
17  rally understood those words to be an opinion, when
18  you didn't clarify that that was your opinion?
19        ATTORNEY IGLITZIN:  Counsel, I think
15:35:55 20  you've gone round on this topic to the point where
21  it's getting -- I appreciate you'll have a chance to
22  argue in some other forum that you are not getting an
23  appropriate answer, but it's getting just a little bit
24  vexatious.
15:36:07 25        ATTORNEY SINGLA:  And I appreciate that,

Page 85

1   but councilmember's answers don't quite cover
2   everything, so I'm just trying to get --
3      A.  I don't agree.  I have been responding, but I
4   don't -- some of the premises you set up are not
15:36:19  5   accurate, and when I don't answer, that's because I
6   don't agree with the premise.
7        Again, just to repeat my answer to your
8   question:  I am not a judge.  Only a judge can decide
9   legally what the outcome of any given case should be.
15:36:38 10  I was there as an elected representative.  Everybody
11  knew that I was there as an elected representative,
12  and that's, that's the basic, that's the basic
13  framework.  That's the premise.  That's the context in
14  which people saw me speaking.  And in that context,
15:36:54 15  yes, people knew that I was giving my opinion.  And as
16  you can see from this email, not everybody shared that
17  opinion, but everybody knew that that was an opinion.
18        ATTORNEY IGLITZIN:  Counsel, I think
19  you've heard a full explanation from the councilmember
15:37:07 20  as to why she believed she could stake out the
21  position she's staking out.
22        ATTORNEY SINGLA:  Right.
23        ATTORNEY IGLITZIN:  I understand it's not
24  satisfying to you, but I don't think it's going to
15:37:19 25  change, from my observation.

22 (Pages 82 to 85)

Kshama Iyengar Sawant                    January 12, 2023

---

Page 86

1      ATTORNEY SINGLA:  We can do this off the
2  record, but I think Judge Pechman will want it on the
3  record anyways.  It's up to you how you want to handle
4  it with your client.  Just because your client does
15:37:34  5  not accept the premise of my question, doesn't
6  mean that she can't -- she still has to answer the
7  question, regardless --
8      ATTORNEY IGLITZIN:  I think she is
9  answering it.  You are not satisfied with or perhaps
15:37:45 10  fully don't understand.  I don't mean that as an
11  aspersion, but it's an interesting analytic
12  discussion.  I think when we look at the transcript,
13  we will see that the councilmember is articulating
14  very clearly her answer to your question, your
15:38:00 15  question being repeatedly, how can you make that
16  assertion without having surveyed people, and she has
17  answered that question.
18      Q.  I'll ask this question:  So the answer is,
19  that it is your presumption without surveying people
15:38:15 20  that they understood it to be an opinion; is that
21  true?
22      A.  Once again, the way you are setting up the
23  question, it implies as if there was some impropriety
24  or, or something objectionable about me going there as
15:38:44 25  an elected representative and conveying my opinion.

Page 87

1  And it's also, quite frankly, absurd to say that
2  people there, you know, in any rally, not just that
3  rally, are thinking about the previous professions of
4  elected representatives of -- you know, in any
15:39:03  5  context.
6      In any context people know that elected
7  representatives give -- officials give their opinions,
8  and you can either agree or disagree with their
9  opinion.  But I think I can reasonably say that people
15:39:18 10  at the rally and since other people, other
11  constituents who have been in touch with us or who
12  know that I am on the council, know that when you are
13  a sitting council member, you are not a judge.
14  Whether they know my previous profession or not, at
15:39:35 15  the very least, they know that I am -- as a sitting
16  council member, I'm not the judge in this case.
17      So at least they know the basic facts that
18  when I say "murder," I could not possibly be speaking
19  as a judge or a potential judge on that case.  And in
15:39:50 20  that sense, yes, it was my opinion, and in that sense,
21  I think it is reasonable for me to assume that people
22  knew that I was giving my opinion, whether they agreed
23  with it or not.
24      Q.  Is it possible that someone at that rally
15:40:04 25  took your statements to be factual and not opinion?

Page 88

1      A.  I think it is, it is a case where it is very
2  much a matter of opinion, because other people, while
3  they may not be elected representatives, are also not
4  the judge in this case.
15:40:26  5      So everybody had an opinion about what
6  happened to Che Taylor.  Some people thought it was
7  just.  Some people thought it was unjust.  And the
8  people who thought it was unjust, many of them called
9  it "murder."
15:40:39 10      So in other words, the usage of the word
11  "murder" is not in a legal sense from either me or
12  people who are not lawyers, and specifically people
13  who are not the judge in that case, and it's being
14  used in common parlance to mean -- you know, the word
15:40:57 15  "murder" is being used in common parlance to mean
16  something that was completely unjust, you know, just a
17  shocking taking of life.  And as I said, people who
18  watched the video and who shared my opinion that it
19  was murder, saw what was really an execution-style
15:41:14 20  killing.
21      Q.  Not my question at all.
22      ATTORNEY SINGLA:  And, Dmitri, that was
23  not even an answer to my question.
24      Q.  My question is a yes-or-no question.  And
15:41:22 25  just to let you know, Councilmember, in this process,

Page 89

1  I do, in fact, get to ask leading questions, and I do
2  get to ask yes-or-no questions, and I'm just looking
3  for a yes-or-no answer.
4      Yes or no:  Is it possible that there were
15:41:38  5  some people at that rally that understood your
6  statements to be factual and not opinion?
7      A.  I think, again, as I said, everybody knew I
8  was speaking as an elected representative, not as a
9  judge, and in that sense, people understood that I was
15:41:53 10  giving my opinion.
11      Q.  Yes or no:  Is it possible that there were
12  some people at that rally that could understand your
13  statements to be factual and not opinion?  Just a
14  yes-or-no question.
15:42:09 15      ATTORNEY IGLITZIN:  Well, Counsel, I'll
16  note that you can ask a yes-or-no question, but the
17  witness gets to answer the question as she sees fit.
18      A.  In the sense that people understood that I
19  was speaking there as an elected representative, not
15:42:23 20  as a judge, people understood I was giving my opinion.
21      Q.  So the answer to -- so I'll take that answer
22  to mean, no, nobody -- it's not possible that anybody
23  at that rally understood your statement to be factual;
24  is that correct?
15:42:39 25      A.  It's not possible for me to answer that

23 (Pages 86 to 89)

Kshama Iyengar Sawant                                    January 12, 2023

Page 90

```
            1    question, because I cannot divine what was in people's
            2    minds.  However, as a reasonable person, everybody
            3    knew that we were -- that I was speaking as an elected
            4    representative, so in that sense, no, I don't think
15:42:54    5    that they could have understood --
            6         Sorry.  What was the question?  That they
            7    could have -- how did you state it?
            8         Q.  That, no, it's not possible that somebody
            9    could have understood your answers, or your statements
15:43:08   10    to be factual.
           11         A.  They could not have understood that as
           12    factual, because they knew that I was speaking as an
           13    elected representative and I was giving my opinion.
           14    So yeah, the answer to your question is, no, they
15:43:19   15    could not have thought that, because I was speaking as
           16    an elected representative.
           17         Q.  And at the same time, you could not divine
           18    what all those people were thinking; right?
           19         A.  I can -- I do know, though, that -- I mean, I
15:43:31   20    can't divine what they were thinking in general, but I
           21    do want to clarify that they do know that I was
           22    speaking as an elected representative.
           23         So in the way that you are asking the
           24    question, the answer to your question is no.
           25         Q.  Okay.
```

Page 91

```
            1         (Discussion off the record.)
            2         (Recess.)
            3         (Exhibits-10 through -13 marked.)
            4         Q.  I'm going to put Exhibits-10 through 13.
15:52:19    5    Before the break, you just said, Hey, look, you are
            6    not a lawyer.  You were using the terms as a
            7    layperson.  I have taken the definitions from the
            8    Merriam-Webster dictionary of what the terms that you
            9    were using were that a layperson would go to if they
15:52:38   10    were looking at what they meant, so let's go through
           11    them.
           12         Exhibit-10, do you agree with me that the
           13    term "murder" definition would be a "crime of
           14    unlawfully killing a person, especially with malice
15:52:53   15    aforethought; was convicted of murder"?  That's what
           16    the first definition states; right?
           17         ATTORNEY IGLITZIN:  I'm sorry.  Object to
           18    the form of the question.
           19         Q.  Go ahead.  I'm just having you confirm that
15:53:04   20    that's what the definition says.
           21         ATTORNEY IGLITZIN:  Are you having her
           22    confirm that's what Exhibit-10 represents that
           23    Merriam-Webster says?
           24         ATTORNEY SINGLA:  Yes.
15:53:14   25         A.  Yes.  Although I think the "was convicted of
```

Page 92

```
            1    murder is a separate thing."
            2         Q.  Right.
            3         A.  Just Englishwise, that doesn't make sense.
            4    The first sentence by itself.
15:53:30    5         Q.  I apologize.  The definition is, "The crime
            6    of unlawfully killing a person, especially with malice
            7    aforethought."  And the way that it's being used is
            8    somebody was, quote-unquote, was convicted of murder.
            9    That's what it says; right?
15:53:45   10         A.  That's what it says.
           11         Q.  And then the second definition, which is 2a,
           12    would be, "something very difficult or dangerous,"
           13    like, "the traffic was murder"; right?
           14         A.  That's correct.
15:53:53   15         Q.  And then the third definition is "something
           16    was outrageous or blameworthy; getting away with
           17    murder"; right?
           18         A.  That's what it says.
           19         Q.  You'd agree with me, at least according to
15:54:06   20    Merriam-Webster what I pulled off the Internet, the
           21    2a, the "something very difficult or dangerous"
           22    wouldn't apply in this situation; right?
           23         A.  That would not apply.
           24         Q.  And the way that you used it, something
15:54:19   25    outrageous or blameworthy would not apply; right?
```

Page 93

```
            1         A.  I mean, obviously the way the term "getting
            2    away with murder" is commonly used, it's referring to
            3    things not actually related to taking of life, but
            4    more like an everyday occurrence.
15:54:41    5         Q.  Right.  I'll direct you to your declaration,
            6    those words that you wrote three days ago, and
            7    paragraph 8 where you said that you "did not
            8    understand anyone who used the word 'murder' to be
            9    using it in the technical, legal sense but only as a
15:55:02   10    layperson would, to describe a wrongful killing that
           11    should be considered criminal."  That's what you said,
           12    should be -- was the definition that you were using;
           13    right?
           14         A.  That's correct.
15:55:15   15         Q.  Okay.  And that would be more akin to the
           16    first definition we're talking about?
           17         A.  I think it is clear what I meant in point 8,
           18    that the word "murder" is -- was not used by me or the
           19    community members in any technical legal sense,
15:55:40   20    because none of us are in a position to make that
           21    call, but as a layperson, what seems to us as wrongful
           22    and should be considered criminal.
           23         Q.  Right.  So I'm going to direct you to
           24    Exhibit-12, which is the Merriam-Webster dictionary
15:55:57   25    definition of "wrongful."  Do you see that?
```

24 (Pages 90 to 93)

Kshama Iyengar Sawant                    January 12, 2023

---

Page 94

1      A.  I do.
2      Q.  Okay.  And in that dictionary definition, I'm
3  just having to confirm, "wrongful" is either "wrong"
4  or "unjust."  That's one definition; right?
15:56:13  5      A.  That's right.
6      Q.  And then the second one is "having no legal
7  sanction" or "unlawful."  That's the second one;
8  right?
9      A.  That's right.
15:56:22 10      Q.  Okay.  And then I'm going to direct your
11  attention to Exhibit-13, and that's the Miriam Webster
12  dictionary of "criminal."  And there the dictionary
13  definition says it's "relating to" or "involving, or
14  being a crime."  That's the first one; right?
15:56:50 15      A.  Right.
16      Q.  The second one is, "relating to crime or to
17  the prosecution of suspects in a crime."  That's the
18  second one?
19      A.  That's correct.
15:57:01 20      Q.  And the examples of that is "criminal
21  statistics, broad criminal action," or "criminal
22  justice system"; right?
23      A.  Correct.
24      Q.  And the third one is "guilty of "crime," as
15:57:14 25  in it's "befitting a criminal"; right?

Page 95

1      A.  Right.
2      Q.  So I'm looking -- and this is what I did,
3  Councilmember:  I looked at your definition that you
4  told Judge Pechman in Exhibit-8, which says you would
15:57:30  5  describe it to be a, murder to be "a wrongful killing
6  that would be considered criminal."  I took no legal
7  definitions.  I took the Merriam-Webster definition.
8  Would it be fair to say that taking your definition
9  from paragraph 8, that this would be a wrong or unjust
15:57:56 10  killing that would be related to a crime?
11          ATTORNEY IGLITZIN:  Object to the form of
12  the question.
13      A.  As I said before, the statement I made at the
14  speech, in the speech was, you know, as an ordinary
15:58:28 15  person who would understand what is wrong, what seems
16  like a wrongful death, a wrongful killing at the hands
17  of the police department, and that it should be
18  considered criminal, which is related to all the
19  statements that my office has made about the need for
15:58:48 20  police accountability; the need for an elected
21  community oversight board that has full powers over
22  the police.
23          So all of that, what all of that implies,
24  that we believe that this was -- that killings like
15:59:03 25  Che Taylor's should be considered murder and, you

Page 96

1  know, but they are not.  As I said elsewhere in my
2  statement, that I know that police officers have not
3  been brought to justice for these types of killings,
4  and that's why there should be police accountability.
15:59:24  5      Q.  What you told -- you were clarifying for the
6  judge in paragraph 8 what you meant by "murder" on
7  February 25th of 2016; right?
8      A.  That's correct.
9      Q.  Okay.  And there you said that what you meant
15:59:40 10  was it was a "wrongful killing that should be
11  considered criminal."  Who should have been criminally
12  charged?
13      A.  As I said before, it's the problems -- and as
14  I said in my speech, the problems are systematic.  And
15:59:57 15  part of addressing the systematic problem is to bring
16  to justice individual actions as well.  Because, you
17  know, Che Taylor was killed by some officers.
18  Similarly Charleena Lyles was killed by some officers.
19  And so unless we started having individual
16:00:20 20  accountability, it would be impossible to begin the
21  process of a systematic overhaul of, you know, lack of
22  accountability.
23      Q.  Is it your testimony that the officers should
24  have been criminally charged for Che Taylor's
16:00:37 25  killing?

