1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SCOTT MILLER, MICHAEL SPAULDING,<br><br>                    Plaintiffs,<br><br>        v.<br><br>KSHAMA SAWANT,<br><br>                    Defendant. | CASE NO. C18-506 MJP<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant Kshama Sawant's Motion for

Summary Judgment. (Dkt. No. 119.) Having reviewed the Motion, Plaintiffs' Opposition (Dkt.

No. 125), the Reply (Dkt. No. 135), and all supporting materials, the Court GRANTS the Motion

and enters summary judgment in Sawant's favor on the remaining claims in this action.

**SUMMARY**

Seattle Police Officers Scott Miller and Michael Spaulding claim that Seattle City

Councilmember Kshama Sawant twice defamed them by referring to them as the murderers of

Andre Che Taylor. Miller and Spauling shot and killed Taylor on February 21, 2016 while

1   attempting to arrest him. Miller and Spaulding claimed they acted in self-defense and were found

2   to have acted within Seattle Police Department policy. They also pursue a claim of "outrage" that

3   is dependent on a valid defamation claim.

4       Sawant asks that the claims not advance to trial because Miller and Spaulding have failed

5   to identify sufficient evidence that her words were defamatory. The Court agrees and finds in

6   Sawant's favor for three independent reasons.

7       First, Sawant's remarks are inactionable statements of opinion. Second, even if the Court

8   were to construe Sawant's remarks as actionable, factual statements, Miller and Spaulding have

9   failed to provide evidence that might allow a jury to find them to be false. Third, Miller and

10  Spaulding have failed to provide sufficient evidence that Sawant acted with "actual malice."

11      Each of these findings separately and independently support entry of summary judgment

12  in Sawant's favor on Plaintiffs' claims. The Court's ruling makes a trial and any further

13  proceedings unnecessary.

**BACKGROUND**

15      Plaintiffs Michael Spaulding and Scott Miller, both Seattle Police Department (SPD)

16  Officers, accuse Sawant, a Seattle City Councilmember, of defaming them on two separate

17  occasions. Spaulding and Miller allege that at two public rallies, Sawant branded them as

18  murderers for their participation in the shooting death of Andre Che Taylor. Discovery has

19  closed and Sawant asks the Court to find that Plaintiffs have failed to develop sufficient facts to

20  prevail on their defamation and outrage claims. Sawant's Motion requires the Court to examine

21  Plaintiffs' involvement in killing Che Taylor, Sawant's first and second remarks, the King

22  County inquest and city-level reviews conducted of the killing, and Plaintiffs' claimed damages.

23

24

**A.      Police Killing of Che Taylor**

On February 21, 2016, Miller and Spaulding were conducting surveillance on an apartment complex on NE 85th Street, in Seattle. (Declaration of Dmitri Iglitzin Ex. 15 at 1 (Final Interrogatories to the Inquest Jury) (Dkt. No. 120).) Miller and Spaulding observed Andre Che Taylor, a forty-six year-old Black man, arrive near the apartment complex at about 3:30 PM. (Iglitzin Decl. Ex. 1 at 18 (Force Investigation Report).) Miller observed a handgun in a holder on Taylor's right hip as Taylor entered the apartment complex. (Id. at 18-19) Miller and Spaulding knew that Taylor was a convicted felon and could not legally possess a firearm. (Id.) Miller and Spaulding determined to arrest Taylor and called for assistance shortly after seeing him enter the apartment complex. (Id. at 7.)

Roughly twenty minutes later, Miller and Spaulding saw Taylor exit the apartment complex. (Iglitzin Decl. Ex. 1 at 20.) Taylor did not immediately return to his car and Miller and Spaulding lost sight of him. (Id. at 20.) A short while later, a white Ford Taurus carrying Taylor in the front passenger seat drove past Miller and Spaulding and parked behind Taylor's car. (Id. at 20-21.) Taylor got out of the Taurus and began speaking with the driver and other passenger from outside the car. (Id. at 21.)

Miller and Spaulding decided the execute the arrest and got out of their unmarked vehicle in plain clothes wearing black SPD jackets with police markings on their chest and back. (Iglitzin Decl. Ex. 1 at 21; Iglitzin Decl. Ex. 3 at 1190-91 (Inquest Transcript).) Spaulding was armed with a rifle, while Miller carried a shotgun. (Iglitzin Decl. Ex. 3 at 1014-15.) They surprised Taylor and commanded him to show his hands and get on the ground next to the white car, which Taylor did. (Id. at 1040, 1076, 1194; Iglitzin Decl. Ex. 7.) When Taylor was prone on the ground, both Miller and Spaulding thought Taylor was reaching for and drawing a firearm from

his right hip. (Iglitzin Decl. Ex. 1 at 21; Iglitzin Decl. Ex. 3 at 1040-41, 1257-58.) Spaulding shot Taylor six times at close range with a rifle, while Miller shot him once with a shotgun. (Iglitzin Decl. Ex. 1 at 21; Iglitzin Decl. Ex. 3 at 1160, 1207.) Taylor died shortly after being transported to Harborview Medical Center. (Iglitzin Decl. Ex. 1 at 21-22.) No gun was found on Taylor's body and neither Miller nor Spaulding saw him holding a firearm at the time of the attempted arrest. (Iglitzin Decl. Ex. 3 at 888, 1098, 1266.) A gun was found in the Taurus under the passenger seat, but there were no fingerprints or DNA that could be matched to Taylor and no records indicated he purchased or registered the gun. (Iglitzin Decl. Ex. 8 at 4 (CSI Vehicle Report); Iglitzin Decl. Ex. 3 at 1551-53, 1548-50.)

**B.     Sawant's First Remarks**

The day after the Taylor died, SPD released video of the shooting taken from the dashcam of an SPD vehicle arriving on the scene while Miller and Spaulding were attempting to arrest Taylor. (Iglitzin Decl. Ex. 7.) Two days later at a news conference, the president of the Seattle King County NAACP called Taylor's death a "coldblooded murder" and an "execution without due process at the hands of the police." (See Iglitzin Decl. Ex. 10 (Seattle Times Article dated Feb. 24, 2016).) The president elaborated: "It was clear to me that they come with the intent to kill, not to arrest." (Id.) The same Seattle Times article that reported on the news conference identified Spaulding and Miller as the officers who shot Taylor. (Id.)

On February 25, 2016, four days after the shooting, a group of around one-hundred people gathered outside of SPD headquarters across the street from City Hall to demand criminal charges be filed against the officers involved in Taylor's death. (Iglitzin Decl. Ex. 11 (Seattle Times Article dated Feb. 26, 2016); Declaration of Kshama Sawant ¶ 3 (Dkt. No. 121); Deposition of Kshama Sawant at 52-3 (Exhibit A to the Declaration of Daniel Brown (Dkt. No.