Page 97

1      A.  As I said, I believe that it was a wrongful
2  killing of Che Taylor, and that there should be --
3  that we should have in our society far more
4  accountability than we do today, in which individual
16:00:55  5  officers are held accountable.
6      Q.  And one of the ways they would be held
7  accountable would be to charge criminally?
8      A.  There has to be, you know, consequences for
9  their actions, so that would be -- that would be in
16:01:12 10  the framework of consequences for their actions.
11      Q.  So yes, the individual officers who killed
12  Che Taylor should have been charged criminally?
13      A.  As I said, it was not just about Che Taylor.
14  It was about a pattern of racial profiling and
16:01:31 15  unaccountable loss of life at the hands of police,
16  and -- I'm answering your question.  And that means,
17  that officers who are responsible for such unjust
18  taking of life should be brought to justice, and part
19  of that is what happens in the criminal justice
16:01:51 20  system.
21          But again, to repeat what I said earlier,
22  I was using the word as a layperson, not as a legal
23  expert or as a judge.
24      Q.  Okay.  So Charleena Lyles had not died as of
16:02:02 25  February 25th of 2016, because she died in 2017.

Kshama Iyengar Sawant                                    January 12, 2023

---

Page 98

1    George Floyd hadn't died as of February 25th of 2016,
2    because he died a year later [sic].  On February 25th,
3    2016, when you used the word "murder," according to
4    you describing it as "a wrongful killing that should
16:02:21    5    be considered criminal," on that day, was it your
6    intention that the officers should have been
7    criminally charge?
8        A.  You are right, that on that day Charleena
9    Lyles had not been killed or George Floyd had not been
16:02:37    10    killed.  But it is not accurate to imply that it was
11    simply about Che Taylor, because Che Taylor's death
12    came on the -- in the wake of a number of killings of
13    ordinary citizens at the hands of the Seattle Police
14    Department, not to mention the far larger number of
16:02:59    15    killings at the hands of police departments in cities
16    across the nation.
17            So as I made it very clear in my speech,
18    yes, Che Taylor deserved justice.  The family of Che
19    Taylor deserves justice.  But it wasn't just about Che
16:03:17    20    Taylor.  It was, it was -- the problem was that it was
21    not an isolated incident.  It was part of a pattern, a
22    systematic process of unaccountability.  And yes, as
23    part of addressing that, or bringing about that
24    unaccountability, it does mean that individual
16:03:32    25    officers need to be held accountable.

---

Page 99

1        Q.  So I'm going to focus on the sentence that's
2    bolded in the complaint.  We confirmed that's what you
3    said.  "The brutal murder of Che Taylor, just a
4    blatant murder at the hands of the police, shows how
16:03:51    5    urgently we need to keep building our movement of
6    basic human rights for the black people and brown
7    people."  I want to focus on that sentence.
8            And in that sentence, I want to focus on
9    the work "murder."  The word "murder" is used twice in
16:04:06    10    that sentence; do you agree?
11        A.  That's correct.
12        Q.  And once it's described as a "brutal murder,"
13    and the second time it's described as a "blatant
14    murder;" correct?
16:04:21    15        A.  That's correct.
16        Q.  And you just got done telling Judge Pechman
17    that when you said the word "murder," either as a
18    "brutal murder" or "blatant murder," you meant it was
19    a wrongful killing that should be considered criminal.
16:04:36    20            So my question is:  When you are using the
21    word "murder" of Che Taylor, not of anybody else,
22    "brutal murder of Che Taylor, just a blatant murder at
23    the hands of the police," did you then understand or
24    mean that the officers who killed Che Taylor should be
16:04:56    25    criminally charged?

---

Page 100

1        A.  As I said before, the reason the Che Taylor
2    murder was such a flashpoint that brought about the
3    rally, and then following that, of course, you saw
4    George Floyd, was because none of these incidents
16:05:14    5    exists by itself.  It shows a pattern of excessive use
6    of force by the police, and Che Taylor's loss of life
7    was part of that pattern.
8            And if we are to bring about any semblance
9    of accountability at the police department, it does
16:05:37    10    mean that part of that process has to be that officers
11    who use excessive use of force have to be held
12    accountable.
13            But as I've said in my speeches and my
14    public speaking many times, that such a thing is not
16:05:58    15    possible without also having a broader framework of,
16    you know, for example, as I said, an elected community
17    oversight board that reviews policies and procedures,
18    and all of that.  I was speaking both as a layperson's
19    understanding of "murder" and as with my
16:06:15    20    responsibility as an elected representative of what I
21    believe needs to be the political shift that needs to
22    happen with police accountability.
23            ATTORNEY SINGLA:  So now, this is where,
24    Dmitri, you put me on a clock.  I'm going to put this
16:06:29    25    on the record.  Councilmember is not answering my

---

Page 101

1    questions directly.  I mean, every question, Judge
2    Pechman can read it, is a three-page answer.  My
3    questions are very simple, yes or no.
4        Q.  Yes or no, Councilmember:  Did you mean that
16:06:43    5    the officers should have been criminally charged?
6    That's a yes-or-no question.
7        A.  It's not a yes-or-no question for me.
8        Q.  It is.
9            ATTORNEY IGLITZIN:  Don't interrupt her.
16:06:53    10            ATTORNEY SINGLA:  I will interrupt her,
11    Dmitri, because here's the thing:  If she's going to
12    go down this way -- and I'm happy to put that -- she
13    can go as long as she wants, but then we can't be on a
14    6 o'clock hard stop.  If on the other hand, I will
16:07:06    15    direct the questions, and these are yes-or-no
16    questions.  I've done this with Judge Pechman before.
17    I'm more than happy to go in front of her just for
18    this deposition and say, the way that this deposition
19    is being conducted, because we are on that hard clock
16:07:20    20    for you is simply inappropriate.
21        Q.  So I'll ask the question one more time.
22            ATTORNEY IGLITZIN:  Hang on.
23            ATTORNEY SINGLA:  Go ahead.
24            ATTORNEY IGLITZIN:  Let me respond.  It's
16:07:31    25    not civil to interrupt her.  You can take your

---

26 (Pages 98 to 101)

Kshama Iyengar Sawant                                    January 12, 2023

Page 102

1    argument to Judge Pechman after the fact. You can
2    take an argument about the hard stop. You can do
3    anything. I respect that. But I think you'll agree,
4    one way or another, you got to let her finish her
16:07:50   5    answers, and then you can try more. That's my
6    position.
7            ATTORNEY SINGLA: Fine. That's a fine
8    position.
9        Q. What information did you have between
16:08:01  10    February 21st and 25th, when you spoke, what
11    information did you have about the incident?
12        A. I had watched the video --
13        Q. Okay.
14        A. -- of Che Taylor's loss of life, and I had
16:08:17  15    spoken to several community members.
16        Q. Okay. Which community members?
17        A. I don't recall which, specifically.
18        Q. I'm going to give you Exhibit-4. We asked
19    this question of you in your discovery responses. And
16:09:20  20    starting on the interrogatory 1, which is on page 7
21    says, "Please identify all persons with whom you have
22    discussed the detectives or Che Taylor incident."
23        A. Where are the page numbers?
24        Q. They're on the very bottom.
16:09:35  25        A. Oh, okay. You said page 7?

Page 103

1        Q. Page 7. And then I'm going to direct you to
2    page 14. Interrogatory No. 2 on page 14, we asked
3    you, "Please explain in detail any investigation you
4    conducted regarding the Che Taylor incident as of
16:10:07   5    February 25th, 2016." Do you see that?
6        A. Yes.
7        Q. And then your response starting on line 14
8    was, "Defendant discussed the Che Taylor incident with
9    the individuals identified in response to
16:10:20  10    Interrogatory No. 1 above." In your response to
11    Interrogatory No. 1, you identified 19 individuals. I
12    need to know of those 19 individuals, which are the
13    individuals that you spoke to prior to February 25th
14    of 2016 before you gave your speech.
16:10:56  15        ATTORNEY IGLITZIN: If I can suggest
16    something efficient, since there's so many names. I
17    expect as you walk through these names, you can
18    identify each one and give the answer, rather than
19    trying to look at all of them.
16:11:08  20        THE WITNESS: Right.
21        Q. And then I can tell you -- how about I do it
22    this way: It will be a yes or no and go quicker.
23        A. Before you start. I can probably tell you
24    with more confidence based on my memory people I had
16:11:22  25    not talked to.

Page 104

1        Q. Okay. But let me --
2        A. But there are people who I probably talked to
3    before and after, so I couldn't be sure.
4        Q. I'm going to go through every one of them,
16:11:32   5    and then you can tell me. Lorena González?
6            ATTORNEY IGLITZIN: And what is the
7    question? Whether she talked to Lorena before the
8    speech?
9            ATTORNEY SINGLA: Yes.
16:11:41  10        A. As I said, I've talked to Lorena González
11    about the issue, but I could not tell you exactly I
12    remember -- you are specifically asking about before,
13    so I'm not sure if I remember that.
14        Q. What about Bruce Harrell?
16:11:56  15        A. Again, I'm not sure I remember, but I'm sure
16    I talked to him about the issue.
17        Q. What about Larry Gossett?
18        A. Same.
19        Q. You don't remember, but you could have talked
16:12:06  20    to him before the issue?
21        A. It's possible. I don't know.
22        Q. Before your speech?
23        A. It's possible. I just don't remember.
24        Q. Ted Virdone?
16:12:14  25        A. Definitely talked to him before, because he's

Page 105

1    my staff member.
2        Q. What did you talk to him about?
3        A. Well, we are a council office, so we, we
4    routinely discuss our political work, and when
16:12:34   5    something as important as this issue comes up, then we
6    have discussions about it. And we also watched the
7    video.
8        Q. So you watched the video with Ted. I
9    understand generally you talk about everything. What
16:12:52  10    about the Che Taylor incident did you talk to Ted
11    about before your speech?
12        A. I don't -- I couldn't remember, exactly.
13        Q. Okay. Is there anything that would help you
14    remember?
16:13:03  15        A. I don't understand. By "anything," what do
16    you mean?
17        Q. Is there any emails or any notes that you
18    took or anything like that that would help you
19    remember?
16:13:13  20        A. I don't know. I mean, maybe there are
21    emails. I couldn't tell you right at this point.
22        Q. What about Adam Ziemkowski? You spoke to
23    him?
24        A. I did speak to him, but again, I couldn't
16:13:27  25    tell you exactly what I spoke about.

27 (Pages 102 to 105)

Kshama Iyengar Sawant                          January 12, 2023

---

Page 106

1    Q.  What about Kathleen O'Toole?  Did you speak
2  to her before your speech?
3    A.  No, I didn't speak to her.
4    Q.  Gerald Hankerson, did you speak to him before
16:13:42  5  your speech?
6    A.  I, again, as I said, it's being so long, I
7  don't remember, exactly, but I -- I know I spoke to
8  him about this issue several times, and I also
9  remember I spoke to him at the rally, but that's all.
16:14:00 10  I can't recall --
11    Q.  And this is before the rally.  You see the
12  rally happening.  You decide to go down there.  I'm
13  talking about before.
14    A.  I'm sorry.  You are asking me before?
16:14:13 15    Q.  Yeah.
16    A.  Yeah, I can't remember if I did or not.
17    Q.  What about Sheley Secrest?
18    A.  Same response.
19    Q.  You can't remember?
16:14:22 20    A.  (Witness shakes head.)
21    Q.  What about Andre Taylor?
22    A.  I had not spoken to him before, because I had
23  not met him.
24    Q.  Right.  Calvin Priest?
16:14:37 25    A.  Probably.  He's my husband, so I had probably

Page 107

1  spoke to him.
2    Q.  Tom Crean?
3    A.  Same answer:  I probably spoke, but I can't
4  remember.
16:14:54  5    ATTORNEY IGLITZIN:  I'm sorry.  Just to
6  clarify.  You probably spoke before the incident?
7    A.  Oh, sorry, no.  I don't --
8    Q.  We'll go back.  This is, did you --
9    ATTORNEY IGLITZIN:  I didn't mean to jump
16:15:05 10  in.
11    A.  The responses I gave so far are all with
12  reference to before the rally.
13    Q.  Before the rally?
14    A.  Yeah.  Andre Taylor, I had not met him before
16:15:19 15  the rally, so that's accurate.  Calvin Priest is my
16  husband.  Very likely I spoke to him before, but I
17  don't know for a fact if I did or not.  Tom Crean, I
18  would probably say I spoke to him after, not before,
19  but again, I'm not sure.
16:15:41 20    Q.  Brian Koulouris?
21    A.  Same response as for Tom Crean.
22    Q.  Most likely after?
23    A.  Most likely afterwards, but probably not
24  before.  But could have been.  I don't know.
16:15:56 25    Q.  Dmitri, obviously not, because --

Page 108

1    A.  No.
2    Q.  Darin obviously not?
3    A.  No.
4    Q.  Jacob Harksen?
16:16:09  5    A.  No.
6    Q.  Not.  What about Katelyn Sypher?
7    A.  No.
8    ATTORNEY IGLITZIN:  I can help with that.
9  Katie was an attorney in my firm at the time.
16:16:25 10    THE WITNESS:  Katie?
11    ATTORNEY IGLITZIN:  Yeah.
12    Q.  Carson Phillips?
13    ATTORNEY IGLITZIN:  Was also an attorney
14  in my firm at that time.
16:16:35 15    A.  No.
16    Q.  And same thing with James Lobsenz.
17    A.  Same.
18    Q.  Well, what about Jonathan Rosenblum?
19    A.  The answer is the same as for Ted Virdone and
16:16:47 20  Adam Ziemkowski.
21    Q.  Because he works for you?
22    A.  Used to.
23    Q.  Okay.  And then, so if I'm taking this, you
24  spoke to your staff, so those are the people that you
16:16:58 25  spoke to before the rally.  And then of the community

Page 109

1  members that you possibly spoke to was, perhaps,
2  Gerald Hankerson would be the one community member of
3  this list, and you can't remember specifically about
4  Tom Crean or Bryan Koulouris?
16:17:26  5    A.  Sorry.  Just to clarify.  Gerald Handerson
6  and Sheley Secrest were both, I believe, at the rally,
7  so I do remember speaking to them at the rally.  What
8  I don't remember is whether I spoke to them in the
9  intervening four days.
16:17:41 10    Q.  That's what I'm trying to get at, because
11  what you said was what you did between the incident
12  and the rally was look at a video and spoke to
13  community members.  What you answered in your
14  discovery responses was all the people that you spoke
16:17:56 15  to prior to the February 25th incident.  And of all
16  the people that you spoke to, I can only identify --
17  aside from your staff, I can only identify, perhaps,
18  Gerald Hankerson, Sheley Secrest, Tom Crean, Bryan
19  Koulouris, we'll call him Bryan, and Calvin priest.
16:18:20 20  Would that be fair?
21    A.  I think when I said "community members," I
22  also was thinking, I mean, people also talked to me
23  whose names I don't know, and it was a fairly
24  prominent incident, and so I'm just saying that I
16:18:38 25  can't remember if I did or not, but, you know.