134)).) Sawant had seen the police video of the shooting and read news reports and decided to

join the protest in solidarity with the protestors, though her participation was unplanned. (Sawant

Decl. ¶¶ 6-7.) Sawant, whose offices are in City Hall, described the event as "a rally outside city

hall on the issue of Che Taylor and the overall issues of the police department in relation to

communities of color." (Sawant Dep. at 51.) According to Sawant, "[m]any people who were

present and several speakers described Che Taylor's death as a 'murder,'" including the

president of the local NAACP branch. (Sawant Decl. ¶¶ 8-9.) In relevant part, Sawant told those

gathered:

> This is dramatic racial injustice, in this city and everywhere in this nation. The brutal
> murder of Che Taylor, just a blatant murder at the hands of the police, show how urgently
> we need to keep building our movement for basic human rights for black people and
> brown people. I want to let you know that I stand here both as an elected official, as a
> brown person, as an immigrant woman of color, and as someone who has been in
> solidarity with the Black Lives Matter movement, and our movement for racial, economic
> and social justice.…
>
> And I am here as an elected official because I am completely committed, unambiguously
> committed, to holding the Seattle Police Department accountable for their reprehensible
> actions, individual actions. We need justice on the individual actions and we need to turn
> the tide on the systematic police brutality and racial profiling.

(Iglitzin Decl. Ex. 12.)

     In support of summary judgment, Sawant declares that throughout her time on the City

Council she has "been outspoken about police violence against people of color, working people,

and the poor, and about the need for reform and increased accountability." (Sawant Decl. ¶ 4.)

Sawant is not a lawyer and asserts that she did not understand anyone who described the

shooting as a "'murder' to be using it in a technical, legal sense, but only as a layperson would,

to describe a wrongful killing that should be considered criminal." (Id. ¶ 8; see id ¶ 5.) She

maintains that it was her opinion that "Taylor's death could fairly be described as a 'murder,' by

which, as a layperson, I meant to convey that I believed the officers' actions were wrongful and

1    should be considered criminal." (<u>Id.</u> at ¶ 9.) And when she spoke at the rally, she did not know

2    the names of the officers who shot Taylor. (<u>Id.</u> ¶ 10; Sawant Dep. at 57 ("When I was speaking at

3    the rally, I had no knowledge of their names[.]").)

4    **C.    Investigations into the Shooting**

5          The SPD Force Investigation Team (FIT) investigated Miller and Spaulding's use of

6    deadly force against Taylor. (<u>See</u> Iglitzin Decl. Ex. 1.) In June 2016, the Force Review Board

7    (FRB) then reviewed those findings and concluded that Miller and Spaulding acted within SPD

8    policy. (Iglitzin Decl. Ex. 13 (Seattle Times Article Dated June 29, 2016).) The review process

9    was mandated by a 2012 consent decree between the City of Seattle and United States

10   Department of Justice. <u>See</u> <u>United States v. City of Seattle</u>, No. 12-CV-1282 JLR, Dkt. No. 3-1

11   at ¶¶ 38, 66, 112, 124 (Consent Decree) (W.D. Wash. July 27, 2012). Before entering into the

12   consent decree the DOJ's reported to the City its investigatory finding of "a pattern or practice of

13   constitutional violations regarding the use of force that result from structural problems, as well as

14   serious concerns about biased policing." (Iglitzin Decl. Ex. 14 at 2.)

15         An inquest into Taylor's death was convened in accordance with a King County

16   Executive Order and the King County Charter, which required an inquest to "'be held to

17   investigate the causes and circumstances of any death involving a member of any law

18   enforcement agency of the county in the performance of his duties.'" <u>See</u> Conducting Inquests in

19   King County, King County Exec. Order No. PHL 7-1-1 (Mar. 16, 2010) (quoting King County

20   Charter § 895); (Iglitzin Decl. Ex. 3 at 17). King County District Court Judge Janet E. Garrow

21   presided over the inquest, which began on January 30, 2017. (Iglitzin Decl. Ex. 3 at 1.) Judge

22   Garrow explained that "[t]he purpose of an inquest is to serve as a fact-finding hearing, to

23   attempt to determine what events happened to cause" a person's death during an encounter with

24

1   law enforcement. (Id. at 17-18.) She explained that "[a]n inquest is not a trial to determine

2   whether someone is guilty of a crime, nor is it an indictment process to determine whether

3   someone should be charged with a crime." (Id. at 18.) "The function of an inquest is simply to

4   determine what happened, for the benefit of the persons involved and the public." (Id.) The King

5   County Prosecutor served as a neutral and asked questions, while lawyers for Miller, Spaulding,

6   and Taylor's family were only allowed to cross-examine witnesses. (Id. at 19.) The Court

7   disallowed any evidence or testimony related to SPD "tactics, policies, and practices." (Id. at 39.)

8         Represented by counsel, Miller and Spaulding provided testimony under oath to

9   questions posed by the Prosecuting Attorney. (Iglitzin Decl. Ex. 3 at 6, 19, 988, 1229.) Eight

10  jurors heard the testimony and answered fifty-five different interrogatories on a "more likely

11  than not" basis. (Id. at 1610, 1619.) The jury provided its answers to the final interrogatories on

12  February 10, 2017. (Iglitzin Decl. Ex. 15.)

13        In response to the interrogatories, six of the jurors believed that Miller saw a handgun on

14  Taylor's right hip approximately 30 minutes before the shooting. (Iglitzin Decl. Ex. 15 at 3.)

15  Although all eight jurors found that Spaulding did not see the gun, they agreed that Miller told

16  him Taylor was carrying a holstered handgun on his right hip. (Id.) The jurors answered

17  unanimously that Miller and Spaulding ordered Taylor to "show his hands" and "get on the

18  ground" and that Taylor complied with these commands. (Id. at 7–8.) Six of the jurors believed

19  that Spaulding saw Taylor move his right hand to his right hip area while he was on the ground

20  during the arrest. (Id. at 9.) All eight jurors agreed that Spaulding believed Taylor was drawing a

21  handgun. (Id.) Seven of eight jurors found that Spaulding had reason to believe Taylor posed a

22  threat of death or serious bodily injury when he shot Taylor, while only six of eight jurors

23

24

1   believed Miller thought Taylor posed a threat of death or serious bodily injury when he shot

2   Taylor (Id. at 9-10.)

3     In March 2017, after the inquest concluded, King County Prosecuting Attorney Dan

4   Satterberg declined to file criminal charges against Miller or Spaulding. (Iglitzin Decl. Ex. 17.)

5   At the time of Satterberg's decision, Washington law required prosecutors to prove beyond a

6   reasonable doubt that police acted with "malice" to be guilty of criminal homicide. RCW

7   9A.16.040(3) (2016). Satterberg stated that there was "insufficient evidence to overcome this

8   complete defense"—that Miller and Spaulding had not acted with malice. (Iglitzin Decl. Ex. 17.)

9   **D.**  **Sawant's Second Remarks**

10     Sawant made her second statements on June 20, 2017 at a rally organized by Che

11   Taylor's brother "to protest the recent police killing of Charleena Lyles." (Sawant Decl. ¶ 12.)

12   Two days earlier, SPD officers shot and killed Lyles, a pregnant Black woman and mother of

13   four, in her home and in front of her children. (Iglitzin Decl. Ex. 24 (The Guardian Article dated

14   June 19, 2017).) The rally was attended by hundreds outside of the apartment building where

15   Lyles was shot and killed. (Iglitzin Decl. Ex. 25 (Seattle P-I Article dated June 20, 2017.)

16   Notably, the attorney who represented Taylor's family at the inquest, called the shooting of Lyles

17   a murder and led the audience in the following refrain: "Murder is murder is murder is murder is

18   murder is murder is murder." (Id.)