28  (Pages 106 to 109)

Kshama Iyengar Sawant                    January 12, 2023

---

Page 110

1    Q.  So what we do know is that you saw the video.
2    Did you look at any newspaper articles?
3    A.  I can't remember if I did or not.
4    Q.  Did you review any officer statements?
16:18:59  5    A.  I can't remember if I did or not.
6    Q.  There's something that's called a Force
7    Review Board that happens at the Seattle Police
8    Department every time there is a use of force,
9    especially a deadly use of force.  Did you contact
16:19:15 10    anybody at the force review board?
11    A.  No.
12    Q.  There's also what's called FIT, F-I-T, which
13    is a force investigation team.  Did you contact
14    anybody from the force investigation team?
16:19:29 15    A.  No.
16    Q.  And you didn't speak to Kathleen O'Toole?
17    A.  No.
18    Q.  Did you speak to anybody in the Seattle
19    Police Department command staff?
16:19:40 20    A.  No.
21    Q.  Did you speak to the captain, who was the
22    captain for these two officers, before the rally on
23    February 25th, 2016?
24    A.  No.  And as I said before, I mean, just in
16:19:56 25    terms of all the, all the -- just the recent

Page 111

1    questions, I think what was absolutely crucial was to
2    watch the video.  And we had a political discussion in
3    our office also in terms of what my staff members felt
4    when they watched the video.  And I did talk to Gerald
16:20:22  5    Handerson and Sheley Secrest and also others -- I
6    don't remember their names now -- others who were at
7    the rally as well about it.
8         And I -- my personal belief is that
9    talking to community members and NAACP leaders was the
16:20:42 10    most crucial thing at that moment.
11    Q.  I'm talking about the facts of the incident
12    itself.  So all you did as far as to discover the
13    facts of the incident -- not who you talked to about
14    how they feel -- the discover the facts of what
16:20:55 15    happened in the Che Taylor incident, was just watch
16    the video; right?
17    A.  I did watch the video, but I also would not
18    agree of your characterization of minimizing watching
19    of the video, because the video is very striking.  As
16:21:12 20    I said, it reveals an execution-style killing, and I
21    did form -- it was a big part of how I formed my
22    opinion.
23         And it is also important to talk about how
24    other people feel, precisely because I wanted to make
16:21:27 25    sure that I was not isolated -- I mean, I was not

Page 112

1    alone in seeing what I saw.  You know, just to
2    confirm, are you seeing what I'm seeing?
3         And again, just to be clear.  I'm speaking
4    as a layperson to other lay people.  I was not asking
16:21:43  5    anybody their legal opinion, because I'm not a legal
6    person.  I'm an elected representative.  And I talked
7    to community members, like community leaders, like
8    Gerald Handerson, in terms of understanding what they
9    felt they saw, what they felt what happened, and
16:22:00 10    listened to their speeches.
11         So in terms of what, what I looked at to
12    formulate my layperson's opinion, this is what I did.
13    Q.  So what you looked at was the video.  Now I'm
14    going to ask you about what is called a "Significant
16:22:21 15    Incident Report."  A significant incident report is a
16    report that's generated at the end of every shift that
17    demarks significant incidents that happen during that
18    shift all around the city of Seattle.  It is available
19    to not only command staff, but also available upon
16:22:39 20    request to other members of the city, including
21    council members, the mayor, and the city attorney's
22    office.
23         Did you request or look at the significant
24    incident report between February 21st, after the Che
16:22:55 25    Taylor incident and before you went to the rally?

Page 113

1    A.  I cannot recall whether I did or not.  But
2    what I can say, as I said before, is that the
3    absolutely essential background that informed my
4    opinion was watching the video.
16:23:23  5         And as I said, I don't remember if I
6    looked at that report or not, but I will also offer my
7    opinion on that, that in reality, this is the problem.
8    I mean, the police department is not being held
9    accountable on virtually any of these incidents.  So I
16:23:42 10    believe that the background that I need to formulate
11    my opinion as an elected representative does not exist
12    in that report.
13         And as I said, I don't remember if I did
14    or not.  It's possible I did.  It's possible I didn't.
16:23:58 15    It's too long ago for me to remember.  I am saying,
16    though, that my opinion is that it should be called
17    murder was based on seeing the, just the absolutely
18    outrageous way in which Che Taylor was killed.
19    Q.  Why didn't you call Chief O'Toole on
16:24:19 20    February 22nd, 23rd, or the 24th to ask her what
21    happened?
22    A.  I'm not exactly clear why you would expect
23    that I would call Chief O'Toole, because I had watched
24    the video.  I could see with my own eyes what
16:24:37 25    happened.

29 (Pages 110 to 113)

Kshama Iyengar Sawant                                January 12, 2023

Page 114

```
            1        And furthermore, as I said many times
            2   before, today, that -- I mean, in this proceeding
            3   today, that Che Taylor's loss of life stood out, not
            4   only because of the blatant way in which it happened,
16:24:59    5   which everybody could see whoever watched the video,
            6   but also because it was one of a long line of
            7   unaccountable loss of life at the hands of -- I'm
            8   answering your question.
            9        Q. Go ahead. I'm not saying anything. Go
16:25:12   10   ahead.
           11        A. But you are gesticulating is if to.
           12        Q. Right, because it's not the question I asked.
           13        A. No, it is the question you asked, and your
           14   gestures would lead anybody in my position to stop
16:25:23   15   themselves in their tracks. That's why I'm asking,
           16   let me finish.
           17        So you asked me, why did you not call
           18   Kathleen O'Toole and I'm explaining to you why I did
           19   not call Kathleen O'Toole. She is the police chief
16:25:38   20   and she was the police chief at the time. And as I
           21   said, the reason Che Taylor's death was such a
           22   flashpoint in part of the -- as part of the ongoing
           23   BLM movement, was precisely not only because of the,
           24   just the shocking nature in which he was killed, but
16:25:55   25   also because it was one in a long line of killings at
```

Page 115

```
            1   the hands of police where the police had not been held
            2   accountable. So I was in no way under any illusion
            3   that having conversations with the police department's
            4   chief is going to give me any reasonable answers.
16:26:17    5        It's a question of what the police
            6   department's record is, and we have seen -- you know,
            7   this was seven years ago. We have seen since then
            8   what has happened. There's been killing after killing
            9   at the hands of the police, and Che Taylor's was one
16:26:33   10   of them. And so I believe that for me to be informed
           11   as an elected representative, I don't -- there's no,
           12   there's no expectation in my mind that calling the
           13   police chief is going to illuminate the issue in any
           14   useful way to me or enlighten me in the way I need to
16:26:53   15   be. I think that watching the video and talking to
           16   community members, especially in the black community,
           17   was what I needed to do.
           18        Q. Did you know, did you at any time discover
           19   between February 21st and before your rally, that Che
16:27:11   20   Taylor was a convicted felony whose right to possess a
           21   firearm had been taken away?
           22        A. I don't know if I was aware of that or not.
           23   However, as I said, the video made it very clear that
           24   it was an execution-style killing.
16:27:29   25        Q. And we're going to put that aside. We're not
```

Page 116

```
            1   going to talk about the video. We are just going to
            2   talk about the incident. And these are going to be
            3   yes-or-no questions. I appreciate that you are going
            4   to tell me that the video showed you something else.
16:27:41    5   We'll pull up the video in a second.
            6        My question is: Did you discover that Che
            7   Taylor was a convicted felony whose right to possess a
            8   firearm had been taken away?
            9        A. As I said, I don't know if I knew it at that
16:27:56   10   time. I probably learned about it, you know, as part
           11   of the discussions around it.
           12        But I also do not agree with an
           13   implication in your question that somehow that killing
           14   might have been justified because of his prior
16:28:13   15   background. I don't agree with that.
           16        Q. I'm not implying that at all. I'm saying,
           17   did you know that?
           18        A. I'm saying that I think you are implying
           19   that, so I'm saying I don't agree with an implication.
16:28:24   20        Q. I'll caution you not to worry about what I
           21   think. Just listen to my question and answer my
           22   question.
           23        My next question is: Did you know that
           24   Officer Miller and Officer Spaulding observed a
16:28:38   25   firearm on Che Taylor's holster, and that confirmed he
```