19     At the rally, Sawant stated in relevant part:

20   I join the NAACP in demanding such a transparent public hearing. When Che Taylor was
murdered by the police, the community and I demanded such a hearing from the Mayor
21   and from Council member Gonzalez whose committee oversees the SPD, but neither the
Mayor nor Council member Gonzalez responded. In . . . in light of the horrific killing of
22   Charleena now I again urge . . . I publicly urge the City Council to hold such a hearing. I
have also earlier today sent a number of important questions to the SPD.

23

24

. . . We demand that the City of Seattle appoint an independent committee to review this case . . . with . . . with full public accountability. We cannot rely on the existing process to determine why Charleena was killed because that process has failed Che Taylor. . . that process has failed every person who was killed at the hands of the Police. Sisters and brothers, I will add one more thing for our movement that is standing with Charleena to think about, a deeply unequal society such as ours also implies that the lives of poor and low-income people, black and brown people, homeless people, those who have mental health issues and challenges . . . the system treats our lives as expendable.

(Iglitzin Decl. Ex. 26.)

**E.      Plaintiffs' Damages**

Plaintiffs allege that Sawant's remarks caused them to endure a variety of damages. Miller declares that "[a]fter she [Sawant] called me a murderer and a racist, my life was turned upside down." (Declaration of Scott Miller at ¶ 2 (Dkt. No. 126).) Miller avers that his "children attended school in the Seattle School District and we were forced to move to a different county in order to avoid being publicly berated and chastised as that started after her [Sawant's] public lies about me and my friend and colleague Michael Spaulding." (Id.) Miller also claims based on hearsay that SPD Chief O'Toole had told him that he and Spaulding "were scheduled to receive two awards," but that after "Sawant's statements calling us murderers . . . we were told we would need to wait until the political climate was diffused." (Id. ¶ 3.) The two officers "never received these awards, despite being told we were going to receive them, which has hurt our careers." (Id.)

Spaulding avers that "[b]eing called a racist and a murderer by Kshama Sawant as she did publicly on more than one occasion directly and negatively impacted many aspects of my life." (Declaration of Michael Spaulding ¶ 2 (Dkt. No. 127).) Spaulding claims that Sawant "started a rhetoric (a false one) that was horrible to endure." (Id.) He states that "threats were made on social media" and he "was screamed at on the street, and once even on my property" when "[s]omeone came onto [his] property and drove on the grass and yelled at me, having something

to do with the Che Taylor incident." (Id. ¶ 3.) This was "very scary" and he "had security

cameras installed at [his] home." (Id.) His parents also installed a security system "because of the

threats and the hostile environment," though he does not identify any threats to his parents. (Id.)

ANALYSIS

**A.     Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

an issue of fact exists, the Court must view all evidence in the light most favorable to the

nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is

sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The

moving party bears the initial burden of showing that there is no evidence which supports an

element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Once the movant has met this burden, the nonmoving party then must show that there is a

genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

matter of law." Celotex, 477 U.S. at 323-24.

**B.     Defamation Claim Elements**

"A defamation action consists of four elements: (1) a false statement, (2) publication, (3)

fault, and (4) damages." Duc Tan v. Le, 177 Wn.2d 649, 662 (2013). The plaintiff has the burden

of proving that the communication was made of and concerning him or her. Sims v. KIRO,

Inc., 20 Wn. App. 229, 233 (1978), cert. denied, 441 U.S. 945 (1979). And the plaintiff must also

1   show that the defendant acted with actual malice. "Actual malice must be shown in cases

2   involving both public figures and public officials." <u>Tan</u>, 177 Wn.2d at 662 (citing <u>Curtis Publ'g</u>

3   <u>Co. v. Butts</u>, 388 U.S. 130, 155 (1967) (plurality opinion)). Given that Plaintiffs and Defendant

4   here are indisputably public figures, "the plaintiff must prove 'actual malice'—that is,

5   knowledge of falsity or reckless disregard of the truth or falsity—to recover." <u>Caruso v. Loc.</u>

6   <u>Union No. 690 of Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.</u>, 100

7   Wn.2d 343, 352 (1983) (quoting <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 342 (1974); citing

8   <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279–80 (1964)).

9         Under Washington law, "a defamation plaintiff resisting a defense motion for summary

10   judgment by a media defendant must establish a prima facie case as to each element of

11   defamation, i.e., falsity, an unprivileged communication, fault, and damages, by evidence of

12   convincing clarity." <u>Camer v. Seattle Post-Intelligencer</u>, 45 Wn. App. 29, 36 (1986) (citing <u>Mark</u>

13   <u>v. Seattle Times</u>, 96 Wn.2d 473, 486-87 (1981)). This standard would apply given that Sawant

14   and Plaintiffs are public figures. But the Ninth Circuit has instructed the Court to apply only

15   Rule 56 in resolving the summary judgment motion. <u>See</u> <u>Miller v. Sawant</u>, 18 F.4th 328, 337

16   n.10 (9th Cir. 2021) (stating that "a federal court must apply Federal Rule of Civil Procedure 56,

17   rather than a state's heightened summary judgment standard, to claims arising under state law")

18   (citation omitted). In resolving the Motion, the Court applies only Rule 56, and not a "convincing

19   clarity" standard.

20   **C.      Defamation Claims Fall Short**

21         The Court finds at least three fatal defects in Plaintiffs' defamation claims. First,

22   Sawant's statements are inactionable statements of opinion. Second, even if her statements were

23

24

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 11

actionable factual statements, Plaintiffs have not shown them to be false. Third, there is inadequate evidence of actual malice.

The Court reviews whether: (1) Sawant's statements are per se defamatory; (2) Sawant's statements are actionable false statements or inactionable opinions; (3) Sawant's statements, if factual, are false; (4) Plaintiffs have provided sufficient facts that Sawant acted with actual malice; (5) Plaintiffs have identified adequate evidence of harm; (6) whether the statements were "of and concerning" Plaintiffs; (7) Sawant's statements are privileged; and (8) Sawant's statements receive heightened protection under the Washington Constitution.

### 1.   Sawant's Statements Were Per Se Defamatory

Plaintiffs argue that Sawant made per se defamatory statements and that therefore this action must proceed to trial. (Pls. Opp. at 11-12.) While the Court agrees that Sawant's remarks are per se defamatory, this only alleviates Plaintiffs' burden to prove special damages. Plaintiffs must otherwise prove all other elements of their claims.