Page 117

```
            1   did not have a lawful right to possess that firearm?
            2        ATTORNEY IGLITZIN: Object to the form.
            3   The question assumes facts not in evidence.
            4        Q. Go ahead. Did you know that?
16:28:50    5        A. Sorry. Ask that question again.
            6        Q. Sure. Did you know that on February 21st,
            7   when Officer Miller and Officer Spaulding saw Che
            8   Taylor, he had a gun in his holster, and they
            9   confirmed that his right to possess a firearm had been
16:29:09   10   taken away because he was a convicted felony?
           11        ATTORNEY IGLITZIN: I also object it's
           12   compound, as well as a question that specifically
           13   confirms facts that are not true.
           14        Q. Go ahead.
16:29:19   15        A. First of all, you are using the names of the
           16   officers. I don't want my response to imply that I
           17   knew the names at that time, because I did not.
           18        Q. Okay. Let me rephrase the question, then.
           19   Did you know that the officers that shot Che Taylor,
16:29:37   20   they saw Mr. Taylor with a gun in his holster, and
           21   after seeing him with a gun in his holster, they then
           22   confirmed that he did not have a lawful right to
           23   possess a firearm? Did you know that?
           24        ATTORNEY IGLITZIN: Objection to the form
16:29:54   25   of the question, compound, assumes facts,
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Kshama Iyengar Sawant                         January 12, 2023

## Page 118

1    counterfactual facts.
2        Q.  Go ahead.
3        A.  It's difficult to answer that question,
4    because, again, the question is premised on this idea
16:30:04  5    that what the police say is a fact.  Well, there's
6    been just countless, countless numbers of incidents
7    that show that police will actually brazenly lie in
8    order to justify their excessive use of force.
9           So I honestly cannot answer that question
16:30:26 10    because it's premised on this idea.  I mean, you are
11    saying, did you know that this is a fact?  Well, I
12    don't accept that's a fact or not, so it's hard for me
13    to answer that.
14        Q.  You didn't call for a hearing or a public
16:30:46 15    hearing in this speech on February 25th; did you?
16        A.  Like I said, it's been seven years, so I
17    don't -- as far as the transcript -- I'm answering the
18    question.  But as far as the transcript that you have
19    handed me and the recording that you played, no, I did
16:31:01 20    not.
21        Q.  And that's the recording.  We played the
22    recording as well.
23        A.  That's what I meant.
24        Q.  In the recording, nowhere do you call for a
16:31:08 25    public hearing or anything like that; right?

## Page 119

1        A.  Not in the recording, no.
2        Q.  And, in fact, you only called for the public
3    hearing the day after you gave the speech where you
4    said Che Taylor Che Taylor was brutally murdered by
16:31:24  5    the police; right?
6        A.  Which speech are you referring to?
7        Q.  February 25th.  You emailed Lorena González
8    and called for a public hearing -- you requested a
9    public hearing with Lorena González on February 26th,
16:31:40 10    the day after you had been at that rally; right?
11           ATTORNEY IGLITZIN:  You mean 2016?
12           ATTORNEY SINGLA:  2016.
13        A.  I did send an email asking for a public
14    hearing.
16:31:51 15        Q.  And if you want to take a look at Exhibit-8.
16    I believe it's the last page.  On February 26th, when
17    you emailed Lorena González and Chief O'Toole, and you
18    asked Lorena González, Councilmember González at the
19    time, for a public hearing; correct?
16:32:26 20        A.  That's correct.
21        Q.  So that was one day after the rally; right?
22        A.  That's correct.
23        Q.  Now, my question is:  At that time I looked
24    at what committees you were on, and I believe you were
16:32:36 25    the vice chair of energy, civil rights, and

## Page 120

1    environment committee.  I don't know what that --
2        A.  I was the chair.
3        Q.  You were the chair.  Now, civil rights issues
4    fell under your purview; right?
16:32:47  5        A.  No, no.  It was not civil rights.  It was --
6    I think it was energy and sustainability, or something
7    like that.  It was definitely not civil rights.
8           ATTORNEY SINGLA:  Dmitri, I can print this
9    out, or you can just take a look at it, and then I'm
16:33:26 10    going to show it to her.
11           ATTORNEY IGLITZIN:  Let me look at it.
12           You can show it to her.
13           What is it?
14        Q.  I'm just looking at, this is the city council
16:33:47 15    member assignments for 2016, 2017.  It shows you as
16    the vice share for civil rights, utilities, economic
17    developments, and arts.  Do you see that?
18        A.  I'm the vice chair of that, yes.  Sorry.  I
19    thought you were asking about the committee that I
16:34:01 20    chaired, and that's why I said that it was definitely
21    not civil rights.
22        Q.  You were the vice chair on this committee;
23    right?
24        A.  I was the vice chair of that committee.
16:34:10 25        Q.  And that committee dealt with civil rights

## Page 121

1    issues; right?
2        A.  That committee dealt with civil rights;
3    however the committee of Lorena González dealt with
4    the police department.
16:34:20  5        Q.  You could have asked for a hearing or you
6    could have done that hearing in the civil rights
7    committee; right?
8        A.  I'm not sure.  What do you mean?  I'm vice
9    chair.  I don't decide what -- no, just to clarify,
16:34:35 10    you are not actually right.  I cannot do that.
11        Q.  Got it.
12        A.  Per council rules, I cannot.  I can only do
13    things in my committee, the committee that I chair.
14        Q.  Got it.  You would agree with me your speech
16:34:50 15    dealt with civil rights issues; correct?
16        A.  I would not only say it's civil rights.  It's
17    also police accountability, it's racism, economic
18    inequality.  All of it is wrapped up in it.
19        Q.  I fully agree with you.  But racism, as a
16:35:12 20    civil rights lawyer, I know racism and systemic racism
21    is a civil rights issue; right?
22        A.  It's at least partially a civil rights issue.
23        Q.  So nothing prevented you from also emailing
24    the chair of the committee where you were vice chair
16:35:30 25    and asking for a public hearing in that committee;

31 (Pages 118 to 121)

Kshama Iyengar Sawant                            January 12, 2023

---

Page 122

1    right?
2         A.  Again, your question implies that somehow I
3    emailed -- that I should have emailed Lisa Herbold,
4    who was chairing the civil rights committee, as
16:35:52  5    opposed to Lorena González, who was chairing the
6    police department -- chaired the committee that
7    oversees the police department.  And in general, I
8    could have emailed the council president.  I mean,
9    there's lots of emails that I could have sent.
16:36:06 10         It's very clear from -- it was very clear
11    to me from the rally, and from, as I said, it was not
12    an isolated incident.  This was a long series of
13    incidents that showed a lack of accountability from
14    the police department.  It was, very specifically, the
16:36:24 15    anger was against the police department.  And so I
16    think it is fairly obvious why I emailed the council
17    member who chaired the police department overview.
18         Q.  I'm going to caution you not to read into my
19    questions.  My question is a very simple question, and
16:36:43 20    I think you answered, no, you did not email Lisa
21    Herbold to ask for a hearing in the civil rights
22    committee; right?
23         A.  That's my part of my answer, but I do not
24    accept that your questions do not have implications.
16:36:55 25    Of course your questions have implications, and I

Page 123

1    will -- I do consider it important in this, in this
2    proceeding, that I identify what I believe is proper
3    implication and then respond to that in the process of
4    responding to your question, and explaining why it was
16:37:10  5    crucial for my office to email the council member who
6    chaired the committee that oversaw the police
7    department.
8         Q.  Okay.  Did you, between February 21st, after
9    the incident and before the rally, contact then
16:37:29 10    prosecutor Dan Satterberg to ask for charges to be
11    filed against the officers, based upon what you saw in
12    the video?
13         A.  I don't believe I did.  But I also, I could
14    not tell you for sure, because it's been a long time.
16:37:49 15         Is it okay if I get some water?
16         Q.  Sure.  There's water right there.
17         ATTORNEY IGLITZIN:  Can we take a personal
18    privilege, I need a quick break.
19         ATTORNEY SINGLA:  Yeah.
16:41:30 20         (Recess.)
21         Q.  So we're going to move from February 25th of
22    2016 to February of 2017.  We're going to talk about
23    that one-year period next.  What did you do within
24    that one-year period to further inquire about what
16:46:06 25    happened at the Che Taylor incident?

Page 124

1         A.  As I said before about this period, it's been
2    so many years, it would be hard for me to say I
3    remember, exactly.  But just going by the way my
4    office approaches political issues, I'm sure we were
16:46:32  5    talking to community members about -- not just about
6    that one incident, but about the pattern of police
7    brutality and the need for accountability and the need
8    for elected community oversight, and you know, things
9    like that.
16:46:53 10         But I could not -- it's been so long, that
11    I could not tell you how much or whom, but I'm just
12    giving you a general sense of what we might have done.
13         Q.  Let me ask this:  Between February 2016 and
14    February of 2017, did you contact Kathleen O'Toole,
16:47:13 15    the chief at that time, to ask about what happened at
16    the Che Taylor incident?
17         A.  I don't remember if I did or not, but it is
18    very possible that we did, because we do ask -- my
19    office does send queries of that kind, where we ask
16:47:35 20    what happened about this or that.  But I could not
21    tell whether we did or not in this incident.
22         Q.  If your office sends queries of this kind
23    about what happens --
24         A.  If your officer?
16:47:47 25         Q.  Office.  If your office sends queries of this

Page 125

1    type about what happened in a particular incident,
2    what didn't happen --
3         A.  No, I didn't mean that.  I meant, what did
4    you do to investigate it, or that's what I meant.  Or,
16:48:02  5    you know, we often will -- and this is something, goes
6    to something we were talking about earlier.  If the --
7    if there had been a council discussion, especially
8    during the budget, about, you know, that they have to
9    do a certain task and there's a certain budget
16:48:20 10    allocated to that, just inquiring whether that was
11    done or not, I meant in that way.
12         Q.  Did your office send any inquiry between
13    February 21st, 2016 and before the rally to the chief
14    or her command staff, asking about any particulars
16:48:39 15    about what happened with the Che Taylor incident?
16         A.  When you say "rally," you are referring to
17    the 2017 rally?
18         Q.  2016 rally.
19         A.  Sorry.  So you are asking what I did before
16:48:50 20    the rally?
21         Q.  Let me reframe it.  The Che Taylor died on
22    February 21st of 2016.  You attended --
23         A.  Oh, I see what you are saying.
24         Q.  -- the rally on February 25th of 2016.
16:49:02 25    Before you attended the rally and after Che Taylor

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Kshama Iyengar Sawant                                    January 12, 2023

Page 126

```
            1   died, did your office send any queries, inquiries to
            2   the chief of police or command staff to get an
            3   understanding or get an idea of what happened at the
            4   incident?
16:49:19    5       A.  I think you asked this question before, and
            6   so I would just give you the -- share with you the
            7   response that I had given to you earlier, which is
            8   that I don't remember exact --
            9       Q.  Okay.
16:49:34   10       A.  No, that's not the end of the response.
           11       I don't remember whether I did or not.
           12   However, as I said, I also added that I don't believe
           13   that calling the police chief will give me -- will
           14   illuminate the issue or enlighten me in a way that
16:49:54   15   needs to be, in the sense that Che Taylor's death was
           16   far from isolated.  This was part of a pattern of the
           17   police department, and this was -- you know, and this
           18   whole pattern of excessive use of force had been
           19   documented, because other people had been talking
16:50:10   20   about it for years before I ever got on the city
           21   council.
           22       Q.  But you said that your office does regularly
           23   send inquiries to the police department?
           24       A.  I didn't say "regularly."  And in fact, I did
16:50:26   25   not say police department at all.  I said that we do
```

Page 127

```
            1   sometimes send emails to departments, but I did not
            2   actually say police department, because in accordance
            3   with what I said earlier -- and I can't remember
            4   when, because it's been several hours -- but I did say
16:50:46    5   that the police department actually is not like other
            6   departments.  Yes, as you said, formally it is part of
            7   the City of Seattle departments.  However, the police,
            8   you know, there is such a, such a striking track
            9   record of unaccountability, that you couldn't put
16:51:07   10   other departments in the same kind of description.
           11       And so actually, if you look at the work
           12   that our office does, we don't actually send that -- I
           13   mean, I'm sure we have sent email inquiries to the
           14   police department.  I'm not saying we haven't.  I'm
16:51:25   15   just saying we don't have an expectation of any honest
           16   engagement from the police department, precisely
           17   because there is an entrenched culture and practice of
           18   lack of accountability.
           19       Q.  Do you think that honest engagement -- your
16:51:42   20   words are not mine, your words of honest engagement.
           21   Do you believe that the lack of honest engagement is
           22   only with your office, or is it with the entire
           23   council?
           24       A.  I think whether or not there would be --
16:51:58   25   whether or not there would be honest engagement
```

Page 128

```
            1   depends on what the particular elected official
            2   considers honest engagement.  And whether or not a
            3   particular elected official considers honest
            4   engagement or not depends on their politics.
16:52:15    5       So there are many elected officials -- and
            6   this is the problem, actually, because American
            7   politics is full of politicians who don't actually use
            8   their elected office to fight to hold the police
            9   accountability.  And when I say "fight," I mean
16:52:32   10   politically fight, politically build a movement, and
           11   that sort of thing.
           12       So I could not speak for other elected
           13   officials, whether or not they think that the police
           14   are engaging -- the police department leadership is
16:52:44   15   engaging in honest -- I mean, whatever term I used,
           16   honest engagement or not, are basically engaged in
           17   discussing honestly or showing accountability.  You
           18   know, you can use different phrases to mean the same
           19   thing.
16:52:57   20       But my point is that, whether or not you
           21   think that depends on your politics.  Like Gregg
           22   MacDonald, the constituent who wrote to us, he has a
           23   different political view of society, and so his view
           24   of the police is different.
16:53:12   25       Similarly, I would presume that most, if
```

Page 129

```
            1   not all, of the elected officials, other than me,
            2   probably have a different view on that.  We've had
            3   many of those debates publicly.  So there's no --
            4   nothing that I'm telling you is new or a mystery or
16:53:27    5   hidden or anything like that.  It's very clear that my
            6   office has had a very unique track record on demanding
            7   police accountability.  So the views of other elected
            8   officials are going to depend on their politics.
            9       Q.  So it's your position for your office, that
16:53:46   10   you don't necessarily think engaging with the police
           11   department is fruitful, because, according to your
           12   office, there's a lack of honest engagement?
           13       A.  As I said, it is true that we have engaged
           14   with them, but overall, what is my opinion about the
16:54:06   15   police department?  Yes, there is a systematic
           16   problem, not just with the Seattle Police Department,
           17   but with police departments nationally.  There's
           18   nothing unique in that sense about the Seattle Police
           19   Department.
16:54:19   20       Q.  Between February 2016 and February of 2017,
           21   did you review any of the statements by the officers
           22   or witnesses involved in the Che Taylor incident?
           23       A.  Again, as I said before, it's been so long, I
           24   don't remember if I did or not.
16:54:38   25       Q.  Did you call Dan Satterberg, the King County
```

33 (Pages 126 to 129)

Kshama Iyengar Sawant                                    January 12, 2023

---

Page 130

```
 1    prosecutor at the time, and ask for criminal charges
 2    to be filed against the officers who were involved in
 3    the Che Taylor incident between February 2016 and
 4    2017?
16:54:56  5    A.  I believe you asked me a similar question
 6    before, and --
 7    Q.  That one was for just the four days --
 8    A.  Yes.
 9    Q.  -- between February 21st and the 25th.  Now
16:55:05 10    I'm asking from the 25th until February of 2017,
11    within that time period, did you contact the then King
12    County prosecutor, Dan Satterberg, and ask him to file
13    charges against the two officers involved in the Che
14    Taylor shooting?
16:55:23 15    A.  Again, it's been so long, I don't remember
16    exactly if I did or not.
17    Q.  Okay.  Did you attend the inquest hearing
18    that occurred in February of 2017?
19    A.  I did not.
16:55:36 20    Q.  Did you have any of your staff members attend
21    the inquest hearing?
22    A.  I cannot remember if I did or not.
23    Q.  Do you know what an inquest hearing is?
24    A.  I have a very layperson's idea of what that
16:55:54 25    might be.
```

Page 131

```
 1    Q.  Did you do any research to understand what an
 2    inquest hearing is?
 3    A.  Again, this is one of the questions where
 4    there's an implication behind the question, so I'm
16:56:07  5    going to answer the question, but I'm also going to
 6    say that I don't like the implication.
 7    Q.  Well, I'll withdraw the question.  Let me ask
 8    the question.  What is your understanding of an
 9    inquest hearing?
16:56:16 10    A.  My understanding is that there is an initial
11    assessment of a given incident, and some initial legal
12    assessments are put forward about what that might be.
13    Q.  Do you know that a judge from a district
14    court, an elected judge from a district court presides
16:56:55 15    over an inquest hearing?
16    A.  I don't know if I knew it for a fact, because
17    I'm not a lawyer, but I'm also not surprised to hear
18    that you say that.  I accept that you are saying that.
19    Q.  You don't need to be a lawyer to do this.
16:57:06 20    You can go on a website and anybody can see it.  So
21    I'm going to ask you a series of these questions.
22        Did you know that an inquest hearing also
23    involves a jury from the community who reviews
24    evidence that is presented to them to answer
16:57:21 25    questions?
```

Page 132