"Not 'every misstatement of fact, however insignificant, is actionable as defamation.'" Sisley v. Seattle Pub. Sch., 180 Wn. App. 83, 87 (2014) (quoting Mark, 96 Wn.2d at 493). As a gateway matter for any defamation claim, the plaintiff must show that "'the substance of the statement makes substantial danger to reputation apparent.'" Id. (quoting Mark, 96 Wn.2d at 493). A plaintiff may satisfy this specific burden by showing that the statement is per se defamatory. See Caruso, 100 Wn.2d at 353). A statement can be "defamatory per se (actionable without proof of special damages) if it '(1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office.'" Life Designs Ranch, Inc. v. Sommer, 191 Wn. App. 320, 328 (2015) (quoting Caruso, 100 Wn.2d at 353). "The imputation of a criminal offense

involving moral turpitude has been held to be clearly libelous per se." <u>Caruso</u>, 100 Wn.2d at 353
(citing <u>Ward v. Painters' Local 300</u>, 41 Wn.2d 859 (1953)). But even if the statement is per se
defamatory, the plaintiff must still satisfy all other elements of the claim, except proof of special
damages. <u>See</u> <u>Maison de France, Ltd. v. Mais Oui!, Inc.</u>, 126 Wn. App. 34, 45 (2005). And
"[t]ruth is an absolute defense to a per se defamatory statement." <u>Id.</u> (citing <u>Ward</u>, 41 Wn.2d at
863). "Whether a given communication constitutes defamation per se may be either a question of
law or a question of fact." <u>Id.</u> at 43. "In all but extreme cases the jury should determine whether
the article was libelous per se." <u>Caruso</u>, 100 Wn.2d at 354.

Here, the Court finds that Sawant's use of the term "murderer" renders her statements per
se defamatory because they impute a criminal offense involving moral turpitude. <u>See</u> <u>Caruso</u>,
100 Wn.2d at 353 ("The imputation of a criminal offense involving moral turpitude has been
held to be clearly libelous per se."). Plaintiffs have satisfied their burden to show that the
statements are defamatory—that they had the capacity to damage Plaintiffs' reputations—and
they are entitled to a presumption of special damages. <u>See</u> <u>Maison de France</u>, 126 Wn. App. at
45. But Plaintiffs must still prove that Sawant's statements were actionable, false statements, that
Sawant acted with actual malice, and that the statements were "of and concerning" them. That is
because a per se defamatory statement only relieves the plaintiff of the burden of proving the
statement had the capacity to damage their reputation and special damages. <u>See</u> <u>id.</u> at 44-45, 47;
<u>Sisley</u>, 180 Wn. App. at 91 (noting that a per se defamatory statement failed to be actionable
because it was not shown to be false or anything other than an opinion).

### 2.      Sawant's Statements Constitute Inactionable Opinions

"Before the truth or falsity of an allegedly defamatory statement can be assessed, a
plaintiff must prove that the words constituted a statement of fact, not an opinion." <u>Robel v.</u>

1    Roundup Corp., 148 Wn.2d 35, 55 (2002). "Rhetorical hyperbole and statements that cannot

2    reasonably be interpreted as stating actual facts are protected under the First Amendment." Tan,

3    177 Wn.2d at 662 (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990)). "Whether the

4    allegedly defamatory words were intended as a statement of fact or an expression of opinion is a

5    threshold question of law for the court." Robel, 148 Wn.2d at 55 (citation omitted).

6        Under Washington law, the court "examin[es] a statement in the totality of the

7    circumstances in which it was made . . . to determine whether a statement should be

8    characterized as nonactionable opinion." Dunlap v. Wayne, 105 Wn.2d 529, 539 (1986). "To

9    determine whether a statement is nonactionable, a court should consider at least (1) the medium

10   and context in which the statement was published, (2) the audience to whom it was published,

11   and (3) whether the statement implies undisclosed facts." Id. (regarding as an inactionable

12   opinion, counsel's statement to plaintiff's employer that plaintiff had been soliciting a kickback);

13   see Robel, 148 Wn.2d at 56 (applying Dunlap test to a claim of defamation).

14           a.       **First Dunlap Factor**

15       Examining the first Dunlap factor, the Court concludes that Sawant's remarks were

16   opinions.

17       The first Dunlap factor focuses on "the nature of the medium" because it "can affect

18   whether a statement is received as 'fact' or 'opinion': statements of opinion are expected to be

19   found more often in certain contexts, such as editorial pages or political debates." Dunlap, 105

20   Wn.2d at 539. "The court should consider the entire communication and note whether the

21   speaker qualified the defamatory statement with cautionary 'terms of apparency.'" Id. Terms of

22   apparency include stating "In my opinion," for example.

23       Sawant has provided undisputed evidence that she made her comments at rallies and

24   protests organized in response to police shootings of people of color which invited political

1   opinion and criticism of police-involved-shootings. Sawant made her first statements four days

2   after Taylor's death in February 2016 outside of SPD headquarters across the street from City

3   Hall. (Sawant Dep. at 52-3.) Sawant described it as "a rally outside city hall on the issue of Che

4   Taylor and the overall issues of the police department in relation to communities of color."

5   (Sawant Dep. at 51.) According to Sawant, "[m]any people who were present and several

6   speakers described Che Taylor's death as a 'murder,'" including the President of the Seattle King

7   County NAACP. (Sawant Decl. ¶¶ 8-9.) Sawant made her second statements on June 20, 2017 at

8   a rally organized by Che Taylor's brother "to protest the recent police killing of Charleena

9   Lyles." (Id. ¶ 12.) The rally was attended by hundreds outside of the apartment building where

10  Lyles was shot and killed by two SPD officers two days earlier. (Iglitzin Decl. Ex. 25.) Notably,

11  the attorney representing Taylor's family at the inquest called the shooting of Lyles a murder and

12  led the audience in the following refrain: "Murder is murder is murder is murder is murder is

13  murder is murder." (Id.) The Court notes that Plaintiffs offer no contrary evidence or evidence to

14  help explain the context.

15      Considering the first Dunlap factor, the Court finds that both rallies were events that

16  invited exaggeration, hyperbole, and rhetoric critical of the police given the temporal proximity

17  to both Taylor's and Lyles's death and nature and purpose of the rallies. The protests were not

18  press briefings or official City Council meetings. Both events brought protestors together in a

19  context not unlike a workplace gathering that the Washington Supreme Court similarly found to

20  be a place "that invited exaggeration and personal opinion." Robel, 148 Wn.2d at 56 (finding that

21  name-calling during a workplace meeting involving coworkers and superiors was a context

22  which "invited exaggeration and personal opinion"). Indeed, other speakers referred to Taylor's

23  death as a murder, and Sawant's statement echoed theirs. The protests also invited "political

24

debate," which the Washington Supreme Court suggests invites opinion, not factual statements. <u>Dunlap</u>, 105 Wn.2d at 539. And Plaintiffs have offered no contrary evidence. This factor supports Sawant's position that her comments reflect opinions, not facts.