```
 1    A.  I don't know if I knew that specifically or
 2    not, but I accept that that's true, if you are saying
 3    it.
 4    Q.  Do you know that an inquest hearing is open
16:57:33  5    to the public?
 6    A.  I'm not sure if I knew that or not.
 7    Q.  Do you know not only that an inquest hearing
 8    is open to the public, but evidence is presented under
 9    oath under the penalty of perjury, the exact same way
16:57:47 10    that you are testifying here today, where witnesses
11    are asked questions and they are required to answer
12    them truthfully?
13    A.  Again, I don't know -- I didn't know
14    specifically the way you are stating is what happens
16:58:00 15    in the inquest, but I assume something along those
16    lines happens.
17        But I would also say that there have
18    been -- just in the case of the police departments
19    across the nation, the reason that there is a
16:58:17 20    systematic use of violence and excessive use of force
21    against just ordinary citizens, as I said, is not
22    because those legal procedures, like the inquest, for
23    example, are not happening, but because that whole
24    system is not delivering justice to ordinary people.
16:58:41 25    Q.  That wasn't my question.  My question just
```

Page 133

```
 1    was --
 2    A.  I was answering.  I know that was not your
 3    direct question --
 4    Q.  Yep.
16:58:49  5    A.  -- but I'm also not stupid.  I know what the
 6    implication of your question is.  There's a series of
 7    questions that shows that you are talking about --
 8        It has nothing to do with my counsel.  I'm
 9    responding to your questions.
16:59:06 10    Q.  No, go ahead.
11    A.  I've answered all your questions factually,
12    but I'm also adding to those factual responses by
13    saying that I'm not, I'm not surprised that an inquest
14    happened.  But I am also very much not surprised if
16:59:25 15    that particular inquest, like many other inquests in
16    the cases of killings at the hands of the police, did
17    not deliver any kind of justice to the people
18    involved.
19    Q.  Right.  And you had said that one of the
16:59:37 20    things that you wanted as part of your process was an
21    independent investigation, where there would be an
22    independent group of people who would hear evidence in
23    a public forum and the findings would be publicly
24    available.  An inquest hearing is an independent group
17:00:06 25    of jurors, similar to jurors that would be trying a
```

34 (Pages 130 to 133)

Kshama Iyengar Sawant                    January 12, 2023

Page 134

1    criminal case or a civil case, sitting with a judge in
2    a public process, hearing evidence under oath.  Is
3    that a sufficient independent process for you?
4        A.  Well, I would say that anybody who thinks
17:00:24  5    that the current state of affairs in terms of the
6    criminal justice system in the United States, that
7    offers any actual public hearing or just
8    investigations, is completely out of touch with the
9    facts.
17:00:38  10       I mean, regardless of your opinion, the
11   facts are that the vast majority of people who get
12   ensnared in the criminal justice system do not -- are
13   not getting justice by the system.  And so I do not
14   believe that the -- I mean, I'm not talking just this
17:01:01  15   particular case.  I do not believe that any
16   procedures, including inquest -- I'm not just saying
17   inquest -- in the broken criminal justice system in
18   the United States necessarily delivers justice.  It
19   may or may not in a given situation.  But if you look
17:01:17  20   at statistically, then, no, statistically speaking,
21   part of the racism in the United States, part of the
22   anti-poor society, anti-working class society that we
23   have here, is that working class people, poor people,
24   and people of color actually get very little justice
17:01:36  25   inside the criminal justice system.

Page 135

1        So when I talk about public hearings and
2    independent investigations, I'm not talking about
3    inquests from within the criminal justice system.  And
4    furthermore, the public hearings that I'm talking
17:01:50  5    about is where ordinary people can come in big numbers
6    and talk about how unjust this was.
7        So again, from a layperson's standpoint
8    that there should be accountability, there should be
9    an elected community oversight board.  All of that.
17:02:06  10   But none of that process, none of the politically
11   important progress that needs to be made can be made
12   inside the narrow confines of the criminal justice.
13   So when you ask me about the inquest, no, I don't
14   believe that that's enough.
17:02:21  15       Q.  So I'll tell you that an inquest hearing is
16   not part of the criminal justice system.  It's not a
17   criminal proceeding at all.  It's a civil proceeding.
18   It's completely outside of the criminal justice
19   system.
17:02:35  20       A.  But to be clear, I am not speaking --
21           ATTORNEY IGLITZIN:  Okay --
22           ATTORNEY SINGLA:  Let me -- I'll ask the
23   question.
24           ATTORNEY IGLITZIN:  Okay.
17:02:37  25           ATTORNEY SINGLA:  I'm going to ask the

Page 136

1    question.
2           ATTORNEY IGLITZIN:  That's fine.
3        Q.  I'm going to ask the question.  It's not in
4    the criminal justice system.  An inquest hearing is a
17:02:45  5    civil proceeding very similar to the civil proceeding
6    that's going to happen in this case; where if this
7    case goes to trial, this will be a civil proceeding in
8    front of a judge with a jury that's going to answer
9    questions.
17:03:01  10       Is it your position that civil proceeding,
11   like an inquest hearing or here, is somehow unfair?
12           ATTORNEY IGLITZIN:  I'm going to object to
13   the form of the question, and it makes assertions that
14   are not in evidence or not actually factually correct.
17:03:15  15       You can go ahead and answer.
16       A.  Well, when I said "criminal justice system"
17   in response to your question about the inquest, I was
18   not talking about the specific legal nature of
19   inquest, which I did not even know until you told me,
17:03:30  20   because I'm not a lawyer.
21       But my answer was about the general idea
22   of whether people can get justice in the criminal
23   justice system.  Only a person who is completely
24   dishonest or out of touch with reality would say that
17:03:47  25   that's true for the most part in the United States,

Page 137

1    because it's not.  Because if that had been true, you
2    would not have had the George Floyd movement, which
3    was the largest protest movement in U.S. history.
4        Q.  So let's go through Exhibit-7.  Let's go
17:04:02  5    through what an independent jury of eight people in a
6    civil proceeding presided over by a judge hearing
7    evidence in public about Che Taylor, that jury
8    found.  I'm going to ask you whether or not you will
9    accept what the jury's finding are in a civil
17:04:23  10   proceeding -- not criminal proceeding, in a civil
11   proceeding -- open to the public with an impartial
12   judge and impartial jury.
13           ATTORNEY IGLITZIN:  I'm going to object to
14   the form of the question and the embedded assumptions.
17:04:34  15           ATTORNEY SINGLA:  Okay.  That's fine.
16       Q.  So do you accept that eight people found yes
17   to the answer that, on the afternoon of February 21st,
18   2016, police officers Scott Miller and Michael
19   Spaulding conducting surveillance on apartment 3 at
17:04:49  20   the complex located at 2024 Northeast, Seattle,
21   Washington?  Do you accept that eight people said yes
22   to that question?
23       A.  Well, again, your question was not just this
24   question, but also the preface you used, so I'm going
17:05:04  25   to respond to your question and the preface.  Because

35 (Pages 134 to 137)

Kshama Iyengar Sawant                    January 12, 2023

---

Page 138

1    you said the preface, so I'm going to respond to it.
2         Of course I am reading the same document
3    that you are reading, so obviously yes, what you just
4    read is what's written, so of course, that's you
17:05:21  5    know, that's a matter of fact.
6         However, you framed this as if to imply,
7    and you've done that again and again, as if to imply,
8    that if the inquest was done, which as you are just --
9    I did not even know this, but as you are informing me,
17:05:36 10    is not technically part of the criminal, but it's
11    civil, that all may be true.  I'm not challenging
12    those facts that you've stated.
13         But I do not accept your premise that
14    because that inquest was done and because eight people
17:05:49 15    reached this conclusion that justice was delivered,
16    because obviously not.  Obviously not.  If this were
17    true, then there would be no question of police
18    accountability, I mean, because everybody would agree,
19    whether or not you agreed on a given case, overall,
17:06:06 20    that the police were being held accountable.
21         But that is simply not true.  I mean, the
22    premise you are setting up is so stunningly
23    contradictory to just the overwhelming mass of facts,
24    that it is hard to just answer your part of the
17:06:22 25    question without answering the premise.  Your premise

---

Page 139

1    is completely at odds with overwhelming reality.
2         But if you are asking just of this
3    question, yeah, I'm reading the same document that you
4    are reading, and yes, that's true.
17:06:33  5    Q.   Let me set aside -- let me put another
6    premise.  If you are found liable for defamation in a
7    federal proceeding in a jury trial, will you accept
8    the premise that you were found liable?
9         ATTORNEY IGLITZIN:  I'm going to object to
17:06:48 10    that question.  I think it's oppressive and
11    inappropriate, and if you want, I'll move for a
12    protective order on this.
13         ATTORNEY SINGLA:  You can.  I want to hear
14    the answer.
17:07:03 15         ATTORNEY IGLITZIN:  No, I'm going to
16    direct her not to answer.
17    Q.   Will you accept the premise of what a judge
18    or a jury may have as a finding in this case, whether
19    it's against you or in your favor?
17:07:17 20         ATTORNEY IGLITZIN:  Same objection.  It's
21    not a proper question.  We go to a judge.  We go to a
22    jury.  We get appeals.
23         ATTORNEY SINGLA:  Sure.
24         ATTORNEY IGLITZIN:  It's got nothing to do
17:07:26 25    with the facts of this case and the allegations in the

---

Page 140

1    complaint -- let me now finish.
2         ATTORNEY SINGLA:  That's fine.
3         ATTORNEY IGLITZIN:  It's got nothing to do
4    with the allegations that your clients brought in this
17:07:36  5    case against Councilmember Sawant.  So her
6    philosophical opinions about the -- I've given you
7    what I think is five, six hours of tremendous leeway
8    to explore things that are not legally relevant, but,
9    yeah, I'm not going to get into that.  There is a
17:07:51 10    point where you have to go, Councilmember Sawant is an
11    elected public official.  This is a publicly
12    available -- you know, there's no protective order for
13    this deposition, so I'm just going to draw the line
14    there.
17:08:06 15         ATTORNEY SINGLA:  Well, first of all,
16    about three hours with the breaks.  Secondly, she's
17    not even accepting the premise that the jury can make
18    a finding in an inquest hearing.
19         ATTORNEY IGLITZIN:  You can ask her -- I
17:08:16 20    didn't object to you --
21         ATTORNEY SINGLA:  Hold on a second.
22         I've got to wonder if she's going to
23    accept the premise that a judge or a jury in this
24    case, in a civil proceeding will make that finding.
17:08:24 25         ATTORNEY IGLITZIN:  And you can wonder,

---

Page 141

1    but it's got nothing to do with the allegations in
2    this suit.
3         ATTORNEY SINGLA:  You can ask for a
4    protective order.
17:08:30  5    Q.   Let me ask you the question on page 3.  I'm
6    going to ask you the question on page 3, question 11.
7    Well, before I ask this question, let me back up.
8         This inquest, the results of this inquest
9    hearing -- and if you look at the last page -- were
17:09:09 10    read on February 10th of 2017.  Do you see that?
11    A.   Yes.
12    Q.   Did you, did you understand or did you know
13    that this inquest hearing had these results as of
14    2017?
17:09:21 15    A.   I believe I answered a similar question
16    before.  I don't think I knew about it, but I
17    also don't -- it's been so long, I don't remember.
18    Q.   Let me give you this --
19    A.   I would be inclined to say that I --
17:09:41 20    actually, yeah, I should not venture because of my
21    memory here is, I couldn't be confident.
22         (Exhibit-14 marked.)
23    Q.   Just to kind of give you a context, this
24    is -- it's kind of printing out weird, but it starts
17:10:06 25    on page 4 of 11.  This is the KUOW article about the

---

36 (Pages 138 to 141)

Kshama Iyengar Sawant                    January 12, 2023

Page 142

1    inquest hearing as of 2017, where it says that the
2    jury finds Che Taylor posed a threat to Seattle
3    Police. Do you see that?
4         A. Sorry. Which page are you saying?
17:10:33  5    Q. Page 4 of 11. See right here.
6         A. Sorry. I do see it.
7         Q. This was part -- I mean, it wasn't as if this
8    was in hiding. I mean, do you remember seeing news
9    articles like this? And it was publicized pretty
17:11:13 10    widely, the results of the inquest hearing.
11         A. Like I said, I don't remember, it's been so
12    long.
13         Q. Then I'm going to take you back to the
14    inquest hearing itself. At the very least, will you
17:11:26 15    agree that eight jurors answered questions yes when
16    asked the question, "Did Officer Scott Miller inform
17    Officer Spaulding, that he saw Che Taylor carrying a
18    holstered handgun on his right hip?"
19         ATTORNEY IGLITZIN: I'm going to direct
17:11:43 20    you to only agree to things you actually know. Don't
21    agree just because counsel handed you a piece of paper
22    and it says something.
23         ATTORNEY SINGLA: Well, why don't you
24    object to the form of the question, rather than --
17:11:53 25         ATTORNEY IGLITZIN: Fair enough. Object

Page 143

1    to the form of the question.
2         ATTORNEY SINGLA: Thank you. That was a
3    little bit more of a coaching than --
4         ATTORNEY IGLITZIN: I think it was an
17:11:58  5    appropriate instruction to the witness.
6         Q. So I will give you the premise that this is
7    what the jury found in answering the interrogatories,
8    and you can look at that, because the first page says,
9    "Final Interrogatories to the Inquest Jury."
17:12:13 10         So the jury was given these
11    interrogatories, and there were eight jurors. Eight
12    jurors were asked to answer yes or no or unknown
13    question. And would you agree that on this inquest
14    hearing, eight jurors answered, yes, that Scott Miller
17:12:30 15    told Michael Spaulding, both officers, that Che Taylor
16    was carrying a holstered handgun?
17         ATTORNEY IGLITZIN: Can I ask you to
18    clarify the question in one regard?
19         ATTORNEY SINGLA: Yes.
17:12:39 20         ATTORNEY IGLITZIN: As I understood the
21    question, you are representing to Councilmember Sawant
22    that this is what the inquest injury answered, and you
23    are asking her now if she agrees with that, assuming
24    the premise is accurate?
17:12:52 25         ATTORNEY SINGLA: No. I'm not asking her

Page 144

1    to agree with the premise. I'm just asking her to
2    recognize that eight jurors answered this question
3    yes. That's all I'm asking.
4         ATTORNEY IGLITZIN: If you know the
17:13:03  5    answer, you can answer it.
6         A. I do have an answer. Again, this is the --
7    it's a fact that this inquest happened. It's a fact
8    that the jurors decided this. So inasfar as you are
9    asking me, do you agree that this happened, of course
17:13:25 10    I agree.
11         But again, your question is not an
12    innocuous one. It is, again, based on the premise
13    that somehow because that inquest happened and because
14    eight jurors decided this, that this was the final
17:13:40 15    word on the justice or injustice in the case of Che
16    Taylor's killing.
17         And my response is to the implied premise,
18    which you are not stating, but it's obviously there,
19    is that if that were -- if that were the bar where we
17:13:58 20    had to draw, where if some sort of proceeding happened
21    in the criminal justice system, that somehow that
22    should be the last word on -- or somehow that should
23    imply justice was done, well, that's completely, as I
24    said before, completely contrary to the overwhelming
17:14:22 25    reality across the nation, including Seattle, about

Page 145

1    whether or not people get justice in the police
2    department -- after actions by the police department,
3    because they don't. For the most part, they don't.
4         That is why you have had mass movements.
17:14:36  5    That is why you have had the, the emergence of the
6    Black Lives Matter movement, and that is why you have
7    study after study, including, you know, Michelle
8    Alexander's, The New Jim Crow, where people have
9    documented how it's actually deeply unjust.
17:14:57 10         If you are just asking as a fact, did this
11    inquest happen, do you agree this inquest happened, of
12    course I agree this inquest happened. Do you agree
13    that these eight people reached a decision? Of course
14    they did. So I'm not in the business of denying
17:15:11 15    reality. I'm not in an alternate universe.
16         However, I also don't think you can take
17    these questions sort of just as isolated. They don't
18    exist on a planet by themselves. This is a part of
19    the overall political and social situation that is
17:15:28 20    related to racism and the lack of police
21    accountability.
22         Q. You don't have the authority to file charges
23    against the officers who are involved in the Che
24    Taylor incident; right?
17:15:42 25         A. I do not.

37 (Pages 142 to 145)

Kshama Iyengar Sawant                 January 12, 2023

---

Page 146