Plaintiffs' response focuses instead on the fact Sawant did not use any terms of apparency to preface her remarks. It is true that Sawant did not expressly identify her remarks as being her opinion, and the Court construes this fact in Plaintiffs' favor. But the Court is not persuaded that this outweighs the substantial evidence suggesting that the context in which Sawant spoke invited opinion statements. When Sawant spoke, she addressed crowds who were protesting and engaging in political rhetoric where terms of apparency were unnecessary. <u>See Robel</u>, 148 Wn.2d at 56 (holding that the unqualified use of the words "snitch, squealer, and liar" were nonactionable opinion because the oral statements were made to others who were "interested in discrediting" or ostracizing the plaintiff). And when she spoke the first time, Sawant qualified her remarks as being those of an elected city councilmember and as a "brown person, as an immigrant woman of color, and as someone who has been in solidarity with the Black Lives Matter movement, and our movement for racial, economic, and social justice." (Dkt. No. 120 at Ex. 12.) This introduction suggests that she was providing her opinion based on her personal experience and not reporting facts.

Plaintiffs also argue because Sawant made her first remarks outside of City Hall, she was making factual statements. Divorced from the overall context, the proximity to City Hall might suggest that Sawant was speaking at what might have been a press briefing or an event that invited the audience to expect a factual report. But the undisputed evidence shows that she was instead appearing at a protest during which the speakers directed their ire at SPD in stark terms. So the fact that City Hall was nearby does little to alter the Court's contextual analysis.

1    The Court finds that the overall context of both rallies invited hyperbole and opinion. The

2    undisputed evidence shows that the events were political in nature and organized in support of

3    racial and social justice in the immediate wake of two different police shootings of persons of

4    color. Sawant and others who spoke referred to the shooting as a murder, a point which

5    reinforces the exaggerated and political nature of the rallies. Although the Court notes the lack of

6    express terms of apparency, it finds that this fact does not alter the overall contextual analysis.

7    And although Plaintiffs suggest that the jury should decide the overall context and the question

8    of whether Sawant's remarks were opinions, their argument fails to track Washington law. (Pls.

9    Opp. at 14-15.) "Whether the allegedly defamatory words were intended as a statement of fact or

10   an expression of opinion is a threshold question of law for the court." <u>Robel</u>, 148 Wn.2d at 55

11   (citation omitted). As such, it is within the Court's purview to resolve this threshold question

12   based on the factual record before it, construing the evidence in the light most favorable to

13   Plaintiffs. Having done so, the Court finds that this <u>Dunlap</u> factor favors finding Sawant's

14   statements were opinions.

   **b. Second <u>Dunlap</u> Factor**

15

16   The second <u>Dunlap</u> factor—the nature of the audience at both rallies—favors finding that

17   Sawant provided statements of opinion, not fact.

18   Within the second <u>Dunlap</u> factor the "court should . . . consider whether the audience

19   expected the speaker to use exaggeration, rhetoric, or hyperbole." <u>Dunlap</u>, 105 Wn.2d at 539.

20   The Washington Supreme Court has suggested that "in the context of ongoing public debates, the

21   audience is prepared for mischaracterizations and exaggerations, and is likely to view such

22   representations with an awareness of the subjective biases of the speaker." <u>Id.</u> (citation and

23   quotation omitted).

24

Both rallies were attended by people sympathetic to the shooting victims—Taylor and Lyles—and they were organized to protest police treatment of people of color. The undisputed evidence suggests that the audiences were drawn to the events to hear opinions, express anger, and show solidarity for the victims of the police shootings. (Sawant Decl. ¶¶ 7-9; Iglitzin Decl. Exs. 10, 24, 25.) As part of these politically-charged rallies where many called Taylor's death a murder, the audience would have "expected the speaker to use exaggeration, rhetoric, or hyperbole." Dunlap, 105 Wn.2d at 539. This is evidenced in Taylor's family's attorney to lead the second rally goers in a chant of: "Murder is murder is murder is murder is murder is murder." (Iglitzin Decl. Ex. 25.)

Curiously, Plaintiffs fault Sawant for not having polled audience members to see if they thought she was providing her opinions or facts. (See Pls. Opp. at 14.) But it is Plaintiffs' burden to "prove that the words constituted a statement of fact, not an opinion." Robel, 148 Wn.2d at 55. And Plaintiffs have offered no evidence that might contradict the evidence Sawant has provided showing that the audience members were participating in political criticism of police shootings and would have expected the use of exaggeration, hyperbole and rhetoric. Nothing in the record suggests that the audience at the rallies would have believed Sawant was providing factual statements. This factor clearly favors Sawant.

### c.    Third Dunlap Factor

Plaintiffs offer no evidence to support the third and "most crucial" Dunlap factor—that Sawant's calling Plaintiffs murderers was supported by undisclosed facts. See Dunlap, 105 Wn.2d at 539-40.

"The third and perhaps most crucial factor to consider is whether the statement of opinion implies that undisclosed facts support it." Dunlap, 105 Wn.2d at 539-40. The Washington Supreme Court adopted the reasoning of the Restatement (Second) of Torts, which "specifically

1    defines an opinion as actionable only if it 'implies the allegation of undisclosed defamatory

2    facts.'" Id. a 540 (quoting Restatement (Second) of Torts § 566). The Restatement explains that:

3           A simple expression of opinion based on disclosed or assumed nondefamatory facts is not
            itself sufficient for an action of defamation, no matter how unjustified and unreasonable
4           the opinion may be or how derogatory it is. But an expression of opinion that is not based
            on disclosed or assumed facts and therefore implies that there are undisclosed facts on
5           which the opinion is based, is treated differently.

6    Restatement (Second) of Torts § 566, comment c. In other words, "[a]rguments for actionability

7    disappear when the audience members know the facts underlying an assertion and can judge the

8    truthfulness of the allegedly defamatory statement themselves." Dunlap, 105 Wn.2d at 540.

9           Plaintiffs argue that Sawant's "statements imply the existence of undisclosed facts," by

10   not identifying the source of "information she based her statements on (e.g., by watching the

11   dashboard video)." (Pls. Opp. at 15-16.) But Plaintiffs fail to articulate what part of either of her

12   statements implies that Sawant was basing her comments on undisclosed, superior knowledge of

13   the incident. This is fatal to their contention and leaves the Court to guess. When Sawant made

14   her first statements, it is possible that some members of the protest could have believed that

15   Sawant knew more than was publicly known given the recency of the events and her position on

16   the City Council. But at the time Sawant spoke, the public already knew the police had shot

17   Taylor and they had access to the SPD video of Taylor's shooting death. (See Iglitzin Decl. Exs.

18   10, 11.) In this context, Plaintiffs' "[a]rguments for actionability disappear" because "the

19   audience members know the facts underlying an assertion and can judge the truthfulness of the

20   allegedly defamatory statement themselves." Dunlap, 105 Wn.2d at 540. And the Court finds

21   nothing specific in Sawant's remarks that imply she knew more about whether the shooting was

22   justified. See RCW 9A.16.040(3) (2016). And when Sawant made her second statements, the

23   results of the inquest and SPD reviews were public, which allowed the public even more

24

1   information to make its own determinations about Sawant's remarks were truthful. See Dunlap,

2   105 Wn.2d at 540.