```
 1      Q.  The King County prosecutor's office has that
 2   authority; right?
 3      A.  Legally, that's the legal -- that's the legal
 4   entity that has the authority to do that.
 5      Q.  Right.  And after the inquest hearing, Dan
 6   Satterberg did not file charges against the two
 7   officers, Officer Spaulding and Officer Miller, for
 8   the Che Taylor incident; correct?
 9      A.  Yes, that's correct.
10      Q.  To this day, no charges for murder, for
11   homicide, for assault, murder in the second degree, or
12   any criminal charges whatsoever have been filed by any
13   law enforcement agency against Officer Miller or
14   Officer Spaulding because of the Che Taylor incident;
15   isn't that correct?
16      A.  It is unfortunately true, that virtually no
17   incidents of unjust killings at the hands of the
18   police have been delivered justice.  Che Taylor's is
19   one of them.  As I said, that is why, as I said in my
20   statement, that as a layperson, I believe that this
21   was murder, because it was completely unjust and just
22   outrageous, and that it should -- that it should be
23   considered criminal.
24      Q.  Not talking about all the other incidents.
25   Just talking about the Che Taylor incident.  Just help
```

17:15:54 (line 5)
17:16:11 (line 10)
17:16:32 (line 15)
17:16:49 (line 20)
17:17:07 (line 25)

---

Page 147

```
 1   me focus on just the Che Taylor incident.
 2      To this date, in the Che Taylor incident,
 3   no charges, criminal charges have been filed against
 4   the officers, Officer Miller and Officer Spaulding,
 5   because of that incident; correct?
 6      A.  It is factually true that no charges have
 7   been filed.  I am explaining that it is part of the
 8   overall and widespread and entrenched lack of
 9   accountability in the police department, because Che
10   Taylor's killing was far from isolated.  It is part of
11   a pattern of excessive use of force.
12      Q.  I'm going to hand you --
13      (Exhibit-15 marked.)
14      Q.  So this is the speech that you gave on
15   February 20th of 2017, approximately four months after
16   the inquest hearing had concluded, and that's a
17   transcript of that speech.  Please go ahead and take a
18   chance to review it.
19      A.  (Witness complied.)
20      Q.  This is a transcript we got from the
21   recording.  We can go through the same exercise.
22   We're a little short in time.
23      A.  That's fine.
24      Q.  Would it be fair to accept that this is what
25   you said in your speech on June of 2017?
```

17:17:24 (line 5)
17:17:43 (line 10)
17:18:23 (line 15)
17:20:38 (line 20)
17:22:22 (line 25)

---

Page 148

```
 1      A.  It's fine to accept without having to go
 2   through all that.
 3      Q.  I'm going to direct your attention to the
 4   page where 471 at the bottom.  I'm going to start on
 5   line 23, where you said, "I join the NAACP in
 6   demanding such a transparent public hearing."  And
 7   then you say, "When Che Taylor was murdered by the
 8   police, the community and I demanded such a hearing
 9   from the Mayor and from Councilmember González, whose
10   committee oversees the SPD, but neither the Mayor nor
11   Councilmember Lorena González responded."  Did I read
12   that correctly?
13      A.  Yes.
14      Q.  And when you were saying the word "murdered"
15   on line 25, is that the definition that you were using
16   that you have put into your declaration, "a wrongful
17   killing that should be considered criminal"?
18      A.  Yes.  When I used that term, it was exactly
19   the same as what I have used before in Che Taylor's
20   speech a year ago, which is basically as a layperson,
21   not in a legal sense, but to describe something that
22   was completely unacceptable and unjust and that should
23   be considered criminal.
24      Q.  And isn't it true, that as of June 20th of
25   2017, no criminal charges were pending against anybody
```

17:22:41 (line 5)
17:23:06 (line 10)
17:23:17 (line 15)
17:23:37 (line 20)
17:23:57 (line 25)

---

Page 149

```
 1   for the killing of Che Taylor?
 2      A.  It is true that what you are saying is
 3   factually accurate.  But at the same time, it also
 4   represents one in many, many incidents which add up to
 5   a pattern of a lack of police accountability.  And
 6   clearly when people were gathered for the rally in
 7   memory of Charleena Lyles, it was clear that Charleena
 8   Lyles's loss of life, Che Taylor's loss of life, these
 9   were not isolated incidents.  They were both part of
10   many, many incidents that were -- that indicate just a
11   systematic lack of accountability.
12      Q.  And isn't it true, at the time that you gave
13   this particular speech in June of 2017, an inquest
14   jury had found that Che Taylor posed a threat to the
15   officers in that incident?
16      A.  Again, as I said before, it's factually
17   accurate, but what it also represents is a deep and
18   systematic injustice where the police departments have
19   not been held accountability.
20      ATTORNEY IGLITZIN:  After the fact, I want
21   to object to the form of that question.
22      Q.  And between February of 2017, when the
23   results of the inquest hearing were made -- well, they
24   were public all along, but they were publicized in the
25   news media, and this speech that you gave in June of
```

17:24:17 (line 5)
17:24:42 (line 10)
17:24:59 (line 15)
17:25:18 (line 20)
17:25:47 (line 25)

---

38 (Pages 146 to 149)

Kshama Iyengar Sawant                    January 12, 2023

| Page 150 | Page 152 |

**Page 150**

1  2017, in those four months, did you contact Dan
2  Satterberg to ask him to file charges against the
3  officers?
4      A.  I don't remember if I did or not.
17:26:01  5      Q.  Did you hold a rally in front of Dan
6  Satterberg's office asking for the officers to be
7  charged criminally, in those four months?
8      A.  I did not, but I also don't accept, again,
9  the implication in your question that somehow if I
17:26:19  10  genuinely believed something should have been done, I
11  should have held a rally outside the office of Dan
12  Satterberg.  Actually, that's not a bad idea, now that
13  you are saying.
14      Q.  Well, Dan is not there anymore.
17:26:31  15      A.  No, I meant King County.  It's not about Dan
16  Satterberg.  It's about the King County prosecutor's
17  office.
18          And so I actually don't disagree with you,
19  that it might be a good idea to have a rally outside
17:26:43  20  the prosecutor's office.  But I also don't accept the
21  underlying premise of your question, that somehow if
22  an elected representative genuinely believed what I
23  believe, then you would have done that rally.  We have
24  done -- my office has hosted a number of rallies.  My
17:27:02  25  office has joined a number of rallies and protest

**Page 151**

1  marches that other community leaders have called, you
2  know, that I have attended or spoken at them.  And so
3  my record in my nearly ten years on the city council
4  is very clear on where I stand as to police
17:27:20  5  accountability.
6      Q.  Not my question at all.  My question was yes
7  or no:  Within those four months, you didn't hold a
8  rally in front of the King County prosecutor's office
9  calling for charges for Che Taylor's killing; right?
17:27:34  10      A.  I'm answering your question.  I said I
11  didn't, but I also don't agree with the premise that
12  is underlying your question.
13      Q.  And between February of 2016, February 21st
14  when Che Taylor died all the way to present, you
17:27:48  15  haven't held any type of a rally in front of the King
16  County prosecutor's office calling for criminal
17  charges to be filed on the Che Taylor's killing
18  incident?
19      A.  As I said, my office and my organization,
17:28:02  20  Socialist Alternative, together we have hosted a
21  number of rallies.  We have ourselves called for a
22  number of rallies.  We have joined other organizations
23  in calling for rallies, and we have -- and I have
24  personally spoken at or attended rallies called for by
17:28:20  25  others.

**Page 152**

1          And I don't accept the premise underlying
2  your question, that somehow because we didn't do that
3  one specific thing, that invalidates all the work we
4  have done.  I don't accept that.  I'm not clear why
17:28:32  5  you would just think about King County prosecutor.
6      Q.  That wasn't --
7      A.  And to be clear, I also don't accept that you
8  can pretend that there was no implication.  Of course
9  there's implication.  You are the opposing counsel, so
17:28:50  10  of course there's implication.  So let's be honest
11  about that.  Let's not be coy.
12          But the fact is, that the George Floyd
13  movement, as I said, was the largest street protest
14  movement in U.S. history, and in Seattle hundreds of
17:29:00  15  thousands of people came out.  So those rallies are
16  now countless and they happened in many different
17  locations.  So I don't agree that any one location
18  should be picked on just because it serves, you know,
19  convenience, you know, whatever purpose in this case.
17:29:17  20  I'm just saying, I'm responding as an elected
21  representative.  I'm not a lawyer.  I'm not here to
22  play games.  I'm telling you what I genuinely believe.
23      Q.  Ma'am, that wasn't the premise of my question
24  at all.
17:29:32  25      A.  I think that it was.

**Page 153**

1          ATTORNEY SINGLA:  Dmitri, I'm going to
2  instruct your client to just answer my question.
3          ATTORNEY IGLITZIN:  And I was going to ask
4  you to ask the next question.
17:29:40  5      Q.  My question is:  I'm not talking about George
6  Floyd and the George Floyd protest, because they
7  happened in 2019 and forward.  I'm talking about 2016
8  and 2017.
9          ATTORNEY IGLITZIN:  I think she answered
17:29:51  10  your question, that she did not --
11          ATTORNEY SINGLA:  No, she didn't.
12          ATTORNEY IGLITZIN:  -- her organization did
13  not do -- she answered it, and then she elaborated on
14  her answer.
17:29:58  15          ATTORNEY SINGLA:  No, no.  In the second
16  part of the question.  She never answered the
17  question, she just went directly into what her point
18  was --
19      A.  What was the question?
17:30:04  20      Q.  My question was:  From 2016 all the way to
21  now, you have not had any type of a protest in front
22  of the King County prosecutor's office calling for
23  criminal charges for the Che Taylor incident?
24      A.  I did answer your question.
17:30:18  25      Q.  So the answer is no, then, you have not

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Kshama Iyengar Sawant                                January 12, 2023

Page 154

```
        1    had --
        2         A.  Can I answer the question?
        3         Q.  Well, let me ask the question this way:  Is
        4    the answer to my question, no, you have not held a
17:30:30 5    rally in front of the King County prosecutor's office
        6    between 2016 to present asking for criminal charges to
        7    be filed for Che Taylor?
        8         A.  I did answer the question, but I will repeat
        9    my answer.  We have not called for a rally outside the
17:30:48 10   King County prosecutor's office.  But I also do not
       11    accept the premise in your question that somehow that
       12    in itself shows anything of any significance.  Because
       13    in reality, as I said, it's precisely because people
       14    like the family of Che Taylor did not get justice,
17:31:09 15   family of Charleena Lyles.  It's precisely because
       16    this has happened over and over again that the George
       17    Floyd movement happened.
       18         Had killings like Che Taylor actually
       19    brought police officers to justice, then you wouldn't
17:31:21 20   have seen the movement happening.  And that movement
       21    hosted rallies throughout the city and throughout the
       22    region.
       23         Q.  I'm going to go back to before February 25th
       24    of 2016.  Between February 21 of 2016 and before you
17:31:38 25   went to the rally on February 25th, why didn't you
```

Page 155

```
        1    think about calling any of your fellow council
        2    members?
        3         A.  Which days are you talking about?
        4         Q.  I'm sorry.  Let me rephrase the question.
17:31:56 5         Right before you went down to that
        6    impromptu rally on February 25th -- follow me?  The
        7    rally was impromptu on February 25th; right?
        8         A.  Yes.
        9         Q.  2016.  Right before you went down there, did
17:32:06 10   you call Lorena González?
       11         A.  I don't remember if I did or not.
       12         Q.  Did you think about calling Bruce Harrell?
       13         A.  I can't tell you what I thought about
       14    seven years ago.
17:32:19 15        Q.  What about Pete Holmes, who was the city
       16    attorney at the time?
       17         A.  Again, as I said, I may or may not have
       18    called.  I may or may not have talked to them.  I
       19    can't recall.
17:32:29 20        Q.  And did you at any point inquire that the
       21    public statements that you would be making, would in
       22    any way implicate the City of Seattle in liability for
       23    what happened to Che Taylor?
       24         A.  Well, as I've said repeatedly now, I was not
17:32:49 25   speaking in a legal sense.  I was speaking as a common
```

Page 156