3       As an aside, Sawant confirmed in her deposition that she had no inside information about

4   the shooting when she made either set of her comments. (See Sawant Dep 110-13.) This

5   buttresses her assertion that she was making her opinion known based on the same facts

6   available to the public. See Dunlap, 105 Wn.2d at 540. The Court does not rely on this fact,

7   though, because the relevant inquiry is what her statements implied to the audience, not what

8   Sawant knew. See id.

9       Plaintiffs also argue that Sawant did not "state what information she specifically did not

10  have (i.e., that no charges had been filed against Plaintiffs—although even if charges had been

11  filed, that still would not provide her latitude to call Plaintiffs murderers)." (Pls. Opp. at 15-16.)

12  Plaintiffs fail to identify what part of her statements imply that Sawant was supporting her

13  comments with undisclosed facts about whether charges had been filed or not. And this argument

14  fails to track the law. The relevant question is whether Sawant supported her statements with

15  undisclosed facts, not whether she failed to disclose countervailing facts. See Dunlap, 105 Wn.2d

16  at 539-40. Sawant's first statements demanded accountability from SPD and "justice on the

17  individual actions" of the officers. But this did not imply undisclosed facts about whether

18  charges would or would not be brought. And when Sawant made her second statements, the

19  results of the inquest and the King County Prosecutor's decision not to charge Plaintiffs had been

20  made publicly available. At that point, the audience members had access to the same facts and

21  could have judged the truthfulness of Sawant's remarks. See Dunlap, 105 Wn.2d at 540.

22      The Court finds that Plaintiffs have failed to identify any evidence that Sawant supported

23  either statement with undisclosed facts.

24

### d.    Summary

The Court finds that Sawant's remarks constitute inactionable opinions. The first and second Dunlap factors strongly favor concluding that Sawant was making politically-charged statements of personal opinion in the context of political rallies that invited exaggeration and hyperbole. See Robel, 148 Wn.2d at 56; Dunlap, 105 Wn.2d at 539. Aside from the lack of express terms of apparency, Plaintiffs point to no evidence that might support their position as to these two Dunlap factors. And construing the missing terms of apparency in Plaintiffs' favor does little to alter the context and what the audience—who self selected to join the protests where Taylor's death was described by several speakers as a murder—would have expected. The Court also finds that final Dunlap factor favors Sawant. Plaintiffs have failed to identify what portions of Sawant's remarks imply any undisclosed facts. And, even if they did, the Court finds it undisputed that the audience and public had access to sufficient information to gauge the truthfulness of Sawant's statements. See Dunlap, 105 Wn.2d at 540. As the Washington Supreme Court has explained, "the context and audience often ensure that any implicit facts will be perceived as 'merely a characterization of those facts.'" Robel, 148 Wn.2d at 57 (quoting Ollman v. Evans, 750 F.2d 970, 985 (D.C. Cir. 1984)). Considering both statements in their full context and in light of the Dunlap factors, the Court finds that Sawant's remarks were opinions, not facts. On this basis, the Court GRANTS the Motion for Summary Judgment.

### e.    Plaintiffs Misrepresent the Record in their Opposition

The Court separately notes that Plaintiffs grossly misrepresent the record in asserting that Sawant has admitted her statements were factual, and not opinions. Plaintiffs write:

> As an initial matter, during her deposition, Defendant Sawant admitted that the public statements calling Plaintiffs "murderers" was a fact. See e.g., Brown Decl., Ex. A (Sawant Transcript, 76: 20-22) ("It's also a fact. It's very clear to everybody. It's not just my opinion. It's also a fact.").

The quoted portion of the deposition transcript is taken entirely out of context. Sawant made no concession. In full, the deposition testimony is as follows (with the quoted portion underlined):

> [Q] My next question is, you are saying that everybody who listens to a politician would understand what is opinion and what is fact. Is that what you are saying?
>
> A. I'm saying that within any reasonable understanding, you know, it's hard to answer your question, because you are putting it in a such a blanket way. But if you were to talk about general things, I think that, for example, in this case, when I said "murder," I believe that everybody understands -- and I can say this -- I don't understand how anybody would think that I was speaking as if a judge would be speaking, where they're actually delivering a legal, you know, legal verdict.
>
> This is -- everybody knows I'm not a lawyer, and everybody knows I was there at the rally as an elected representative when I was expressing my opinion, and that it is not being spoken in a legal framework as a judge. I mean, you know, but it's slightly different than if I were to say, Today is Thursday. Today is Thursday. <u>It's also a fact. It's very clear to everybody. It's not just my opinion. It's also a fact.</u>
>
> But I think reasonable people have the ability to understand that when it is something like this, that this is not being said from a legal -- when Kshama Sawant, the city council member, said this was a brutal murder of Che Taylor, reasonable people, as far as I know, everybody would understand that this is your opinion. Whether you share that opinion or not is a different story.

(Sawant Dep. at 75-77 (emphasis added).) This makes clear that Sawant was merely stating that whether a day of the week is a Thursday is a fact, not that her statements were facts. Plaintiffs briefing misrepresents the record on this point. This type of misrepresentation misleads the Court and undermines the credibility of counsel's work.

### 3.     Falsity of the Statements

Even if the Court construes Sawant's comments as factual, Plaintiffs have failed to raise a genuine dispute of fact as to whether they are false.

1    "With respect to falsity, Washington does not require a defamation defendant to 'prove

2    the literal truth of every claimed defamatory statement.'" Mohr v. Grant, 153 Wn.2d 812, 825

3    (2005) (quoting Mark, 96 Wn.2d at 494). "A defendant need only show that the statement is

4    substantially true or that the gist of the story, the portion that carries the 'sting', is true." Id.

5    (quoting Mark, 96 Wn.2d at 494). "The 'sting' of a report is defined as the gist or substance of a

6    report when considered as a whole." Id. (citation and quotation omitted). "In applying this test,

7    we require plaintiffs to show that the false statements caused harm distinct from the harm caused

8    by the true portions of a communication." Id. "Stated another way, [w]here a report contains a

9    mixture of true and false statements, a false statement (or statements) affects the 'sting' of a

10   report only when 'significantly greater opprobrium' results from the report containing the

11   falsehood than would result from the report without the falsehood." Id. at 826 (citation omitted).

12   It is for the Court to determine the "gist" of a report. Id.

13       Plaintiffs argue that Sawant's statements are false because they accuse them of

14   committing a crime for which they have never been charged or convicted. (Pls. Opp. at 16.) It

15   remains true that Plaintiffs were never charged or found guilty of murder. But this fact does not

16   prove the falsity of Sawant's statements. First, Sawant never stated that the officers had been

17   charged or convicted of murder. Second, to the extent that Sawant accused Plaintiffs of engaging

18   in conduct that could technically constitute murder, there are no facts proving this to be false.