```
        1    person in common parlance as an elected representative
        2    who believed that what happened to Che Taylor was
        3    absolutely unjust and unacceptable, and should be
        4    considered -- you know, it was wrongful and should be
17:33:08 5    considered criminal.  I was speaking in that capacity.
        6         So I was not -- I was not -- I did not
        7    make it in a legal sense.  And I did not choose to
        8    file this lawsuit against me.  Other people chose to.
        9    So I did not have a crystal ball at that time.
17:33:24 10        So your question, again, assumes that I
       11    would have known all of this would happen.  Of course
       12    not.  And how would I have known, first of all,
       13    fundamentally I was not speaking in a legal sense.
       14         Q.  I'm not talking about speaking in a legal
17:33:38 15   sense.  You were speaking as an elected official;
       16    right?
       17         A.  I was speaking as an elected representative,
       18    and my usage of the word "murder" was based on my
       19    opinion of what happened and what should be considered
17:33:52 20   criminal.
       21         Q.  My question didn't even ask anything about
       22    murder.  My only question was:  You were speaking as a
       23    Seattle city council member; correct?
       24         A.  I was speaking as a Seattle city council
17:34:01 25   member, yes.
```

Page 157

```
        1         Q.  Do you understand that speaking as a Seattle
        2    council member makes you a speaking agent for the City
        3    of Seattle?
        4         ATTORNEY IGLITZIN:  Objection.  Call for a
17:34:10 5    legal conclusion.  Object to the form of the question.
        6         A.  I don't understand what that means.
        7         Q.  Did you contact the city attorney to ask them
        8    whether or not you speaking at a rally, as an elected
        9    Seattle City council member, one of nine policymakers,
17:34:27 10   whether or not your statements would make you a
       11    speaking agent for the City of Seattle?
       12         ATTORNEY IGLITZIN:  Objection.  Calls
       13    for -- well, I'm sorry.  I withdraw my objection.
       14         A.  Well, first of all, I don't understand.  I
17:34:40 15   mean, seems to me, again, this is legalistic
       16    terminology like "speaking agent."  I don't think of
       17    my job in those terms.  Obviously we, in my office, we
       18    are not, we are not -- we don't use words -- if what
       19    you are getting at is, do you just speak flippantly?
17:35:06 20   Of course we don't speak flippantly.  But nor are we
       21    lawyers in the sense that our primary motivator of
       22    what words we use is based on our view of society.
       23         And like I said many times, the reason I
       24    used the word "murder" was not in any way to mean it
17:35:24 25   in a legal sense, which if you did, I can see you
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Kshama Iyengar Sawant                                    January 12, 2023

<table>
<tr><td>Page 158</td><td>Page 160</td></tr>
</table>

**Page 158**

1  would want to look at what would be the legal
2  consequence of that.
3          I was speaking as an elected
4  representative with my layperson's understanding of
17:35:36  5  what "murder" should be. And as you can see, that
6  opinion has been shared by many community members.
7      Q.  Do you understand that as an elected
8  representative, you have a higher responsibility than,
9  say, a layperson who is not an elected representative?
17:35:54 10          ATTORNEY IGLITZIN:  Counsel, I'm going to
11  lodge an objection, if you are going to continue this
12  line.  Because I can't figure out the relevance, my
13  inference this is -- let me finish.  For the record,
14  my inference is that this is designed solely to elicit
17:36:10 15  responses that will embarrass the council member,
16  because -- here I'm channeling my client -- the
17  insinuation is that she has somehow fallen down on the
18  job of being a council member by not considering the
19  City's pecuniary interests.  So to the extent that
17:36:28 20  that's where you are going --
21          ATTORNEY SINGLA:  That's not where I'm
22  going.
23          ATTORNEY IGLITZIN:  All right.
24          ATTORNEY SINGLA:  She's been -- throughout
17:36:30 25  this entire deposition, she's been saying, I was

**Page 159**

1  there.  I was acting as a city council member and I
2  was speaking as a layperson.
3      Q.  And what I want to ask her, and this is
4  specifically and wholly relevant is:  Do you have an
17:36:44  5  understanding that when you are elected by your
6  district as an elected representative, you have a
7  higher responsibility for your actions than, say, an
8  average unelected person?
9          ATTORNEY IGLITZIN:  I'm going to object to
17:36:59 10  the form of the question, and assumes concepts, I
11  guess, not in evidence.
12          You can certainly go ahead and answer.
13      A.  I will answer to that point, I will answer
14  based on my understanding of what you believe -- what
17:37:11 15  you -- what I believe -- what did you -- "higher"
16  what?  "Higher responsibility?"
17      Q.  "Higher responsibility."
18      A.  As a socialist and as an elected
19  representative of working people, I absolutely believe
17:37:25 20  that I have -- I'm not going to characterize it in
21  terms of higher, but I do believe that I have
22  tremendous responsibility in my -- my office has a
23  tremendous responsibility to doggedly and boldly
24  represent the interests of working people.
17:37:41 25      Q.  Not my question.

**Page 160**

1      A.  That's my interpretation of your question,
2  and that's my answer.
3      Q.  So what I'm going to say is:  You understand
4  that as an elected representative, you stand for
17:37:51  5  elections, stood for election three times, and people
6  have voted for you, and now you sit in office as one
7  of nine council members and decision-makers.  Do you
8  have a concept that that carries a responsibility,
9  say, than somebody else who is not sitting in the
17:38:09 10  position of a policymaker like you are?
11          ATTORNEY IGLITZIN:  I'm going to object to
12  the form of the question.  Asked and answered.
13      Q.  Go ahead.
14      A.  Well, first of all, you said I've been voted
17:38:19 15  in three times.  That's not being accurate.  I've been
16  voted in four times.
17          And also, as far as your question is
18  concerned, I have answered it, and I will say it
19  again.  As a socialist and as an elected
17:38:34 20  representative of working people, I absolutely take my
21  responsibility seriously of representing working
22  people, the poor, low-income people, communities of
23  color, marginalized and oppressed communities.  And
24  that means never selling out and boldly using your
17:38:49 25  office to not only fight for justice in the case of

**Page 161**

1  police accountability, but also winning victories,
2  like the $15 minimum wage and the Amazon tax, not to
3  mention the whole host of renter's rights that we have
4  won.
17:39:07  5          ATTORNEY SINGLA:  This case is nothing --
6  I'm going to make a motion to strike.
7      Q.  This case is nothing about renter's rights,
8  Amazon tax --
9          ATTORNEY IGLITZIN:  You asked her about
17:39:15 10  her conception of her role on the city council.
11          ATTORNEY SINGLA:  No, I did not.
12          ATTORNEY IGLITZIN:  Well, a higher
13  authority didn't mean anything -- a higher
14  responsibility didn't mean anything, other than --
17:39:21 15          ATTORNEY SINGLA:  I'm not going to argue
16  with you, Dmitri.
17          ATTORNEY IGLITZIN:  That's fine.
18      Q.  Here's my next question for you:  At any
19  point before you went down to that rally on
17:39:28 20  February 25th, did you consider that you should
21  perhaps show restraint and say, We should inquire
22  about all the facts before we make any decisions?
23      A.  I think the idea of the way you are framing
24  the question, you know, showing restraint and inquire
17:39:48 25  all the facts, that, again, would imply that somehow

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Kshama Iyengar Sawant                                    January 12, 2023

Page 162

1  you weren't aware of, one, what had happened to Che
2  Taylor.  You know, if I hadn't watched the video and
3  understood what had happened, then I would -- and
4  again, the same with Charleena Lyles.  If I had not
17:40:10  5  known the facts of how she was killed, then obviously
6  I would say, Yes, you know, we should, we should --
7  you know, let's look into what happened.
8         However, at that moment, it was my
9  opinion, and, as I said, it's still my opinion, that
17:40:23 10  what happened to Che Taylor was absolutely shocking
11  and unjust.  It was an execution-style killing, and
12  that is why I used the word "murder," not in legal
13  sense, and I still use that.
14     Q.  Ma'am, you only saw the video.  You don't
17:40:37 15  know any of the other context about what was
16  happening; right?
17         ATTORNEY IGLITZIN:  Are we talking about
18  2016, 2017, or --
19         ATTORNEY SINGLA:  Now, when she said she
17:40:45 20  saw the video.
21     Q.  You saw the video, and you don't know any
22  context --
23         ATTORNEY IGLITZIN:  "You don't know," I'm
24  not clear.  Do you mean you didn't know --
25     Q.  You didn't know, yeah --

Page 163

1         ATTORNEY IGLITZIN:  -- in 2016?
2     Q.  You didn't know in 2016 when you saw the
3  video what was happening; right?
4     A.  Again, I don't understand the meaning of the
17:40:59  5  question, because in the sense that the video was very
6  striking.
7     Q.  Okay.
8         ATTORNEY SINGLA:  Let's pull up the video.
9  We're going to add this as an exhibit.
17:41:25 10     Q.  This is the video you saw before February
11  25th, 2016; right?
12         (Video playing.)
13     Q.  That's the video you are talking about;
14  right?
17:41:56 15     A.  I mean, it's been a long while, but, yes.
16     Q.  In that video, you don't know what Che Taylor
17  is doing behind that car door; right?
18     A.  I couldn't see it properly just now.
19     Q.  Let's play it again.
17:42:11 20         ATTORNEY IGLITZIN:  It's pretty hard on
21  that tiny screen.
22         THE WITNESS:  Yeah, it is.
23         ATTORNEY IGLITZIN:  I've seen the video
24  before.
17:42:17 25     A.  Yes.

Page 164

1     Q.  Let me know however many times you want to
2  see it.  We'll blow up the screen.  We can even slow
3  it down, if you want.
4         (Video playing.)
17:42:47  5     Q.  Do you want to see it again?
6     A.  (Witness shakes head.)
7     Q.  Now we've seen the video twice.  You can't
8  tell what Che Taylor is doing behind that opening car
9  door; right?
17:43:00 10     A.  Yes, you can.  You can see him -- I mean,
11  obviously when he's down, you cannot.
12         But the whole point is that he was, you
13  know, he was trying to comply with the police
14  officers, and it all happened in a flash, how it
17:43:17 15  happened in a couple of seconds.  That is not, that is
16  not what should happen at the hands of the police.
17     Q.  You could not tell in that video what Che
18  Taylor was doing when he was behind that car door;
19  correct?
17:43:29 20         ATTORNEY IGLITZIN:  Object to the form of
21  the question.
22     Q.  Go ahead.
23     A.  It's very clear that he was killed in a
24  matter of one or two seconds, and that is absolutely
17:43:41 25  not acceptable.  It is absolutely shocking, and it

Page 165

1  really does seem like an execution-style killing.
2     Q.  Not my question.  My question was:  You
3  cannot tell what Che Taylor was doing behind that car
4  door in that video; correct?
17:43:57  5         ATTORNEY IGLITZIN:  Object to the form of
6  the question.
7     Q.  Go ahead.
8     A.  I mean, it's obvious there was no time for
9  anybody to even see what he was doing.  You know, it's
17:44:08 10  immediately he is being shot dead.
11     Q.  The officers, on the other hand, were in
12  front of Che Taylor, and they could have told what he
13  was doing; right?
14     A.  Again --
17:44:21 15         ATTORNEY IGLITZIN:  Objection.  Calls for
16  speculation.
17     Q.  Sorry.  I'll rephrase the question.
18         The officers, on the other hand, were in
19  front of Che Taylor; right?
17:44:31 20     A.  They were in front of Che Taylor, yes.  But
21  again, sorry, I don't agree with the way you are
22  asking the question in the sense, yes, they were in
23  front, but whether they're speaking the truth or not,
24  I don't know.  And in fact, given the long track
17:44:47 25  record of injustice at the hands of the police,

42 (Pages 162 to 165)

Kshama Iyengar Sawant                              January 12, 2023

Page 166

1    there's no reason to in any case --
2        Q.  I'm going to show you this video --
3            ATTORNEY SINGLA:  And I've stopped it,
4    Dmitri, if you want to take a look at it.  I've time
17:45:02  5    stamped and stopped it.
6        Q.  This is a position of where the officers
7    were, and Che Taylor was now behind the door, behind
8    the passenger's door.
9        A.  To be really honest, this is a very bad
17:45:16 10    quality video.  I mean, it's very hard to tell what's
11    happening.  I'm trying to do my best.
12        Q.  This is the dash cam video --
13        A.  Yeah, I know, but on your laptop it's --
14        Q.  Well, all I can tell you is, this is the dash
17:45:29 15    cam video that was released to the public between
16    February 21st and 25th.  So if you watched a video,
17    unless you had access to other dash cam videos, that
18    was the video.
19            ATTORNEY IGLITZIN:  She might have had
17:45:43 20    access to a larger computer screen.
21            ATTORNEY SINGLA:  Sure.
22            ATTORNEY IGLITZIN:  Counsel, the video
23    speaks for itself.
24            ATTORNEY SINGLA:  You can make your
17:45:50 25    objection to the form.