19   Plaintiffs misstate the record in arguing that they were cleared of any wrongdoing:

20       The King County prosecutor convened an inquest to determine whether charges should
         be brought for the shooting. After the inquest took place, an impartial jury cleared the
21       Plaintiffs of any wrongdoing. No charges were ever brought against the Plaintiffs, and
         certainly no conviction has ever occurred.
22

23   (Pls. Opp. at 16.) The inquest was not convened to determine criminal liability or to determine

24   whether the officers could or would be charged for any criminal conduct. See Conducting

1    Inquests in King County, King County Exec. Order No. PHL 7-1-1 (Mar. 16, 2010). As the judge

2    who presided over the inquest explained: "An inquest is not a trial to determine whether

3    someone is guilty of a crime, nor is it an indictment process to determine whether someone

4    should be charged with a crime." (Iglitzin Decl. Ex. 3 at 18.) And the inquest jury's response to

5    the interrogatories did not answer the question of whether the shooting was intentional or

6    justified. In fact, their response to the final interrogatories were mixed on certain questions that

7    might be construed to relate to criminal liability. For example, all eight jurors found that Taylor

8    complied with police commands and that no gun or holster was found on Taylor's body after he

9    was shot. (Iglitzin Decl. Ex. 15 at 8, 10-11.) Seven of eight jurors found that Spaulding had

10   reason to believe Taylor posed a threat of death or serious bodily injury when he shot Taylor,

11   while only six of eight believed Miller thought Taylor posed a threat of death or serious bodily

12   injury when he shot Taylor. (Id. at 9-10.) This evidence cannot be construed to prove the falsity

13   of Sawant's statements.

14        Plaintiffs also misstate the record in arguing that the FIT, FRB, and SPD "cleared them of

15   any wrongdoing." (Pls. Opp. at 16-17.) First, they cite to no evidence in the record in making

16   these assertions. (See Pls. Opp. at 5, 16-17.) This is a clear failure of proof. Second, based on

17   evidence Sawant has provided, the FIT and FRB merely concluded that Plaintiffs had acted

18   within SPD policy. (See Iglitzin Decl. Ex. 13.) That is not preclusive of the possibility that they

19   could have been charged and/or found guilty of murder—i.e., that they acted with malice. See

20   RCW 9A.16.040(3) (2016). As such, these investigations do not show proof of falsity.

21        On the record before the Court, it finds the lack of sufficient evidence that the statements

22   are false and the Court GRANTS the Motion for Summary Judgment on this independent

23   ground.

24

#### 4.     No Evidence of Actual Malice

Plaintiffs fail to provide evidence of actual malice, which constitutes an alternative

reason their defamation claims fail.

Under Washington law, Plaintiffs "must prove with clear and convincing evidence that

the defendant made the statements with 'actual malice.'" <u>Tan</u>, 177 Wn.2d at 668. Actual malice

"is, knowledge of falsity or reckless disregard of the truth or falsity." <u>Caruso</u>, 100 Wn.2d at 352

(citation and quotation omitted). "Actual malice can, however, be inferred from circumstantial

evidence, including a defendant's hostility or spite, knowledge that a source of information about

a plaintiff is hostile, and failure to properly investigate an allegation." <u>Tan</u>, 177 Wn.2d at 669.

"These factors in isolation are generally insufficient to establish actual malice; they must

cumulatively amount to clear and convincing evidence of malice to sustain a verdict in favor of a

plaintiff." <u>Id.</u> "The question whether the evidence in the record in a defamation case is sufficient

to support a finding of actual malice is a question of law." <u>Id.</u> at 668–69 (citing <u>Bose Corp. v.</u>

<u>Consumers Union of U.S., Inc.</u>, 466 U.S. 485, 510–11 (1984)). The Court notes, however, that it

has not applied the "clear and convincing" standard as to this element of the claim, given the

Ninth Circuit's direction. <u>See</u> <u>Miller</u>, 18 F.4th at 337 n.10.[1]

Plaintiffs have failed to raise a genuine issue of material fact concerning actual malice.

As to the first statements, Plaintiffs assert that Sawant "did not investigate anything before she

spoke" and recklessly used her position as a councilmember to "pronounc[e] her verdict" that

Plaintiffs' committed murder. (Pls. Opp. at 21.) But Plaintiffs contradict that assertion by

admitting in the same paragraph that she did "watch a video." (<u>Id.</u>) There is insufficient evidence

---

[1] Even if the Court applied the "clear and convincing" standard, it would not change the outcome
of its decision.

1    of actual malice. As Plaintiffs concede, Sawant reviewed the video of the shooting and based her

2    statements on that video. (Id.) Sawant has also provided uncontroverted evidence that she also

3    read news reports and talked to constituents about the shooting before she spoke. (See Sawant

4    Decl. ¶ 6.) This was an investigation and there is no evidence that this review gave Sawant any

5    reason to believe her statements were false. And while she did not speak to the officers involved

6    or other members of the police before speaking, her "[f]ailure to investigate is not sufficient to

7    prove recklessness." Herron v. KING Broad. Co., 112 Wn.2d 762, 777, 776 P.2d 98 (1989) (but

8    noting that "when a reporter does in fact conduct an investigation and his investigation does not

9    support his false statement or brings to his attention facts which rebut the false statement, that is

10   evidence from which a jury can infer reckless disregard"). As Sawant articulated during her

11   deposition, she had no reason to believe she would learn anything useful from contacting SPD.

12   (Sawant Dep at 113-115, 118, 126-27.) There is no evidence that Sawant knew her statement was

13   false or in reckless disregard for the truth when she made her statements based on the video of

14   the shooting, news reports, and her discussions with constituents.

15       Plaintiffs also fail to identify what information Sawant would have learned from the

16   inquest or FIT/FRB/SPD investigations that would have made her second comments reckless or

17   knowingly false. Neither the inquest nor the city-level reviews determined conclusively whether

18   Plaintiffs' decision to shoot Taylor was justified. The results of this investigations did not render

19   Sawant's statements reckless or knowingly false.

20       Plaintiffs argue that "[a]t a minimum, the circumstantial evidence is something that needs

21   to go to the jury." (Pls. Opp. at 21.) While actual malice can be inferred from circumstantial

22   evidence, Tan, 177 Wn.2d at 669, Plaintiffs have failed to identify any evidence from which a

23   jury could find actual malice on Sawant's part. Applying Rule 56, the Court finds Plaintiffs have

24

1    failed to identify sufficient facts to allow the reasonable factfinder to find in their favor that

2    Sawant acted with actual malice. The Court GRANTS the Motion for Summary Judgment on

3    this alternative basis.

4        **5.      The Statements are "Of and Concerning" Plaintiffs**

5        Plaintiffs have provided sufficient evidence to a raise a dispute of fact as to whether

6    Sawant's statements were of and concerning them. Before Sawant made her first remarks, Miller

7    and Spaulding had been identified in the press as the officers involved. And Plaintiffs present the

8    declarations of five individuals who state that they understood Sawant to refer to Plaintiffs in her

9    remarks. These declarations are sufficient to raise a dispute of fact, as each declarant explains

10   their basis for finding the remarks concerned and referred to Plaintiffs.

11       Sawant asks the Court to strike all five declarations because they are from witnesses who

12   were not identified in Plaintiffs' initial disclosures. (Reply at 11.) Except as to one witness, the

13   Court disagrees with Sawant. According to Sawant's counsel, Plaintiffs have never served initial

14   disclosures. (Iglitzin Decl. ¶ 13 (Dkt. No. 102).) Technically, Sawant is correct that all of these

15   witnesses who support Plaintiffs' case-in-chief should have been disclosed pursuant to Fed. R.