Page 167

1        Q.  My question is:  I've stopped the video.  Che
2    Taylor at this point is behind the door.  The one
3    officer is behind the car.  The other officer is
4    behind the rear passenger side.  And the question I
17:46:06  5    had to you was:  You can't tell, as you see a still of
6    this video, what Che Taylor was doing behind that car;
7    correct?
8        A.  What I can tell is the fact that heavily
9    armed police immediately gunned down to death an
17:46:25 10    individual.  That's a fact.  It's a fact that Che
11    Taylor was killed, and I believe --
12            I don't agree with you, because I believe
13    that we cannot have a society where people are gunned
14    down in this manner, and that is why -- and this is
17:46:43 15    hardly my individual opinion.  You've had years of
16    mass movement around this very issue.  So you know,
17    I'm on very safe ground based on statistical evidence
18    that this was absolutely wrongful, and it should be
19    considered criminal.
17:47:01 20        Q.  So we've sat here today -- I mean, I think
21    the answer, I think I got it.  But we have sat here
22    today, and you now know and we discussed it, that the
23    inquest hearing and the juries in the inquest hearing
24    cleared the officers of any wrongdoing.  I know it's
17:47:21 25    your --

Page 168

1            ATTORNEY SINGLA:  It's my question.  You
2    can object to it.
3        Q.  Have cleared the officers in the
4    wrongdoing --
17:47:27  5            ATTORNEY SINGLA:  And I'm going to start
6    the question again, so you can make your objection
7    afterwards.
8        Q.  As you sit here today, we've gone through
9    everything -- well, not everything, but as much as
17:47:37 10    time would apply.  And you know that the inquest
11    hearing cleared the officers of wrongdoing, in the
12    sense that Dan Satterberg has declined to follow up,
13    or the King County prosecutor's office has declined to
14    follow up with any criminal charges.  Are you still
17:47:54 15    saying that Che Taylor's killing was a murder, which
16    means a wrongful killing that should be considered
17    criminal?
18            ATTORNEY IGLITZIN:  I'm going to object to
19    the question, because it includes several assertions
17:48:06 20    which are factually untrue.
21            But you can go ahead and answer the
22    question.
23        A.  Sorry.  Can you ask the question again?
24        Q.  I'll break it down.  I'm going to break it
17:48:17 25    down in parts.  I'm not going to ask it for a

Page 169

1    response.  I'm just going to break it down in parts so
2    you can understand what I'm saying.
3            ATTORNEY SINGLA:  If it's okay with you,
4    can you waive your objection on compound, so I can
17:48:32  5    break it down in parts?
6        A.  I think -- sorry.
7        Q.  So this is where we are:  We are where there
8    has been an inquest in February of 2016.  A jury has
9    answered questions.  A jury has found that Che Taylor
17:48:46 10    posed a threat to at least one of the officers.  The
11    King County prosecutor's office has looked at the
12    results of the inquest and has declined to file
13    charges against the officers.  And as you are sitting
14    here today, is it still your position that Che Taylor
17:49:04 15    was murdered, and according to your definition, which
16    would mean a wrongful killing that should be
17    considered criminal?
18            ATTORNEY IGLITZIN:  Same objection as
19    before:  compound, assumes facts not in evidence.
17:49:17 20            If you understand the question, you can
21    answer.
22        A.  Yeah, I will respond to the question.
23            I've said this -- I believe I answered
24    this question already many times today, but I will say
17:49:26 25    it again.  I do believe now, as I did then, that what

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Kshama Iyengar Sawant                              January 12, 2023

---

Page 170

1    happened in the case of Che Taylor was murder.  And as
2    I said, as I spoke then and as I'm speaking now, I'm
3    speaking not as a lawyer, not as a judge, but as an
4    elected representative and as a layperson who believes
5    that that was absolutely unjust and should be
6    considered criminal.
7         And as a matter of fact, there's nothing
8    astounding about this at all, because as I've said, it
9    is hardly an isolated case.  This is -- unfortunately,
10   it's deeply tragic that what happened to Che Taylor
11   was far from the only one and is part of a long litany
12   of statistics of police accountability.
13       Q.  You used the word "believe" three times in
14   that particular response, that you believed it then,
15   you believe it now.  You did not use that same word
16   "believe" in your February 2016 transcript of your
17   speech or your June 2017 speech; right?  You never
18   used the word "believed it was murder"; correct?
19           ATTORNEY IGLITZIN:  Object.  Compound.
20   Asked and answered.
21       Q.  Go ahead.
22       A.  I've already answered this question many
23   times, that in the speech, I do believe that what you
24   are asking is a little bit absurd, in the sense that
25   everybody who's listening to me speak as an elected

Page 171

1    representative understands, whether they agree with me
2    or not, that what I'm speaking is something I believe
3    or I agree with.  Not that I would be talking about
4    something that I don't actually believe but somebody
5    else believes and I'm channeling them.  No.  Obviously
6    what I'm talking about is what I believe.
7            ATTORNEY SINGLA:  Can we take a break?
8            ATTORNEY IGLITZIN:  Yeah.  Let me ask a
9    question while we're on the break.
10       (Recess.)
11           ATTORNEY IGLITZIN:  Counsel, give your
12   best shot here.  I'm withdrawing my instruction not to
13   answer.  You'll probably repeat the question, and then
14   I'll have a new objection.
15       Q.  The question was, when we were talking about
16   this, Councilmember, and we were talking about whether
17   or not you accepted the results of the jury in the
18   inquest process, do you remember when we were talking
19   about that?
20       A.  I remember.
21       Q.  And you had said that even though the jury
22   had come out with the process, you didn't believe that
23   adequately addressed the underlying issues of race and
24   social justice and police brutality, just to use that
25   word.

Page 172

1        A.  Yes.
2        Q.  So in that concept, I explained to you that
3    that wasn't a criminal process.  That was a civil
4    process, very much similar to the civil process we're
5    going to have here in this case, if this case goes to
6    trial.
7            And my question was, and this is what I'm
8    really wondering is:  If you are not willing to accept
9    a jury in a civil process like an inquest process,
10   will you be able to accept a jury's decision in this
11   process, which is also a civil process, and merely not
12   an inquest process, but the same civil process in
13   public?  People are going to testify under oath.
14   Evidence is going to be given.  Will you be able to
15   accept this?
16           ATTORNEY IGLITZIN:  Object to the form of
17   the question.  Assumes facts not in evidence, and
18   makes various assertions that are disputable.
19           You can go ahead and answer.
20       A.  Yes, I will answer.
21           One, just to clarify.  When I say
22   "criminal justice system," and you keep saying, This
23   is civil, this is criminal, you are speaking as a
24   lawyer.  I'm speaking as a layperson, and specially as
25   a socialist, who believes a lot is wrong under the

Page 173

1    system of capitalism.  And so when I say "criminal
2    justice system," I want just to clarify, that I'm
3    talking about the status quo as a whole, economic
4    outcomes for most people, also the legal system.
5            You know, so you may make a distinction
6    between civil and criminal, but it's still the legal
7    system.  In that sense, what I'm saying still applies,
8    and I didn't mean to misspeak.  I did mean what I
9    said, which is that in the legal system under
10   capitalism, I don't think that the majority of
11   ordinary people get any kind of justice, especially
12   for people of color in the context of the United
13   States.
14           And so when you say, Well, you are not
15   accepting this inquest in the first place, will you
16   accept this, just to clarify:  Even in the case of the
17   inquest, it's not that I'm living on another planet
18   and I'm in denial of the facts.  Of course those are
19   the facts.  But politically, do I -- and in terms of
20   social justice, do I accept that it was the correct
21   thing?  No, I don't.  So there's a distinction between
22   the two.  It's the same thing that applies for your
23   question about would you accept a decision in this
24   particular case that we're talking about.  My response
25   would be similar, in the sense that would be deeply

Timestamps (left margin, Page 170): 17:49:46 (5), 17:50:00 (10), 17:50:22 (15), 17:50:41 (20), 17:50:54 (25)
Timestamps (left margin, Page 171): 17:51:10 (5), 17:55:09 (10), 17:55:34 (15), 17:55:52 (20), 17:56:07 (25)
Timestamps (left margin, Page 172): 17:56:19 (5), 17:56:34 (10), 17:56:52 (15), 17:56:59 (20), 17:57:12 (25)
Timestamps (left margin, Page 173): 17:57:28 (5), 17:57:42 (10), 17:57:55 (15), 17:58:11 (20), 17:58:27 (25)

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Kshama Iyengar Sawant                         January 12, 2023

## Page 174

1    unfortunate. In my view that would be just like it
2    happened for so many people and has happened for so
3    many people under the legal system of capitalism in
4    the U.S., many miscarriages of justice have happened.
17:58:46   5        So if your question is, would I accept it
6    as matter of fact, yes, of course. I'm not going to
7    be in denial of fact. I'm not going to live on
8    another planet. But in that sense, yes, that would be
9    true. But it will also be deeply unfortunate.
17:58:59  10        And also I think a lot of the history of
11   the legal system has shown that verdicts are
12   overturned when they're found to have been unjust,
13   untrue, inaccurate, and that sort of thing. So those
14   things happen also, and it's possible that could
17:59:17  15   happen in this case.
16        And also the judgment of history is also,
17   is also there, and I care deeply about that. History
18   will decide, you know, future generations will decide
19   whether something was just or unjust, and I will keep
17:59:31  20   going on in terms of what I believe is correct.
21   Q. Okay. That's all I have.
22        ATTORNEY IGLITZIN: All right.
23        (Deposition adjourned at 5:59 p.m.)
24        (Signature reserved.)
25        *    *    *

## Page 175

1        S I G N A T U R E
2
3
4
5        I declare under penalty of perjury
6    under the laws of the State of Washington that I have
7    read my within deposition, and the same is true and
8    accurate, save and except for changes and/or
9    corrections, if any, as indicated by me on the CHANGE
10   SHEET flyleaf page hereof. Signed in..............WA
11   on the......day of, ................, 2023.
12
13
14
15        ..........................
16        KSHAMA IYENGAR SAWANT
17
18        Taken: January 12, 2023
19        PEGGY FRITSCHY HAMILTON, RPR,
20        CSR, CLR
21
22
23
24
25

## Page 176

1        C E R T I F I C A T E
2    STATE OF WASHINGTON   )
                            ) ss.
3    COUNTY OF KING        )
4        I, the undersigned Registered
5    Professional Reporter and Washington Certified Court
6    Reporter, hereby certify that the foregoing deposition
7    upon oral examination of KSHAMA IYENGAR SAWANT was
8    taken before me on January 12, 2023 and transcribed
9    under my direction;
10        That the witness was duly sworn by me
11   pursuant to RCW 5.28.010 to testify truthfully; that
12   the transcript of the deposition is a full, true, and
13   correct transcript to the best of my ability; that I
14   am neither attorney for, nor a relative or employee
15   of, any of the parties to the action or any attorney
16   or counsel employed by the parties hereto, nor
17   financially interested in its outcome.
18        IN WITNESS WHEREOF, I have hereunto set
19   my hand and seal this date: January 19, 2023.
20
21   \S\ PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR
22        Court Reporter in and for the State of
23   Washington, residing in Seattle. License expires
24   July 3, 2024.
25

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

Exhibit 2

LOCAL NEWS

## Attorneys weigh in on police officers' lawsuit against Kshama Sawant

Aug 22, 2017, 4:47 PM | Updated: Aug 23, 2017, 10:53 am



**BY MYNORTHWEST STAFF**
The team that brings you MyNorthwest

Two Seattle police officers are suing Kshama Sawant for "having their reputations ruined by an ambitious politician, doing so for personal gain."

**Read the lawsuit, filed by Williams, Kastney and Gibbs.**

Former Attorney General Rob McKenna explains the lawsuit to KIRO Radio's Jason Rantz. Listen here.

**Is suing Sawant personally an easier case to make?**

McKenna: I think it's a pretty easy case to make that the councilmember was not acting in her official capacity when she accused them of being murderers. The analogy that I would use is that if she walked up to one of these officers and punched them in the face, that would not be part of her official duties. And the city would not be required or even allowed to defend her. Defamation is a different kind of assault. It's an assault on reputation.

**What are the next steps in this case?**

McKenna: They filed a complaint with superior court and Sawant will have to file an answer to that complaint. She'll probably talk to the City Attorney's office to find out whether they're going to provide a defense for her — by way of City Attorney or by hiring outside counsel to represent her on the City's nickel. What could happen is they decline to provide the City Attorney, which I think is appropriate.

Instead they'd tell her, 'You will hire your own attorney and then you can seek reimbursement from the City and we'll decide whether or not you're going to get it.'

**How serious is this?**

McKenna: It's pretty serious because accusing someone of murder is a very serious statement. In my opinion, the councilmember has crossed over from political rhetoric to defamation. I think the case can possibly be made, even though it is a high standard.  There's not much to say about someone that's worse than accusing them of being a murderer. Maybe a rapist or child molester, etc. In this era we live in when people make reckless, inflammatory statements for political purpose –particularly when the statements are made by a public figure with the following that the councilmember has —  I think the law ought to take it seriously.  I think these officers should have a good case here. Having said that, it is a high standard. Proving that she knew the statements were false when she made them is a fairly heavy burden to carry. It may be that the sympathies of a jury or judge will be with the police officers here and they'll decide, in this case, that she should have known.

Seattle legal analyst Anne Bremner explains defamation to KIRO Radio's Dori Monson.  Listen here.

**Are the police officers public figures?**

Bremner: They are public figures and the law says so. There are varying degrees of public figures out there, but you can say, with certainty, that police officers fall in that category.

**How does that change things in a defamation lawsuit?**

Bremner:  It basically means that they have a higher standard that they have to prove, in proving defamation. They have to prove actual malice – it's under a case called New York Times vs Sullivan.  Actual malice means a reckless disregard for the falsity of the statements or the truthfulness of the statements. Malice is a high standard admittedly, but it doesn't mean they can't sue. It just means they have a higher burden of proof in terms of the mental element of the one that defamed them.

**Is calling the police officer murderers a reckless disregard for the truth by Sawant?**

Bremner:  Sure. The fact is that murder means a criminal act. She's not saying they're responsible for a death or that they killed or etc. She called them murderers, right?  That basically means she's accusing them of criminal homicide. They have been cleared by inquest jury, that's a factual determination by that jury. They haven't been charged, criminally.  So to call them murderers, clearly, is reckless.