16   Civ. P. 26(a). The failure to do so is grounds to strike the witnesses unless the failure to disclose

17   was "substantially justified or harmless." See Fed. R. Civ. P. 37(c)(1). This is where Sawant's

18   argument runs into trouble. All but one of these five witnesses was disclosed to Sawant when

19   Plaintiffs opposed the dismissal of their third amended complaint in August 2020. (See Dkt. Nos.

20   61-64.) So while the failure to identify them in initial disclosures deviated from the letter and

21   spirit of Rule 26(a), the result was harmless. The Court accepts the statements of these four

22   previously-disclosed witnesses. But the Court strikes the statements of Jared Keller, whose

23   August 2020 declaration was only filed with the opposition to summary judgment in 2023. (See

24

Declaration of Jared Keller (Dkt. No. 129).) The submission of this declaration with the

opposition to Sawant's Motion was untimely and Plaintiffs provide no grounds to find the failure

substantially justified or harmless given that the discovery period has already run and Sawant

had no notice of this declarant. The Court STRIKES this declaration.

### 6.     Evidence of Harm

Because the statements here constitute defamation per se, there is no requirement to

prove special damages. As such, the Court declines to grant summary judgment on this basis.

As an aside, the Court notes that Plaintiffs mispresent the record with regard to

Spaulding's claim of injury. Plaintiffs' Opposition states "Officer Spaulding had to install a

security system at his parents' home after they received numerous death threats." (Pls. Opp. at 6

(citing Spaulding Decl., ¶ 3).) But Spaulding's declaration only states that he received "threats"

on social media and was screamed at in public and "once even on [his] property." (Spaulding

Decl. ¶ 3.) He does not describe any incident involving death threats.

### 7.     Privilege

In her opening brief, Sawant argues that her statements are privileged because they fall

either within an absolute legislative privilege or the Washington Constitution's Speech and

Debate Clause. (Mot. at 20-21.) Sawant also argues that her statements enjoy an absolute

privilege because Washington recognizes a common law absolute privilege for citizen

complaints concerning policy conduct. (Id. at 22-23.) But Sawant has abandoned these

arguments in her reply. Given this posture and the fact that the defamation claim fails for three

independent reasons, the Court does not reach these issues.

1    **8.      Washington Constitution**

2    Sawant argues that the guarantee of free speech in Article I, Section 5 of the Washington

3    Constitution protects her from the defamation and outrage claims. This is a novel issue that the

4    Court does not reach given the failure of proof on at least three elements of Plaintiffs'

5    defamation claim.

6    **D.      Outrage Claim Fails as a Matter of Law**

7    Sawant seeks summary judgment on Plaintiffs' outrage claim on the theory that it is

8    dependent on the defamation claim. (Mot. at 29.) Plaintiffs do not address this argument and

9    provide no reason why it should survive. The Court GRANTS summary judgment on the outrage

10   claim given the absence of any disputed facts that might support it.

11   **E.      Expert Reports**

12   Both sides ask the Court to strike expert reports submitted by their opponent.

13   First, Plaintiffs ask the Court to exclude all opinions from Lisa Daugaard, Sawant's

14   expert. (Pls. Opp. at 7-11.) But in deciding the issues presented in the Motion, the Court has not

15   relied on Daugaard's opinions and DENIES the request to strike as MOOT.

16   Second, Sawant asks the Court to strike as untimely the expert reports of John A.

17   Hawkins, Plaintiffs' expert. The Court finds merit in this argument and GRANTS the request

18   because Plaintiffs failed to timely provide either of Hawkins' reports and the failure to do so was

19   neither justifiable nor harmless.

20   Plaintiffs failed to disclose either of Hawkins' reports in a timely fashion. Plaintiffs

21   provided Hawkins' opening report on November 18, 2022, roughly one month after the expert

22   disclosure deadline. (Dkt. No. 80.) And Plaintiffs served Hawkins' rebuttal report on January 17,

23   2023, which was well more than a month after Daugaard's report was served and over a month

24

1    after the close of discovery. (See id.; Iglitzin Decl. ¶ 30 (noting that Daugaard's declaration was

2    "submitted in this matter on October 16, 2022); Id. Ex. 29 at 10 (Daugaard's report dated

3    October 16, 2022).) Under Fed. R. Civ. P. 26(a)(2)(D)(ii), any rebuttal report was due by

4    November 15, 2022, making the service of the rebuttal report untimely.

5            The Court finds that the proper remedy here is exclusion. See Fed. R. Civ. P. 37(c)(1).

6    Although Plaintiffs claim to have provided Hawkins' original report to Sawant in 2017 when

7    they filed a state action, they did not identify Hawkins as a witness in this federal action until

8    well after the expert disclosure deadline. The earlier disclosure does not temper the sting of the

9    late disclosure in this action. By providing Hawkins' opening report after the expert deadline and

10   with only a few days left in discovery, Sawant had insufficient time to depose Hawkins—a

11   problem compounded by the fact Hawkins was out of the country and not available during the

12   remaining the discovery period. (See Iglitzin Decl. ¶¶ 5-8 (Dkt. No. 111).) The failure to timely

13   disclose Hawkins as an expert in this action was not excusable or justifiable. Nor was the failure

14   to timely provide his rebuttal report. Under Rule 37(c)(1), the proper remedy is exclusion. The

15   Court therefore STRIKES both reports and has not considered them.

16           Separately, the Court notes that Plaintiffs failed to invoke any of Hawkins' opinions to

17   support their arguments in opposition to raise a dispute of fact. True, Plaintiffs cite Hawkins'

18   reports in a section of Plaintiffs' brief entitled "Evidence Relied Upon," and they filed both

19   reports with the opposition. (See Pls. Opp. at 6.) But nowhere in the brief do Plaintiffs cite to,

20   invoke, or rely on Hawkins' statements and opinions to oppose summary judgment. As such, the

21   Court finds that Plaintiffs failed to properly invoke any of Hawkins' opinions to raise a dispute

22   of material fact on any issue.

23

24

**CONCLUSION**

In opposing summary judgment, Plaintiffs largely rely on fiery rhetoric, rather than admissible evidence that could create a genuine issue of material fact . (See, e.g., Pls. Opp. at 3 ("This case arises out of what may be the single most justified police shooting in the history of the state.").) Having considered the record before it, the Court finds that there are no genuine issues of material fact to support Plaintiffs' claims. Sawant's remarks, while impolitic and rash, were inactionable statements of opinion. Even if the Court construed them as factual, Plaintiffs have failed to point to any admissible evidence that might allow the factfinder to determine them to be false. And Plaintiffs similarly fail to provide any admissible evidence to support a finding that Sawant acted with actual malice. The Court therefore finds that Sawant is entitled to summary judgment on the defamation and outrage claims. The Court GRANTS Sawant's Motion for Summary Judgment and directs entry of judgment in her favor on the remaining claims. The Court also STRIKES the expert reports of John Hawkins and the declaration of Jared Keller. And the Court DENIES as MOOT the request to strike the expert report and opinions of Lisa Daugaard.

The clerk is ordered to provide copies of this order to all counsel.

Dated March 9, 2023.

Marsha J. Pechman
United States Senior District Judge